## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **(1) MALCOLM NIGEL SCOTT, and** ) | |
| **(2) DEMARCHOE CARPENTER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.: 17-CV-400-TCK-FHM** |
| ) | |
| **(1) CITY OF TULSA, OKLAHOMA,** ) | **ATTORNEY LIEN CLAIMED** |
| **(2) MIKE HUFF,** ) | **JURY TRIAL DEMANDED** |
| **(3) GARY MEEK,** ) | |
| **(4) RONALD PALMER,** ) | |
| **(5) RANDALL W. SOLOMON, and** ) | |
| **(6) JIM CLARK,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## THIRD AMENDED COMPLAINT

**COME NOW**, the Plaintiffs, Malcolm Nigel Scott ("Mr. Scott" or "Scott"), and

Demarchoe Carpenter ("Mr. Carpenter" or "Carpenter"), by and through their attorneys of

record, in the above styled case, and for their causes of action against the Defendants, allege

and state as follows:

### Introductory Statement

1. ***"Malcolm Scott and Demarchoe Carpenter are innocent."*** Those were

some of the final words of Michael Lee Wilson ("Wilson") immediately before he was put

to death by the State of Oklahoma on January 9, 2014.  Wilson had confessed to the

September 10, 1994 murder of a young woman named Karen Summers, a crime for which

Scott and Carpenter were wrongfully convicted.

2. By the time Wilson made his dying declaration, Mr. Scott and Mr. Carpenter

had spent nearly twenty (20) years in prison for a crime they did not commit.  And were it

not for flagrant and egregious violations of their Constitutional rights, this grave injustice would have been averted.

3.    After all of those hard, lost years behind bars came a measure of vindication. On May 13, 2016, Judge Sharon Holmes entered an order in the Tulsa County District Court granting Plaintiffs' Applications for Post-Conviction Relief, and finding merit in Plaintiffs' claims of actual innocence.

4.    On November 10, 2016, Judge Holmes' Order was affirmed by the Oklahoma Court of Criminal Appeals ("COCA"). The COCA provided an apt synopsis of the case as follows:

> The record supports Judge Holmes' conclusions. The ***State's case at trial was weak*** and the evidence and circumstances that have been developed and presented to the trial court at this hearing do nothing to strengthen the State's position.
>
> The firearm and vehicle used to facilitate this shooting were found in Wilson's possession. After saying he hid a gun for [Scott and Carpenter] and remaining silent during their prosecution, Wilson recanted and repeatedly took full responsibility. Wilson implicated [Richard] Harjo and [Billy] Alverson who both corroborated Wilson's version confirming they were in the car with Wilson who was the shooter. The evidence at this hearing was that [Rashun] Williams and [Kenneth] Price, the eyewitnesses at trial, originally stated they ***did not see who fired the shots and only adopted the law enforcement version of events identifying [Scott and Carpenter] based on <u>coercion</u> and fear of being prosecuted personally.*** Wilson took credit for these crimes when speaking with [his friend Danny] Ogans, both immediately following the event and again later in the county jail. Judge Holmes was presented with more than sufficient grounds to find [Scott and Carpenter] made a colorable showing they were ***factually innocent of the crime for which they were convicted.***

COCA Opinion (11-10-16) at 15-16 (emphasis added).

5.    Plaintiffs have now filed this lawsuit seeking justice for the unfathomable wrongs inflicted upon them. They hope to find and expose the full truth concerning their mistreatment. It is their sincere wish that not one other innocent person is ever again forced

to endure prolonged imprisonment, indignity, pain and humiliation for a crime he/she did not commit.

## Jurisdiction and Venue

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivation of rights secured by the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States.

8.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

9.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## Parties

10.     Plaintiff Malcolm Scott ("Mr. Scott") resides in Tulsa, Oklahoma. At the time he was convicted of Karen Summers' murder, Mr. Scott was just eighteen (18) years old.  He spent the next twenty (20) years in prison as a wrongfully convicted, innocent man.

11.     Plaintiff Demarchoe Carpenter ("Mr. Carpenter") resides in Tulsa, Oklahoma. At the time he was convicted of Karen Summers' murder, Mr. Carpenter was just eighteen (18) years old.  He spent the next twenty (20) years in prison as a wrongfully convicted, innocent man.

12. Defendant City of Tulsa ("City"), a municipal corporation and political subdivision of the State of Oklahoma, was, at all times pertinent hereto, the employer of the individual Defendants, Mike Huff, Gary Meek and Ronald Palmer. In addition, the City is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Tulsa Police Department ("TPD"), and the training, supervision and discipline of TPD employees.

13. Defendant Gary Meek ("Defendant Meek" or "Cpl. Meek") was, at all times relevant to this Complaint, a duly appointed and acting police detective with the TPD, holding the rank of Corporal, and acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tulsa and State of Oklahoma. Defendant Meek is sued in his individual capacity.

14. Defendant Mike Huff ("Defendant Huff" or "Sgt. Huff") was, at all times relevant to this Complaint, a duly appointed and acting police detective with the TPD, and acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tulsa and State of Oklahoma. Defendant Huff is sued in his individual capacity.

15. Defendant Ronald Palmer ("Defendant Palmer", "Chief Palmer" or "Former Chief Palmer") was, at all times relevant to this Complaint, the Chief of the Tulsa Police Department. Defendant Palmer was, at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing rules, regulations, policies, practices, procedures, and/or customs of the Tulsa Police Department, including the

policies, practices, procedures, and/or customs that violated the Plaintiffs' rights as set forth in this Complaint. He is sued in his individual capacity under a supervisory liability theory.

16.    Defendant Randall W. Solomon ("R.W. Solomon" or "Officer Solomon"), was, at all times relevant to this Complaint, a duly appointed and acting police officer with the TPD, and acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tulsa and State of Oklahoma. Officer Solomon is sued in his individual capacity.

17.    Defendant Jim Clark ("Clark" or "Sergeant Clark"), was, at all times relevant to this Complaint, a duly appointed and acting police officer, and supervisor, with the TPD, and acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tulsa and State of Oklahoma. Sergeant Clark is sued in his individual capacity.

## **Factual Allegations**

18.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

### **Preamble to the Shooting**

19.    On November 19, 1993, the Tulsa County Sheriff's Office ("TSCO") Gang Unit reports that a purported "gang fight" broke out at a high school basketball game. Alleged participants in this fight included Malcolm Scott on one side and Kenneth Price and Rashun Williams on the other.

20.    On September 7, 1994, Michael Lee Wilson (sometimes, hereinafter referred to as "Wilson"), a known member of the Bloods street gang, was sitting on a friend's front porch when several local members of the Hoover Crips street gang began yelling and throwing gang hand-signs at Wilson. One of the Crips then raised a pump-action shotgun and fired it at Wilson. Wilson rolled into the front door as the shooter emptied as many as six shells in his direction. Multiple pellets of buck shot struck Wilson in the right leg and one pellet struck him in the left knee. After being shot, Wilson told the reporting officer, Officer D.L. Philliber, that he was a former Blood and was hanging out in a Crip neighborhood when the shooting occurred.

21.    On September 7, 1994, Wilson rented a ***red/maroon Ford Taurus*** from Enterprise Rental Car. *See* DA2_0168.

22.    On September 9, 1994, at approximately 7:00 p.m., Mr. Scott and Mr. Carpenter were riding in an automobile in the vicinity of the Apache Manor Apartments in Tulsa.  Mr. Scott was driving and Mr. Carpenter was the passenger.  The automobile in question was a 1982 Oldsmobile Grand Prix, with a caramel brown paint job, peanut butter vinyl top and tinted windows.  A little after 7:00 p.m., Scott and Carpenter were pulled over by the Tulsa Police in the caramel brown Grand Prix.  Defendant Jim Clark ("Clark"), then a Sergeant with the Tulsa Police Department, was present at the scene.  Because Mr. Scott was driving without a license or insurance, he was given a ticket and the brown Grand Prix was impounded.

23.    After the caramel brown Grand Prix was impounded, Mr. Scott was taken into custody, questioned about an unrelated matter, and then released, at approximately 10:30 p.m. on September 9, to the custody of his aunt, Cozetta Tyson.

24.     Later, on September 10, after the shooting at issue, Defendant Clark *falsely* stated that when he encountered Scott and Carpenter on September 9, they were in a red Ford Escort, when in fact, they were in the caramel brown Oldsmobile Grand Prix.  Clark created this false story to bolster a trumped-up case against Mr. Scott and Mr. Carpenter.  Only *after* Clark heard reports that deadly shots were fired from a red or maroon Ford Escort, in the early morning hours of September 10, did he manufacture the narrative that he had witnessed Scott and Carpenter in a red Ford Escort on the evening of September 9.

25.     Defendant Clark's lie concerning the red or maroon Ford Escort was repeated in a Prosecution Report, which was endorsed by Defendant Gary Meek, with reckless indifference to the truth.  The false Prosecution Report was pointed to and relied upon as a basis for probable cause to hold Mr. Scott and Mr. Carpenter in custody for the murder of Ms. Summers.

26.     On September 9, 1994, it was announced through fliers and word of mouth that there would be a house party that night in the vicinity of 227 E 29th Street North in Tulsa.  *See* DA2_0170. It was known that members of the Crips would be hosting and attending this party.

27.     In the early morning hours of September 10, 1994, Wilson drove by the Crip party, and then picked up his friends, Richard Harjo ("Harjo") and Billy Alverson ("Alverson"), who were just two blocks away at Jennifer Harjo's house (Harjo's sister and Alverson's girlfriend and the mother of his child).  At the time, Wilson was carrying a loaded .380 Lorcin semiautomatic handgun.

28.     Upon arriving at the Harjo house, Wilson got in the back seat of the maroon Ford Taurus, and Alverson took over driving duties.

29.     *Neither Mr. Scott nor Mr. Carpenter was <u>ever</u> in the maroon Ford Taurus that night, nor at any other time.*

**The Shooting of September 10, 1994**

30.     At around 2:40 a.m. on September 10, 1994, Wilson instructed Alverson to drive by the house on 29 Street North where the "Crip" party was being thrown. As they drove by the house, Wilson pulled out his .380 Lorcin and fired several shots -- from the back seat of the maroon Ford Taurus -- into a crowd of people at the party.[1] Wilson fired these bullets in retaliation for his being shot by some Hoover Crips just a couple of days prior.  A young woman attending the party, nineteen-year-old Karen Summers, was fatally wounded. Two teenagers, and known members of the Hoover Crips, Alonzo Johnson and Kenneth Price, were also wounded.  Alverson quickly drove away from the scene.

**The Investigation**

31.     Tulsa Police officers, including Homicide Detective Defendant Gary Meek, Officer R.W. Solomon and Defendant Sgt. Jim Clark, subsequently arrived at the 29th Street North location to investigate.  Notably, police recovered three spent shell casings from a .380-caliber weapon in the street.  Later, Officers also took several witness statements.

**A.     The Interviews of Kenneth Price**

---

[1]     Evidentiary Hrg. Transcr. 166:1-169:20 (Jan. 29, 2016).

32.    Hours after the shooting, Kenneth Price first spoke with a police officer with short dark hair at the Tulsa Regional Medical Center ("TRMC"). *See* Price Aff. (2-3-14). Price was at TRMC getting treatment for his injuries.  It is now known that this officer was R.W. Solomon. Price told Solomon, in no uncertain terms, that he did not, and could not, see who was in the car or who fired the shots from the car.  Solomon began coercing Price to identify "Malcolm" and "Demarchoe" as the shooters.  Despite the coercive tactics, Price insisted that he didn't see anything.  Later, Officer Solomon drafted a highly misleading police report falsely suggesting that Price saw Mr. Carpenter and Mr. Scott in a red Ford Escort at the scene of the crime.

33.    The false information from Solomon concerning Price's statement was repeated in a Prosecution Report, which was endorsed by Defendant Gary Meek, with reckless indifference to the truth.  The false Prosecution Report was pointed to and relied upon as a basis for probable cause to hold Mr. Scott and Mr. Carpenter in custody for the murder of Ms. Summers.

34.    Solomon would later testify against Carpenter and Scott at trial, providing materially misleading testimony and failing to disclose that Price told him, at TRMC, that he could not see who was in the car or who fired the shots.  And Solomon never disclosed this exculpatory information to Plaintiffs or their criminal defense lawyers.

35.    Price next gave a recorded interview to Detective Meek, at TPD's Detective Division headquarters, at approximately 5:10 p.m, on September 10, 1994. Price was a teenager at the time the interview was conducted.  Price largely repeated what he had previously told Solomon.  During the recorded interview, Price claimed that he was at the 29th Street North party when a car drove through heading toward Cincinnati Avenue.  Price

told Detective Meek that he had his ***back turned*** to the car. *See* DA2_0203. Then, he claimed that he heard around ten gunshots. Price further asserted that when he was hit "in the side" by a bullet, he was facing toward Cincinnati. Importantly, Price stated, in no uncertain terms, that he could ***not*** see who was in the car because his ***"back was turned."*** DA2_0205. Detective Meek asked again: "Ken, you sure you didn't see who was in that car?". *Id.* at 206. Price replied: ***"I didn't see who was in the car for sure…."*** *Id.* (emphasis added). Price also stated, during the recorded interview, that he had seen Malcolm Scott, earlier that week, driving a big, white Thunderbird or "Cougar type" car with a brown top. DA2_0210.

36.     Nevertheless, Price would later change his story and testify at trial that, despite his back being turned to the car, he saw both Mr. Scott and Mr. Carpenter shooting from the car and Michael Wilson driving. Price would later recant this testimony, and state, under oath, that he was coerced by at least one Tulsa Police officer (on information and belief, Detective Meek and/or Officer Solomon) to falsely identify Malcolm Scott and DeMarchoe Carpenter as the shooters.

37.     For instance, Price stated in a sworn Affidavit, dated February 3, 2014, as follows:

> When I got home [from TRMC the evening of September 10, 1994], one police officer came to my house and questioned me about the shooting. ***I told them I did not see who was in the car. Rashun*** was there too and he ***told the police he did not see who was in the car.***
>
> The next day … I was asked to go to the Tulsa Police Station for additional questioning. I spoke with a detective and again told them ***I did not see who was in the car shooting. The detective became angry because I did not [know] who the shooters were.*** I think this interview was recorded.

Over the next month I was interviewed several more times by Tulsa police officers. The police ***began to put pressure on me to say Malcom [sic] Scott and Demarchoe Carpenter had shot us.***

\*\*\*

I understood that the Tulsa police wanted me to say Malcom [sic] and Demarchoe were the shooters. ***The police made me believe that I would be charged with the murder if I did not help them by saying Malcom [sic] and Demarchoe were the shooters.*** After that, I went along with what the police wanted me to say; Malcom [sic] Scott and Demarchoe Carpenter were the shooters in the car that night.

*See* Price Aff. (2-3-14).

38.     Price gave similar testimony during a January 2016 evidentiary hearing:

Q.     [D]id you see anyone in that vehicle?

A.     ***No, I didn't, which is what I was trying to tell the <u>police</u> all along***, you know, and they pretty much ***<u>coerced</u> us in to saying [Mr. Scott and Mr. Carpenter were in the vehicle]***, and, you know, ***tell us to say we seen it <u>even</u> if <u>we</u> <u>didn't</u> <u>see</u> it***, ….

Q.     Well, do you remember if there was a light on in the car?

A.     I really never did see, you know, who was in the car, and we told [the police] that maybe about ***three or four times***, maybe, you know. I guess they came to the hospital and asked us. ***We didn't see it.***

**B.     The Interviews of Rashun Williams**

39.     Less than one hour after the shooting, on September 10, Tulsa Police Officer Richie G. Stiles (n/k/a Richie G. Stiles-Riddle) interviewed a purported witness, Rashun (identified as "Rashon") Williams, at the Tulsa Regional Medical Center ("TRMC"). During this interview with Officer Stiles, Williams indicated that he was at a "Crip Party" when a ***red or maroon four door Ford*** drove by. DA2_0148.  Williams further told Officer Stiles that gunshots were fired into the crowd while he was seated on the hood of a car next to a female, now known to be the victim, Ms. Summers.  However, Williams indicated that he ***could "<u>not</u> see" the shooter(s). Id.***  Officer Stiles completed a TRACIS (acronym for

"Tulsa Regional Automated Criminal Information System") Report summarizing her interview with Williams.

40.     Later, at trial, Williams claimed that he did not provide the statement as summarized by Officer Stiles.  Officer Stiles has since given a sworn Affidavit, declaring that Williams did in fact give the statement as summarized in her TRACIS Report. In that same Affidavit, Officer Stiles states that she was never subpoenaed or otherwise called back to testify at trial, but that she "would have had ***no issue with testifying as to the validity of [her] report had [she] been subpoenaed.***"  Nonetheless, Steve Sewell, Carpenter's lawyer, did not call Officer Stiles to testify at trial, but merely agreed with prosecutors to stipulate to the statements made in Stiles' Report.

41.     At approximately 10:00 p.m. on the night of September 10, 1994, Williams was interviewed by Detective Meek.  During this interview with Meek, Williams changed his story from what he had previously told Officer Stiles, and now stated that he saw "Marco" in the back seat of the maroon Ford.  After some heavy prompting from Detective Meek, Williams agreed that "Marco's" last name was Carpenter, and that he was approximately 6'2", thin and light-skinned.  In response to another leading question, Williams also claimed, during the interview that he ***"could"*** have seen Malcolm Scott in the middle of the front seat of the car sticking a gun out of the back window. DA1_0079-80.[2]  Or, Williams went on, Mr. Scott ***"could"*** have been in the backseat. *Id.*  In a moment

---

[2]     In this portion of the interview transcript, Meek references an earlier conversation with Williams that was not recorded.  On information, evidence and belief, it was during this unrecorded conversation that Meek threatened and coerced Williams into falsely stating that he saw Carpenter and Scott in the maroon Ford. And this practice, of coercing false witness statements through unrecorded threats of arrest and prosecution, was widespread such that it was a municipal custom within the TPD/City.

that highlights the patent unreliability of the interview, Williams told Meek, ***"anything's***
***possible***...." *Id.* at DA1_0080. Nonetheless, Williams claimed he could see Mr. Scott
through the open back window. Williams further stated during the interview that shots
***"could"*** have come from a blue Cutlass that rolled through the party. *Id.* at DA1_0083.[3]

42.    Also inconsistent with his earlier statement given to Officer Stiles, Williams
told Meek that he had never seen the maroon Ford before the shooting took place.
DA1_0082. By contrast, Williams gave a statement to Officer Stiles that he (Williams)
"recognized the car" as belonging to Malcolm and/or "Marco". DA2_0148.

43.    Like Kenneth Price, Williams was coerced and threatened by at least one
Tulsa Police Officer, believed to be Detective Meek, to falsely identify Carpenter and
Scott. As he would later confirm in a sworn Affidavit, consistent with his original
statement to Officer Stiles, Williams ***"didn't see anything."*** *See* R. Williams Aff.
(emphasis added). Rather, according to Williams, ***"[i]t was the officers for the Tulsa***
***Police Department that ___coerced___ [him] into making statements that ___weren't___ ___true___."*** *Id.* As
Williams has stated under oath, "[t]he Tulsa Police Officers told me I would be charged
for the murder if I didn't testify against De'marco Carpenter and Malcolm Scott." *Id.*

44.    Williams was a teenager at the time of the shooting and subsequent
interviews.

**C.    The Evidence Obtained, and *Not* Obtained, From Michael Wilson**

45.    On September 11, 1994, the day after the shooting, Homicide Detective
Mike Huff went to the home of Michael Wilson. Deputy Truewell of TCSO's gang unit

---

[3]    There are two separate transcripts of the Williams recorded interview which are, in substance, materially different.

had received a "page" from a Confidential Informant ("CI") that the car was parked in front of Wilson's house.  Truewell passed that information on to Huff.  At trial, Detective Huff testified that he went to Mr. Wilson's home to question him about "shooting incidents at that time." Trial Tr. at 536. When Huff arrived, he saw the rented, maroon 1994 Ford Taurus parked in Wilson's driveway; it matched the car some witnesses to the shooting, such as Rashun Williams, described as the vehicle they observed during the shooting.  *Id.* Detective Huff asked Wilson if he would go to the police station for questioning and Wilson agreed but asked to first call his mother and put on his shoes. *Id.* at 537. Huff followed Mr. Wilson into the home.  Huff did not have a warrant to search the house. Huff watched as Mr. Wilson sat on the edge of his bed and ***attempted to remove a gun from under his shirt and conceal it under the bed.*** *Id.* Huff testified that he drew his weapon and ordered Mr. Wilson to stand back. *Id.* at 538. Upon doing so, Sergeant Huff ***retrieved the weapon,*** without a warrant, and noted that it was as a ***dark colored Lorcin .380 semi-automatic handgun.*** *Id.* at 538.

46.     For reasons that are unclear and baffling, Huff did not seize the maroon Ford Taurus for forensic testing.  Thus, no fingerprints were ever taken from the maroon Ford Taurus.  No testing for gunpowder was ever conducted of the maroon Ford Taurus. In addition, despite seizing the Lorcin .380, Huff did not have the gun tested for fingerprints. And the Lorcin .380 was never tested for fingerprints by any other officer. These were basic forensic tests that are, and should be, routinely done in homicide investigations.  Yet, without any explanation or justification, Huff, and the rest of the investigating officers, including Meek, chose not to gather this potentially exculpatory evidence.

47.    Wilson was interviewed by Detective Meek at 8:27 p.m. on September 11, 1994. *See* DA2_0226. The interview was recorded and transcribed. During the interview, Wilson **admitted** to driving the **maroon Ford Taurus** after he got off work at around midnight on September 10, 1994. *Id.* at 227. Wilson also told Meek that he had been shot in the leg earlier that week, Wednesday, September 7. Additionally, Wilson informed Meek that he saw Mr. Scott and Mr. Carpenter at around 2:00 a.m. at the QuikTrip on North Harvard. Wilson said that Scott and Carpenter were in a **white four-door Lumina**, with **two females**. Wilson claimed that he gave Carpenter some .380 bullets.

48.    With respect to the Lorcin .380 semiautomatic that was seized by Detective Huff, Wilson represented to Meek that his mother gave him the gun for protection. Meek asked, "Did you loan your car to anybody?". Wilson replied, "No." DA2_0235. Meek next inquired, ***"Did you loan your gun to anybody?"***. Wilson again answered, ***"No."*** DA2_0235 (emphasis added). Amazingly, Meek then let Wilson go home.

49.    Through ballistics testing, Tulsa Police would later confirm that the ***Lorcin .380 seized from Wilson was the murder weapon.***

50.    Thus, Tulsa Police, including Meek and Huff, knew that the murder weapon was at all times in the possession of Wilson, that Wilson possessed the car involved in the shooting and that Wilson claimed to have never loaned the murder weapon or car to anyone else. All of the evidence was pointing toward Wilson. However, in dereliction of their Constitutional duties, the Tulsa Police, including Meek and Huff ignored the plain evidence pointing toward Wilson. Rather, despite a total lack of evidence, other than the illegally coerced and false statements of Price and Williams, the Tulsa Police chose to pursue Mr. Carpenter and Mr. Scott as the shooters.

51.     Further, Wilson's admission of being shot just days before the Summers murder provided a clear motive for his retaliation against the Crips at the party. And, Mr. Wilson's own admission of carrying the gun, which was the murder weapon, further substantiated that motive. The police went to talk to him less than forty-eight (48) hours after the shooting. The police, including Meek and Huff, ignored this evidence and released Mr. Wilson that same day.

52.     Wilson was consistent with respect to his complicity in the murder of Karen Summers. Throughout his prosecution in the criminal case, up until the time of his execution, he repeatedly stated that he committed the crime. In fact, the day after the murder, Wilson told his friend, Danny Ogans, of his involvement. In 2001, Ogans came forward with the following statement:

> On September 10, 1994, I went to Michael Wilson's home to talk with him about purchasing some speakers. While talking with him I noticed he was limping badly and had a bandage on his leg. I asked him what happened. He told me that he had been shot by the hoover crips… He stated that it was cool, because he ***blasted some of them*** who were at a party by his homeboy Billy Alverson's house. He stated that him (Wilson), Billy Alverson and [one] of his other partners caught some crips (Hoovers) in the street at a party and ***dumped on them.***

*See* Ogans Aff. (emphasis added).

53.     In addition to telling Mr. Ogans of his participation in the crime rather than Plaintiffs', Wilson had several conversations with his attorney Robert Payden. Mr. Payden represented Wilson after he was charged in the Summers case. Mr. Payden remembers Wilson telling him that he was in the backseat of the maroon Ford as shots were fired from that car toward a group of people congregating on the street. All witnesses who testified for the State confirmed that shots came from the backseat of the car.

54.    ***Wilson again confessed to the Summers murder*** in 2013. In a December 30, 2013 Affidavit, Wilson admits to shooting Karen Summers and wounding Kenneth Price and "lil Seven." He says that he was seated behind Alverson, who was driving the car. He stuck the gun out of the car window and yelled, "What's up Blood," a statement that is consistent with what an "eyewitness" heard just before the shots were fired. He further testified that Ogans and another person, Tony Armstrong, knew he was the shooter.

55.    On January 7, 2014, just two days before he was executed for an unrelated murder, Wilson gave a videotaped confession to the Oklahoma Innocence Project. Wilson's videotaped confession ***confirmed once again, that Wilson was the shooter, and that he was responsible for the murder of Karen Summers, as well as the injuries to Kenneth Price and Alonzo Johnson a/k/a Lil Seven.*** Wilson further confirmed that he fired the shots from the back of the maroon Ford, and that neither Mr. Scott nor Mr. Carpenter was in the car with him. Rather, Alverson and Harjo were the other two individuals in the car. In Wilson's videotaped confession, he also expressed bewilderment that Huff and Meek caught him with the murder weapon, but let him go anyway. It was clear to Wilson that Huff and Meek were not after him, but were after Scott and Carpenter.

56.    During his final statement, before his execution for an unrelated murder, Mr. Wilson said ***"Malcom Scott and Demarchoe Carpenter are innocent."*** *See* Branstetter, Ziva. "Just Before Execution, Tulsa Killer Says Co-defendants in Drive-by are innocent." Tulsa World, 2014.

### D.    The Interview of Alonzo Johnson

57.    Alonzo Johnson was interviewed by Detective Meek at around 5:58 p.m. on September 10, 1994. Similar to Rashun Williams, Alonzo also told Meek that a ***maroon***

*Ford "Taurus or Tempo"* drove through the party early in the morning of September 10 (at around 2:40 or 2:45 a.m.). DA2_219. Alonzo *could not see* who was in the car. Alonzo believed that four or five shots were fired from the Ford, including the one that hit him in the arm.

58.     Prior to the recorded interview with Meek, Alonzo was interviewed by Officer Solomon at TRMC. Consistent with his statement to Meek, and like Ken Price, Alonzo told Solomon that he could not see who was in the car. However, with reckless disregard to the truth, Solomon stated in a police report that Alonzo witnessed "Malcolm" "fire several rounds into crowd", while failing to disclose Alonzo's statement that he could not see the shooter or who was in the car.

59.     The false information from Solomon concerning Alonzo's statement was repeated in a Prosecution Report, which was endorsed by Defendant Gary Meek, with reckless indifference to the truth. The false Prosecution Report was pointed to and relied upon as a basis for probable cause to hold Mr. Scott and Mr. Carpenter in custody for the murder of Ms. Summers.

### F.     The Forensic Evidence / Physical Evidence, or Lack Thereof

60.     As noted, *supra*, on September 11, 1994, Detective Huff retrieved the .380 Lorcin from Wilson that Wilson was trying to hide from the Detective. Huff took possession of the murder weapon and placed it in evidence. On September 13, 1994, Detective Meek submitted a request to the Tulsa police laboratory asking them to determine if the projectile taken from the body of Karen Summers was fired from Wilson's .380 Lorcin. On September 21, 1994, Richard Raska checked the weapon out of the property

room. Raska test fired the .380 Lorcin and determined that the projectile had been "fired from the barrel" of the weapon taken from Wilson on September 10, 1994.

61.     Thus, ballistics confirmed that the gun seized from Wilson, a gun that Wilson admittedly never loaned to anyone on September 10, was the murder weapon.

62.     Nevertheless, Scott and Carpenter were arrested and charged with first-degree murder *before* the ballistics testing on Wilson's weapon was even completed. (Scott was arrested and charged on September 10, and Carpenter was arrested and charged on September 11.)  More troubling, the case was closed by Detective Meek on September 20, 1994, a day *before* the ballistics test was conducted.

63.     Further, as discussed above, Detectives Huff and Meek did not seize the maroon Ford Taurus for forensic testing.  Thus, no fingerprints were ever taken from the maroon Ford Taurus.  No testing for gunpowder was ever conducted of the maroon Ford Taurus.

64.     Moreover, despite seizing the Lorcin .380, Huff did not have the gun tested for fingerprints.  And the Lorcin .380 was never tested for fingerprints by any other officer. These were basic forensic tests that are, and should be, routinely done in homicide investigations.  Yet, without any explanation or justification, Huff, and the rest of the investigating officers, including Meek, chose not to gather this potentially exculpatory evidence.

65.     While the .380 shell casings were purportedly tested for fingerprints, no fingerprints were detected.

66.     There was *never any* physical or forensic evidence linking Scott or Carpenter to the crime.  And Huff, Meek and other investigating officers deliberately chose

to ignore the evidence of Wilson's guilt and the lack of evidence of Scott and Carpenter's guilt.

67.     No evidence was presented during Scott and Carpenter's trial that either one of them took possession of Wilson's maroon Ford Taurus, or had possession of the murder weapon, Wilson's .380 Lorcin.

68.     The only "evidence" that tied these two men to the drive- by shooting was shaky and inconsistent eyewitness testimony by Kenneth Price and Rashun Williams, who both later recanted their trial testimony as being improperly coerced.

**The Trial**

69.     Mr. Scott and Mr. Carpenter were each convicted of one count of first-degree murder, two counts of shooting with intent to kill, and one count of using a vehicle to discharge a weapon. Mr. Scott was sentenced to life in prison for the murder, two seventy-five year terms for the shooting with intent to kill convictions, and twenty years for the use of a vehicle to discharge a weapon.

70.     Scott and Carpenter's convictions were the direct result of the drive by shooting -- on September 10, 1994 -- carried out by Wilson, Alverson and Harjo.  At trial, the State's case against Scott and Carpenter was comprised of nothing but coerced false testimony.   There was zero physical evidence linking Scott or Carpenter to the crime. The only physical evidence of the crime was the murder weapon and the car used in the shooting; and both of these items were found in ***Wilson's possession*** shortly after the murder.

71.     The State specifically relied on testimony from ballistics expert Richard Raska who tied a gun found in Michael Wilson's possession to bullet fragments recovered from the corpse of the victim, Karen Summers.

72.     Kenneth Price testified at trial he was standing near a car parked across the street from the party when he observed a maroon-colored car drive by and turn around; then he heard shots being fired. He also stated that although he had been shot in the buttock and was running up the hill away from the gunfire, he was able to see Scott and Scott shooting from the backseat of a maroon Ford holding a gun. According to Mr. Price's testimony, he also saw Mr. Carpenter sitting next to Mr. Scott firing shots toward the house while Mr. Wilson drove the car. On cross, Mr. Price admitted that he told officers after the shooting that the vehicle was a maroon Ford and that he was lying when he gave a subsequent statement that the car was a "goldish-orange like car." Still on cross, Mr. Price was asked if he lies often and he stated "I told you I wanted revenge."

73.     Price could not explain why he originally told the police that he could not see the shooters or who was in the car.  We now know that Price's false testimony was coerced by Detective Meek and/or Solomon (and/or other officers).

74.     Alonzo Johnson testified he knew both Mr. Scott and Mr. Carpenter to associate with the Red Mob Bloods. He further testified he was standing near Ms. Summers and Rashun Williams when a car passed through the neighborhood and then circled back and began shooting. Mr. Johnson believed the car was a red Ford Tempo or Taurus, and he did not see who the shooters were because the incident happened in less than a minute.

75.     Rashun Williams testified that a motion light located on a neighbor's home came on as the car drove by and allowed him to see Mr. Scott and Mr. Carpenter in the

backseat, where Mr. Scott held a gun. However, on cross he stated the light merely flickered as the car went by.

76.     Again, Officer Stiles was not called to testify concerning Williams' original inconsistent statement that he could not see who was in the car.

77.     Ernestine Truewell, a Tulsa County Sheriff's Office Gang Task Force member, testified she was at the Hoover Crip Party sometime before the shooting to gain gang intelligence. She offered, without objection, expert testimony on gang relations and the meaning of a "certified" gang member.

78.     Darrell Benson testified he did not personally know Mr. Scott but had "heard of him." He also testified he was at the Apache Manner apartment complex on September 9, 1994, and overheard Mr. Scott tell an individual named Psycho3 he was going to "handle some business at a Crip party" that night. However, on cross he admitted he could not be absolutely certain it was Mr. Scott's voice he had heard that day because he had never actually spoken with Mr. Scott in person.

79.     Tulsa Police Department Detective Michael Huff testified he went to Mr. Wilson's home on September 11 or 12, 1994, to ***speak with him regarding an unrelated matter***. When he arrived, he noticed a maroon Ford Taurus in the driveway. Mr. Huff testified he then followed Mr. Wilson into the home and observed Mr. Wilson remove a Lorcin .380 semiautomatic handgun from his waistband, the same type of gun used in the shooting.

80.     The State then called Mr. Wilson to testify but he refused to answer any questions. In response, Gary Meek was called to testify about a conversation he and Mr. Wilson had at the Tulsa Police Department Detective Division. Corporal Meek testified

Mr. Wilson said he had seen Mr. Scott and Mr. Carpenter at Quick Trip around 1:00 a.m. where Mr. Wilson spoke with Mr. Carpenter and gave him some .380 ammunition. Id. at 572.

81.    Mr. Ogans was never called to testify.

**Additional Post-Trial Evidence**

82.    In addition to the sworn recantations of Price and Williams, the confessions of Wilson and the Affidavit of Ogans, which are all discussed *supra*, and incorporated herein, there was additional post-trial evidence proving Scott and Carpenter's innocence. Most notable are the statements of Harjo and Alverson. Neither Harjo nor Alverson, who were the indivduals with Wilson when he fired those shots from the backseat of maroon Ford Taurus, was ever questioned by Huff, Meek, or any other Tulsa Police Officer. And Neither Harjo nor Alverson was called to testify at trial.

**A.    Billy Alverson**

83.    Billy Alverson was never arrested or charged for this murder and this shooting with intent to kill. In fact, no police reports have been disclosed showing Mr. Alverson was ever questioned about the crime, notwithstanding his presence in the maroon car used during the crime. Francine Sharp testified at trial that she saw a maroon car at the Quick Trip around 1:00 a.m. occupied by Mr. Wilson and two other men. Although Sharp did not know the two men, she was certain she saw two men that were ***not Mr. Scott and Mr. Carpenter in that maroon Ford***. Further, she told police just that. Those two men, by their own admissions, were Mr. Alverson and Richard Harjo.

84.    Additionally, Mr. Alverson confessed his participation in the drive-by shooting while in Oklahoma Department of Corrections custody for a separate crime:

> On February 27, 2010, 1:00 am I Billy Alverson II truthfully sw[ear] concerning the case involving Demarco Carpenter and Malcom Scott offer this statement of truth: After returning and then leaving my home on North Elgin, I was driving a car rented by Michael L. Wilson with Richard Harjo in the front passenger and Wilson in the back. We were headed up towards Cincinnati where the lights shined on a crowd in the street. Wilson noticed who they were and said that these were the dudes who tried to shoot him and as we were driving passed Wilson rolled down the back drivers window pulled a gun he had hidden and began to fire. So I sped away. As soon as I could drove Wilson to the house where we stayed. Harjo and I got out of the car walking away leaving Wilson. I didn't find out who the people were until Wilson was jailed for the shooting. Before his trial I had a conversation with Carpenter. I told him to call me as witness and I would tell the court they were not involved, but I was never called.

Aff. of Alverson.

**B.    Richard Harjo**

85.    Michael Wilson's friend and cohort, Richard Harjo, was also never arrested or charged for the crime. Like Mr. Alverson, no police reports exist showing Mr. Harjo was ever questioned about the crime. In 2001, Mr. Harjo felt compelled to come forward and confess that he -- along with only Mr. Wilson and Mr. Alverson -- was in the maroon Ford on September 10, 1994, and that Mr. Scott and Mr. Carpenter were not, in any aspect, participants in the shooting.

86.    While in Oklahoma Department of Corrections custody for a separate crime, Mr. Harjo made the following handwritten statement:

> I Richard Harjo do state under oath that I am of legal age and I state and make known the following to wit: I know who actually shot and killed Karen Summers and wounded Kenneth Price and Alonzo Johnson. Due to the fact I was an eyewitness. Two people who had nothing to do with the crime charged and erroneously convicted of. I have been reluctant to come forward with this information due to threats on my life. Nonetheless, I've been transferred from O.S.P to a private prison.  Therefore I'm able to submit this sworn affidavit. On or about Sep. 10, 1994, between 2:00 am and 2:30 am in

> retaliation for being shot himself, Michael Wilson shot into a crowd
> of people from the backseat on the drivers side of his burgundy Ford
> rental car. With his .380 caliber handgun at a houseparty down the
> street from my sister Jennifer Harjo house. I thought it was strange
> at the time that he got into the backseat of his car until I seen what
> he did and then realized why.

Harjo Aff.

87.     Mr. Wilson's, Mr. Alverson's, and Mr. Harjo's confessions all corroborated
not only each other's confessions, but also the physical evidence and the crime scene
descriptions. The statements of Mr. Ogans and Mr. Payden, uninterested parties, prove the
veracity of those confessions as Mr. Wilson told them of the three men's involvement just
one day after the murder occurred. Further, Plaintiffs had neither the gun nor the car used
in the crime in their possession at any point; rather, Mr. Wilson did. Mr. Raska's forensic
analysis proves the gun recovered from Mr. Wilson was the murder weapon.

### The Post-Conviction Relief Applications and Evidentiary Hearing

88.     On February 21, 2014, and March 11, 2014, respectively, Scott and
Carpenter, by and through counsel, filed Applications for Post-Conviction Relief in the
Tulsa County District Court claiming their convictions should be vacated because they
were actually innocent; the State failed to disclose exculpatory evidence; the State
knowingly allowed false testimony; and several claims alleging ineffective assistance of
both trial and appellate counsel.

89.     An evidentiary hearing on the Post-Conviction Applications was held on
January 29, 2016.  Numerous live witnesses testified on Mr. Scott and Mr. Carpenter's
behalf.

90.     For instance, Investigator Eric Cullen testified he was hired by Plaintiffs in
2006 to work on their post-conviction applications, He spoke with Billy Alverson, Richard

25

Harjo and Michael Wilson, each of whom maintained Plaintiffs had nothing to do with this murder. In March of 2007, Wilson gave Cullen a letter for Scott which was admitted at the hearing as Exhibit 2, Wilson explained he needed to "make things right" and told Cullen the only individuals involved in this crime were Alverson, Harjo and himself. Wilson explained his reason for committing this crime was revenge for being shot in the leg a few days before. Cullen also interviewed alibi witnesses for Plaintiffs. Alverson and Harjo claimed law enforcement never interviewed these alibi witnesses.

91.    Danny Ogans testified he spoke with Wilson both on the day following this murder and later in the county jail and each time Wilson took credit for this shooting, Ogans relayed this information to Scott and was contacted by Carpenter's trial counsel but was never interviewed by law enforcement, and Plaintiffs' trial counsel did not call Ogans to testify at trial.

92.    Michael Harris, Scott's trial counsel, also testified.  Harris was adamant that Plaintiffs were innocent.  Harris maintained that the State's eyewitnesses at trial, that were each themselves incarcerated, each had a plea agreement worked out with the State in exchange for their testimony against Plaintiffs. Harris stated he was never given police reports where the State's eyewitnesses initially told police officers they did not see who fired the shots or who was in the car.

93.    As previewed above, Ken Price also testified at the evidentiary hearing. Kenneth Price, one of the shooting victims, testified for the State at trial. Price stated he did not see who was in the car nor could he identify the shooter. After repeatedly telling law enforcement he did not see anything, Price eventually changed his story. According to Price, he was coerced into identifying Plaintiffs. Price maintained he was told charges

would be filed against him if he did not testify for the State. Price said he did not understand the process because he was sixteen-years old at the time and decided that if the police were this certain Plaintiffs were responsible, he would testify to their version rather than go to jail himself.

94.     Richard Harjo also testified, and confirmed that during this incident he was a passenger in the car, Alverson was the driver and the other passenger, Wilson, fired the shots from the rear driver's side seat. Harjo was sentenced to life without the possibility of parole in a separate incident and stated he was aware his testimony regarding this incident could subject him to criminal prosecution.  Initially Harjo was incarcerated in the same prison facility with Wilson and Alverson. Based on his fear of what would happen if he confessed, Harjo remained silent. After being moved to a different facility Harjo executed an affidavit in 2001 admitting what actually occurred and sent the letter to a friend of Scott's to "right a wrong." He was never interviewed by law enforcement regarding this case. According to Harjo he did not come forward initially because his life experience taught him if you reported anyone else's crimes you would be killed.

95.     Based on this testimony, the confessions of the deceased Wilson, the recantation of the deceased Rashun Williams, and other, similar, evidence, the Tulsa County District Court granted Plaintiffs' Applications for Post-Conviction Relief.

96.     Following the combined hearing on both applications, Judge Holmes entered an order in the Tulsa County District Court on May 13, 2016, granting Plaintiffs' Applications for Post-Conviction Relief, and finding merit in Plaintiffs' claims of actual innocence.

97.     The State appealed.

**Opinion of the Court of Criminal Appeals**

98.     On November 10, 2016, the Court of Criminal Appeals issued an Opinion upholding the Tulsa County District Court's decision to grant the Applications for Post-Conviction Relief *and the finding of **actual innocence***.

99.     In this regard, the Court of Criminal Appeals held and reasoned as follows:

> The record supports Judge Holmes' conclusions. The ***State's case at trial was weak*** and the evidence and circumstances that have been developed and presented to the trial court at this hearing do nothing to strengthen the State's position.
>
> The firearm and vehicle used to facilitate this shooting were found in Wilson's possession. After saying he hid a gun for [Scott and Carpenter] and remaining silent during their prosecution, Wilson recanted and repeatedly took full responsibility. Wilson implicated Harjo and Alverson who both corroborated Wilson's version confirming they were in the car with Wilson who was the shooter. The evidence at this hearing was that Williams and Price, the eyewitnesses at trial, originally stated they did not see who fired the shots and only adopted the law enforcement version of events identifying [Scott and Carpenter] ***based on coercion and fear of being prosecuted personally.*** Wilson took credit for these crimes when speaking with Ogans, both immediately following the event and again later in the county jail. Judge Holmes was presented with more than sufficient grounds to find [Scott and Carpenter] made a colorable showing they were ***factually innocent of the crime for which they were convicted.***

COCA Opinion (11-10-16) at 15-16.

100.     The Court of Criminal Appeal's Mandate was also issued on November 10, 2016.

101.     Mr. Scott and Mr. Carpenter were innocent and had spent over twenty years in prison for crimes they did not commit.[4]

**Municipal Policies and Customs**

---

[4]     Prior to filing this action, Plaintiffs gave proper notice of their tort claims, as required by 51 Okla. Stat. § 156.  In addition, this action was timely filed within 180 days of the City's denial of Plaintiffs' tort claim, as required by 51 Okla. Stat. § 157.

102.    Upon information and belief, during all pertinent timeframes, the City of Tulsa employed a number of unconstitutional law enforcement policies and customs that were a moving force behind the violation of Plaintiffs' constitutional rights, as well as the wrongful convictions of several other citizens.

103.    For instance, TPD had a custom, policy, or pattern and practice of fabricating inculpatory evidence, failing to adequately investigate other leads or evidence, withholding material exculpatory or impeachment evidence, and failing to properly train, supervise, or discipline officers, specifically including Defendants Meek and Huff, concerning the execution of lawful investigations, how to conduct proper and Constitutional identification procedure and interviews, and the legal obligation to investigate and disclose exculpatory and impeachment material.

104.    Upon information and belief, the TPD had no written policies, procedures, or guidelines concerning the execution of lawful investigations, constitutionally adequate interview and interrogation techniques, or the legal obligation to disclose exculpatory and impeachment material.

105.    The failure to have written policies and procedures regarding these fundamental aspects of law enforcement procedure is further evidence of an unconstitutional failure to train and supervise in deliberate indifference to the harms likely to result therefrom.

106.    To the extent that TPD had written policies, those policies were not followed nor enforced, in deliberate indifference to the harm that would likely result.

107.    There was also an established unconstitutional policy, practice or custom within the TPD of using interrogation tactics to coerce or threaten witnesses, victims and

suspects into giving statements that are not true and then recording only the rehearsed coerced portions of the statements. These recorded, coerced statements would then be used in furtherance of wrongful arrests, prosecutions and convictions.

108.    Investigating officers would then fail to disclose the coerced nature of the testimony thereby withholding valuable impeachment evidence in violation of *Brady* principles.

109.    Moreover, on information and belief, TPD had a practice of utilizing confidential informants to provide false testimony.

110.    Plaintiffs were not isolated victims of Defendant City of Tulsa's unconstitutional customs, policies, or patterns and practices; other cases have been brought to the attention of the City of Tulsa, and its final policymakers. Yet, the City failed to take appropriate remedial measures to prevent this unconstitutional conduct from continuing.

111.    Tulsa County is Eighteenth (18th) in the Nation, ***not*** per capita, exclusive of the drug cases that were overturned, in ***total*** wrongful convictions. Tulsa County's population is such that this high number of wrongful convictions is particularly troubling. For many years, there was a system in place that has fostered a fertile environment for such constitutional violations to take place on a wide scale.

112.    On June 11, 1989, the Tulsa World published a story entitled, "Unprepared Attorneys Blamed for Acquittals". In that article, District Judge Hopper stated that that the District Attorney's office was not properly evaluating cases and bringing cases they should not. At the time, the conviction rate was 65-70%. Judge Hopper complained, "A prosecutor should get convictions in ***90%*** of the cases he tries".

113.   The following day, June 12, 1989, the Tulsa World published another article, "Tulsa Prosecutors unhappy with Conviction Rates".  It is noted that changes must be made to improve the conviction rate, and that anything below 80% is unacceptable. District Attorney David L. Moss told five Assistant District Attorneys to seek employment elsewhere, and began shaking things up.

114.   By August 1992, it was publicly reported that the conviction rate in Tulsa County had risen to an astounding ***89%.***   David Moss is given credit for giving a "pep talk" in 1989, and three years after, the conviction rate had increased dramatically.

115.   The rise in gang violence and the pressure to increase conviction rates forced changes in the conduct of prosecutors and police alike. And this led to cutting corners and an attitude of get the "bad guy" by any means necessary.  Unfortunately, all too often, the "means" were unconstitutional, and innocent citizens, like Plaintiffs, became casualties of this system.

**Corey Atchison**

116.   The case involving Scott and Carpenter was not the first time that Detective Meek, and other Tulsa Police Officers, coerced witnesses into falsely identifying a purported murderer.  Corey Atchison ("Mr. Atchison") is currently serving a life sentence under the custody of the Oklahoma Department of Corrections ("DOC") for a first-degree murder conviction. He was convicted in connection with the shooting death of James Lane ("Lane" or "Mr. Lane"), after a jury trial in Tulsa County District Court, on June 14, 1991.

117.   On August 3, 1990, Mr. Lane was shot and killed.  Approximately six (6) months later, Mr. Atchison was arrested and charged for Mr. Lane's murder.  At the preliminary hearing, before Judge Pete Messler, two alleged eye-witnesses testified, Doane

Thomas and Demacio McClendon.   Thomas testified that he and McClendon were at the scene of the shooting and saw Corey shoot Mr. Lane. McClendon began his testimony with a similar story, but then recanted on the witness stand, revealing that his testimony against Mr. Atchison was false.  McClendon went on to testify that, in fact: (A) he had not been at the scene of the Lane shooting; (B) he had been *coerced into giving a false statement by Tulsa Police* Detectives Gary *Meek* and Robert Jackson; and, (C) he was pressured by Assistant District Attorney, Tim Harris into giving false testimony at preliminary hearing. McClendon was just 15-years-old at the time of his coerced testimony.

118.    Despite McClendon's shocking revelation of serious investigative and prosecutorial misconduct at the preliminary hearing, Mr. Atchison was inexplicably bound over for trial before Judge Clifford Hopper.  At the jury trial, the State, through Assistant District Attorney Tim Harris, presented as witnesses Doane Thomas, Ben King and some of the Tulsa Police Officers who worked on the case. Thomas' testimony at trial was largely consistent with his testimony at the preliminary hearing.  Ben King, who was with Mr. Atchison the night of the shooting, testified that Corey Atchison did *not* murder James Lane.  King was then confronted with a video recording of him being interviewed by Detectives *Meek* and Jackson.  During this portion of the videotaped interview, King identified Mr. Atchison as the shooter.  Nonetheless, similar to McClendon's testimony at preliminary hearing, King testified at trial that Detectives *Meek* and Jackson *coerced and threatened* him into falsely identifying Corey as the shooter during an interrogation that went on for several hours.  On the witness stand at trial, King steadfastly insisted that he was with Mr. Atchison during the shooting and that Corey *did not shoot* Mr. Lane. Ben King was only 17-years-old when he testified at trial.

32

119.    After the State rested, Mr. Atchison, represented by Christopher Grant, presented two (2) witnesses, Mareo Johnson and himself. Like Ben King, Johnson testified that he, too, was with Mr. Atchison at the time of the shooting and that Corey did not shoot Mr. Lane. Mr. Atchison testified at trial to the same story he had told the police multiple times before, that he did not shoot James Lane.  Nonetheless, the jury convicted Corey of first-degree murder and recommended a sentence of life in prison.

120.    ***Now, Doane Thomas, the lone witness who gave sworn testimony identifying*** Mr. Atchison ***as the shooter, has recanted.***   Mr. Thomas has given a sworn Affidavit, testifying that he, like Ben King and Mareo Johnson, was also ***coerced*** into giving false testimony identifying Corey as the murderer.   Specifically, Thomas swears that Detectives ***Meek*** and Jackson and Assistant District Attorney Tim Harris ***threatened and coerced him into providing the false eyewitness testimony.***  Additionally, there is evidence of multiple eyewitnesses at the scene of the Lane murder who identify the shooter to be persons other than Corey Atchison.  These witnesses were never called to testify at trial.

121.    On information and belief, the TPD did not discipline, counsel or provide remedial training for Detective Meek or Jackson after it came to light that they had coerced and threatened witnesses into testifying against Atchison.  Indeed, on information and belief, the City made no changes to TPD's training, supervision, interview or investigative methods and techniques, thereby ratifying and tacitly condoning Meek and Jackson's misconduct, and tacitly encouraging other Tulsa Police Officers to engage in such misconduct.

**Sedrick Courtney**

122.    At about noon on April 6, 1995, two men with pistols and wearing ski masks kicked in the door of Shemita Greer's apartment in Tulsa, Oklahoma. The men forced Greer to the floor, pistol-whipped her and duct-taped her eyes and mouth.

123.    During the robbery, which lasted less than 10 minutes, the men kicked Greer, 23, in the head and she played dead. They left with $397 in cash from her purse, four tires and four wheel-rims.

124.    After the robbers left, Greer called police. She said the taller man, who was wearing a black ski mask, was 23-year-old Sedrick Courtney, whom she had known for about three years and had socialized with in the past. She said that before her eyes were covered, Courtney lifted up his ski mask high enough so that she recognized him. Greer also said she recognized the man's skin tone and voice as Courtney's.

125.    The ski masks, one black and one green, were found outside the apartment.

126.    Courtney was arrested on June 12, 1995 and charged with robbery and burglary. The other robber was never identified or prosecuted.

127.    At trial in Tulsa County District Court, Greer identified Courtney as her assailant, saying she was "positive" in her identification.

128.    Several hairs recovered from the ski masks were sent to the Tulsa Police Department crime laboratory for analysis. Seven of the hairs had roots and were sent for DNA testing, but the results were inconclusive.

129.    A crime laboratory analyst testified that she could not make a comparison with Courtney's hair because his hair samples were too short. She said the hairs in the black ski mask could not be eliminated as having come from Courtney. The analyst said that a

bleached red hair found in the green ski mask was microscopically consistent with a bleached red hair recovered from Courtney.

130.    Faced with this inconsistency—the hair said to be consistent with Courtney's hair came from the green mask while Greer said Courtney was wearing the black mask—the prosecution argued to the jury that Courtney could have owned both masks and worn both of them prior to the robbery.

131.    Courtney presented three relatives who testified that he had borrowed a car to attend a class at an unemployment center at the time of the robbery.

132.    On February 8, 1996, a jury convicted Courtney of armed robbery and burglary and he was sentenced to 30 years in prison.

133.    In 2000, after losing his appeals, Courtney sought DNA testing on the hairs, but the Tulsa Police Department said the hairs had been destroyed.

134.    In 2001, Courtney contacted the Innocence Project for help. In 2007, an Innocence Project lawyer sent a letter requesting a search for the hairs, the masks and the duct tape that was recovered at the crime scene.

135.    In 2008, again TPD falsely reported that the evidence had been destroyed. Courtney was paroled in June 2011 after serving more than 16 years in prison.

136.    In September 2011, a law student working on the case for the Innocence Project telephoned the TPD to ask once more about the evidence. This time, the department reported that it still had the hair slides from the black and green masks.

137.    Mitochondrial DNA testing failed to link Courtney to either the black or green mask. Testing on the 10 hairs from the black mask excluded Courtney and nine of

the hairs came from the same person. Testing on the 5 hairs from the green mask also excluded Courtney and four of them came from the same person.

138.     On March 12, 2012, a petition for a state writ of habeas corpus was filed in Tulsa County District Court.

139.     On July 19, 2012, Courtney's conviction was vacated and the charges were dismissed. In July 2013, Courtney was granted a certificate of actual innocence. Since then he has received $175,000 in state compensation and in June 2014 he filed a federal lawsuit against the City of Tulsa. In the lawsuit, Courtney alleged that the investigating officer *coerced the victim into implicating Courtney.*

140.     The lawsuit was settled in October 2015 for $8 million.

**Tim Durham**

141.     On May 31, 1991 an eleven-year-old girl was violently raped and sodomized by the pool of her Tulsa, Oklahoma residence. Two years later, Timothy Durham was wrongfully accused and convicted of the crime.

142.     Investigators had only inconclusive hair and semen evidence found at the crime scene and the victim's *vague description of the attacker, which did not match Durham.* Nevertheless, TPD's investigation began to focus around Timothy Durham, a local resident with a previous criminal history that included firearms and parole violations.

143.     In his 1993 trial, prosecutors presented *unvalidated forensic evidence* that allegedly pointed to Durham. An analyst testified that he had compared hairs from the crime scene with Durham's hair and found similar characteristics that he had seen in "less than 5 percent" of hair samples he had examined. There is not adequate empirical data on

the frequency of various class characteristics in human hair. Consequently, it is invalid for an analyst to characterize whether consistency is a rare or common event.

144.    Durham was convicted of multiple charges including first-degree rape, forcible sodomy, and attempted robbery. Despite the ***testimony of eleven witnesses who placed Durham at a skeet shooting competition in Dallas*** at the time of the rape, the prosecution was successful in convincing the jury of Durham's guilt. His total sentence: over 3,100 years.

145.    In 1996, Durham contacted the Innocence Project and requested that DNA testing be performed on the physical evidence that had been discovered at the crime scene. Testing revealed that the semen found on the victim's swimsuit could not have come from Durham. This revelation placed the prosecution's accusation beyond the realm of plausibility and pointed to the guilt of a convicted rapist named Jess Garrison, who had moved to Tulsa following his parole. In December of 1991, one month after Durham was charged, Garrison was found hanged in a warehouse in what was eventually ruled a suicide. The prosecutor, who felt he could not justify further action against Durham without any evidence other than eyewitness testimony, eventually dismissed Durham's case.

146.    Timothy Durham spent over three and a half years in prison for a rape he did not commit.

**Arvin McGee**

147.    In 1987, a twenty-year-old woman was attacked in the Tulsa, Oklahoma, laundry where she worked. The victim was tied up and locked in the restroom. The attacker returned, carried her over his shoulders to a car, drove to a secluded area, and raped her. In

1989, after three trials, Arvin Carsell McGee was convicted of this brutal crime and sentenced to 365 years in prison.

148.    McGee's conviction rested largely on the victim's identification. McGee was identified from a photographic-array four months after the crime occurred. ***She had initially picked out another man in another photographic lineup. Mr. McGee's conviction was ultimately based on the TPD officers' fabrication of the victim's identification of him.*** Prosecutors also relied on serological testing of semen collected from the victim, which could not exclude McGee as a possible contributor.

149.    McGee continued to maintain his innocence. At the time of the crime, he was suffering from an injury requiring surgery, rendering him physically unable to carry out the crime. His defense attorneys also pointed out the inconsistencies in the victim's description of her attacker, which changed several times. McGee's first trial was a mistrial, the second ended in a hung jury. After the third trial, he was convicted of rape, kidnapping, forcible sodomy, and robbery. His sentence was later reduced to 298 years.

150.    More than thirteen years later, his case was taken on by the Oklahoma Indigent Defense System. They arranged for DNA testing of the semen evidence. The results revealed that McGee was excluded as a contributor of the spermatozoa and, therefore, could not have been the perpetrator. A second round of testing ordered by Tulsa County prosecutors yielded the same results. Arvin McGee was exonerated and freed from prison in February 2002. He had spent more than 12 years in prison for a crime he did not commit.

151.    In September 2002, Oklahoma authorities revealed that the DNA profile from the biological evidence matched the profile of Edward Alberty, a prisoner in

Oklahoma. Alberty charged with first-degree rape and forcible sodomy, but was not convicted because the statute of limitations had expired. He was subsequently convicted of burglary and other charges and sentenced to 15 years in prison.

152.    In 2006, the city of Tulsa agreed to pay McGee $12.5 million to settle a federal civil rights lawsuit, after a jury had found that the City violated McGee Constitutional rights.

**Michelle Murphy**

153.    About 6 a.m. on September 12, 1994, police in Tulsa were summoned to the townhouse of 17-year-old Michelle Murphy who said she found her 15-week-old son, Travis, stabbed to death in her kitchen.

154.    The baby was lying in a pool of blood, with a puncture wound in his chest and a deep laceration of his neck that resulted in a near decapitation.

155.    By 2 p.m. that afternoon, police said Murphy had confessed. Police said that Murphy gave a statement in which she said she was holding a knife and quarrelling with another woman. She said she leaned over Travis and Travis was accidentally stabbed. No knife was ever linked to the crime.

156.    *Although Oklahoma law prohibited police from questioning minors without a parent or guardian present, Murphy, a minor, was interrogated alone for eight hours. At the time, she was wearing only shorts and a t-shirt and was barefoot. Although Detective Mike Cook had a tape recorder, he only recorded the last 20 minutes of the interrogation.*

157.    During the interrogation, Detective Cook yelled at Murphy, promised her she could go home if she confessed, ran his hand up her leg, and failed to provide Murphy medical care even though she complained of a head injury.

158.    Murphy's confession was coerced by Detective Cook in violation of her constitutional rights.

159.    Soon after, police discovered that a 911 call had been placed at about 3:00 a.m. by 14-year-old William Lee, a neighborhood resident, who reported that Murphy and her husband were quarrelling in the townhouse. In response, police went to the townhouse, but did not enter, and left when no one answered the door. Murphy had separated from her husband, Harold Wood, earlier in the year and lived there with Travis and her two-year-old daughter, also named Michelle.

160.    Detective Cook questioned Lee, who said that while he was walking the neighborhood because he could not sleep, he heard Murphy and Wood arguing. Lee said he called 911 and went home, but left his apartment again at about 4:30 a.m. and again walked by Murphy's townhouse.

161.    Lee said that this time, as he peered through the window of the townhouse, he saw Murphy carry Travis, who was alive, from the living room into the kitchen. Lee recounted that he walked around the building to try to look into the kitchen, and although the blinds on the kitchen window were shut, he was able to see through holes in the blinds that the baby was on the floor in a pool of blood and Murphy had blood spots on her arms. Despite seeing this, Lee claimed that he went home and did not call police.

162.    Lee testified to those details at a preliminary hearing. By the time Murphy went on trial in Tulsa County District Court in November 1995, Lee was dead as a result

of asphyxiation during an auto-erotic hanging. Consequently, the tape-recording of his testimony at the preliminary hearing was played for the jury.

163.   The prosecution's case relied upon Lee's testimony at the preliminary hearing, Murphy's confession, testimony from a crime analyst, and from Detective Cook.

164.   Detective Cook admitted during his testimony that he touched Murphy during the interrogation, claiming he was "examining" her for evidence that she had been molested or attacked. He admitted he touched her head and examined her thighs.

165.    Cook testified that his entire investigation – after obtaining the statement from Murphy – consisted of his interrogation of Lee, an interview with one of Murphy's neighbors, visiting the townhouse to look at the blinds that Lee said he looked through, and going back to Murphy's vacant townhouse six months after the murder. Cook told the jury no suspect had ever falsely confessed to him.

166.   Serology tests had been performed on numerous blood samples collected from the crime scene. The prosecution had informed the defense that all the blood samples collected were determined to be from Travis. However, at the trial, a crime lab analyst falsely testified that Travis's blood type could not be determined because he was too young, that all the blood around the baby was the same blood type, and that blood type AB had been found as well. The analyst said Murphy could not be ruled out as the source of the type AB blood. In fact, the analyst had determined that Travis had type O blood and Murphy had type A blood, which excluded them as the source of the AB blood. That information was not disclosed to Murphy's defense attorney. The lab's analysis of all the blood samples from the scene failed to find any of Murphy's type A blood.

167.    The defense called Murphy's estranged husband, Harold Wood, who testified that he was not in the townhouse that night. He said he was with other friends - several of whom testified that Wood was with them that night.

168.    In rebuttal, Assistant District Attorney Tim Harris called Scott Richie to the witness stand. Richie testified that about a month after the murder, Wood said that he had been at the townhouse on the night of the killing, and that he and Murphy had quarreled because Wood suspected that he was not Travis's father. According to Richie, Wood said that he told Murphy that if she got rid of the child, he would move back in with her.

169.    Although Harris had printed out records showing that Richie had numerous prior convictions and at least three hospitalizations in a mental institution, those records were not disclosed to the defense. Consequently, Murphy's lawyer did not question Richie about his mental problems. He also failed to question Richie about his past convictions. Richie was the last witness the jury heard.

170.    During closing arguments, despite having lab reports that showed that none of Murphy's blood was found at the scene, prosecutor Harris suggested to the jury that Murphy's blood was present and that it was proof that she killed Travis.

171.    On November 19, 1995, a jury convicted Murphy of first-degree murder and she was sentenced to life in prison without parole. Her daughter was given up for adoption.

172.    At the time of the murder, Murphy was studying to obtain a high school equivalency credential. An instructor, Susan Jones, believed Murphy was innocent. For more than 15 years after the conviction, Jones attempted to get legal help for Murphy. In 2011, she persuaded Tulsa lawyers to begin investigating the case.

173.    The lawyers discovered that the prosecution knew that the type AB blood that was found at the scene could not have come from either Murphy or Travis.

174.    ***They also discovered that Detective Cook – who testified that he never had a defendant falsely confess – had in fact obtained a false confession several years earlier.***

175.    In May 2014, after DNA testing on the bloodstains revealed the DNA profile of an unknown male (not that of William Lee), prosecutor Timothy Harris, who was by then the elected District Attorney, agreed to vacate Murphy's conviction. Murphy was released on bond on May 30, 2014.

176.    On September 12, 2014, Harris dismissed the charges. On that date, Judge William Kellough also declared Murphy innocent. In 2015, Murphy received $175,000 in compensation from the state of Oklahoma. Despite the judge's finding, Prosecutor Harris continued to publicly state that he believes Murphy is guilty. In September 2015, Murphy filed a federal civil rights lawsuit against the city of Tulsa.

**LaRoye Hunter**

177.    On December 5, 1989, LaRoye Hunter was charged with Murder in the First Degree in Tulsa County.

178.    The case was investigated by the Tulsa Police Department, with Detective Mike Cook as lead investigator.

179.    LaRoye Hunter was a juvenile when the allegations occurred.

180.    Hunter was interrogated by Detective Cook, who claimed that Hunter confessed to the murder.

181.    Judge Bill Beasley ruled Hunter's confession to police was inadmissible as evidence at trial citing "several severe problems" with the interrogation.

182.    During the interrogation, Detective Cook yelled at Hunter, called him racial slurs, and shut off his tape recorder when using coercive tactics.

183.    On August 30, 1990, prior to trial, the charges against Hunter were dismissed by the State citing a lack of evidence.


**Damages**

184.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

185.    The unlawful actions of Defendant officers, and other investigating officers, as described herein, caused Mr. Scott to spend over twenty (20) years in prison for a murder he did not commit.

186.    The unlawful actions of Defendant officers, and other investigating officers, as described herein, caused Mr. Carpenter to spend over twenty (20) years in prison for a murder he did not commit.

187.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiffs each sustained injuries and damages, including each suffering a loss of his freedom for twenty (20) years, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, music, movies, travel, enjoyment and freedom of speech and expression.

188.    In addition, there is a causal link between Plaintiffs' damages and the municipal policies, customs and practices described above.

## Claims For Relief

### Federal Causes of Action

### Count I

### Fourteenth Amendment Violations / *Brady v. Maryland*
(**42 U.S.C. § 1983**)

189.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

190.    As described more fully above, Defendants, all state actors, acting deliberately, recklessly, and/or intentionally, individually, jointly, and/or in concert or conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Scott of his constitutional right to a fair trial.

191.    As described more fully above, Defendants, all state actors, acting deliberately, recklessly, and/or intentionally, individually, jointly, and/or in concert or conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Carpenter of his constitutional right to a fair trial.

192.    More particularly, as described more fully above, Plaintiffs' right to a fair trial was violated by multiple instances of the fabrication of inculpatory evidence, thru, *inter alia*, the coerced false testimony of purported eyewitness as described herein.

193.    Further, Defendants Meek, Solomon, and other investigating officers, specifically withheld and concealed from Plaintiffs and their counsel the coercive tactics used to obtain the false statements and testimony of Price and Williams. Evidence of the coercive tactics used by Meek, Solomon, and other investigating officers, was important and valuable impeachment evidence. Defendants' failure to disclose, and active concealment of, this impeachment evidence was a *Brady* violation and a violation of Plaintiffs' right to a fair trial.

194.    Additionally, Defendants Meek and Solomon withheld and concealed from Plaintiffs and their counsel the evidence that Price told Solomon, at TRMC, that he could not see who was in the car or who fired the shots. Defendants' failure to disclose, and active concealment of, this impeachment evidence was a *Brady* violation and a violation of Plaintiffs' right to a fair trial.

195.    Solomon would later testify against Carpenter and Scott at trial, providing materially misleading testimony, and failing to disclose that Price told him, at TRMC, that he could not see who was in the car or who fired the shots. And Solomon never disclosed this exculpatory information to Plaintiffs or their criminal defense lawyers.

196.    Moreover, Plaintiffs' right to a fair trial was violated by multiple instances of the suppression of exculpatory evidence, thru, *inter alia*, Defendant Officers', and other investigating officers', failure to conduct basic forensic testing of physical evidence and their disregard of the overwhelming weight of evidence pointing to Wilson as the shooter.

197.    Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiffs and their continuing wrongful imprisonment, violating their clearly established Fourteenth Amendment due process rights including the

right to a fair trial, along with their Fourth Amendment right to be free from unreasonable seizures.

198.    As a direct and proximate result of this violation of their Constitutional right to a fair trial, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress, as described more fully above.

199.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and deliberate indifference to Plaintiffs' clearly established constitutional rights.

## Count II

**Fourteenth Amendment Violation**
**Substantive Due Process**
**(42 U.S.C. § 1983)**

200.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

201.    As described more fully above, all of the Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived each of the Plaintiffs of his constitutional right to due process.

202.    Although Defendant Officers, and/or other investigating officers, knew or should have known that Plaintiffs were not involved in murder of Ms. Summers and shooting of Price and Johnson, they fabricated evidence, including, without limitation, the coerced and rehearsed false testimony of Price and Williams.

203.    Moreover, Defendant Officers, and/or other investigating officers, suppressed exculpatory evidence, through, *inter alia*, the failure to conduct basic forensic

testing of physical evidence, such as fingerprints of the gun and car, and the disregard of the overwhelming weight of evidence pointing to Wilson as the shooter.

204.     Further, Defendants Meek and Solomon, and other investigating officers, specifically withheld and concealed from Plaintiffs and their counsel the coercive tactics used to obtain the false statements and testimony of Price and Williams.  Evidence of the coercive tactics used by Meek, and other investigating officers, was important and valuable impeachment evidence.  Defendants' failure to disclose, and active concealment of, this impeachment evidence was a *Brady* violation and a violation of Plaintiffs' right to a fair trial.

205.     Additionally, Defendants Meek and Solomon withheld and concealed from Plaintiffs and their counsel the evidence that Price told Solomon, at TRMC, that he could not see who was in the car or who fired the shots. Defendants' failure to disclose, and active concealment of, this exculpatory evidence was a *Brady* violation and a violation of Plaintiffs' right to a fair trial.

206.     Solomon would later testify against Carpenter and Scott at trial, providing materially misleading testimony, and failing to disclose that Price told him, at TRMC, that he could not see who was in the car or who fired the shots.  And Solomon never disclosed this exculpatory information to Plaintiffs or their criminal defense lawyers.

207.     These fraudulent, outrageous, and/or egregious acts robbed Plaintiffs' criminal trial of fundamental fairness to a degree that shocks the conscience, violating Plaintiffs' clearly established constitutional right to substantive due process of law as guaranteed the Fourteenth Amendment and causing Plaintiffs' wrongful convictions and

the injuries and damages set forth above, a magnitude of potential and actual harm that is truly conscience shocking.

## Count III

### Fourth & Fourteenth Amendment Violation
### Malicious Prosecution
### (42 U.S.C. § 1983)

208.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

209.    Defendants Meek, Huff, Solomon and Clark accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they knowingly, or with reckless disregard to the truth, provided false and coerced statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

210.    Defendants Meek, Huff, Solomon and Clark caused Plaintiffs to be illegally seized, charged with murder and other felonies, and improperly subjected to judicial proceedings for which there was no probable cause. Plaintiffs' arrest and the judicial proceedings against them were instituted and continued maliciously, resulting in damages as described more fully above.

211.    Defendants also suppressed exculpatory evidence, thru, *inter alia*, the failure to conduct basic forensic testing of physical evidence, such as fingerprints of the gun and car, and the disregard of the overwhelming weight of evidence pointing to Wilson as the shooter.

212.    The want of probable cause is, and was at the time of arrest, evident, and any appearance of probable cause was only created through Defendants' illicit misconduct.

213.    Plaintiffs were held to be actually innocent by the Courts of the State of Oklahoma.

214.    As a direct and proximate result of this misconduct, Plaintiffs sustained, and continue to sustain, damages as set forth above, including pain and suffering.

## Count IV

### Failure to Intervene
### (42 U.S.C. § 1983)

215.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

216.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

217.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs each suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

218.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to the clearly established constitutional rights of each Plaintiff.

## Count V

### *Monell* Claim / Municipal Liability

219.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

220.    The actions of each of the individual Defendant Officers, and other investigating officers as described herein, were undertaken pursuant to policies, practices and/or customs of the Tulsa Police Department, described more fully in paragraphs 103-183, *supra.*

221.    The polices, practices and/or customs described in this Complaint were maintained and implemented by the City of Tulsa with deliberate indifference to the Constitutional violations likely to result.

222.    There is a causal nexus between the policies, practices and customs and Plaintiff's damages and injuries as described herein.

## Count VI

### Civil Conspiracy To Violate/Deprive Constitutional Rights
### Against All Named And Unnamed Individual Defendants
### (42 U.S.C. § 1983)

223.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

224.    After the murder of Karen Summers, the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive the Plaintiffs of their constitutional rights, including their rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

225.    In this manner, Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

226.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above–such as coercing false identifications and testimony–and was an otherwise willful participant in joint activity.

227.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiffs' rights were violated and they each suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

228.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to the Plaintiffs' rights.

## Supervisory Liability
### (Palmer)

229.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

230.    There is an affirmative link between the aforementioned violation of Plaintiffs' constitutional rights and policies, practices and/or customs (described more fully in paragraphs 103-183, *supra*) which Defendant Palmer promulgated, created, implemented and/or possessed responsibility for.

231.    Defendant Palmer knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of citizens like Plaintiff.

232.    Defendant Palmer disregarded the known and/or obvious risks to the health and safety of citizens like Plaintiffs.

233.    There is an affirmative link between the unconstitutional acts of his subordinates and Defendant Palmer's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

234.    As a direct and proximate result of the aforementioned policies, practices and/or customs, Plaintiffs suffered the injuries and damages as alleged herein.

235.    Plaintiffs are entitled to punitive damages on their claims brought against Defendant Palmer in his individual capacity as his conduct, acts and omissions alleged herein constitute reckless or callous indifference to Plaintiffs' federally protected rights.

**Oklahoma State Law Causes Of Action / Governmental Tort Claims Act**

**Count VII**

**Negligence**

236.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

237.    Defendants owed Plaintiffs a duty of reasonable care.

238.    Defendants violated that duty by subjecting Plaintiffs to unreasonable and wrongful arrest, imprisonment, prosecution and conviction as described herein.

239.    As a direct and proximate result of the Defendants' actions, Plaintiffs suffered and continue to suffer damages as described more fully *supra*.

## Count VIII

### Respondeat Superior

240.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

241.    The City of Tulsa is vicariously liable for the conduct of its employees acting within the scope of their employment, including Meek, Huff, Solomon, Clark and any other officer who violated Plaintiffs' rights as described herein.

### Punitive Damages

242.    Plaintiffs re-allege and incorporate by reference each paragraph of this Complaint, as though fully set forth herein.

243.    Plaintiffs each are entitled to punitive damages on their respective claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Plaintiffs' federally protected rights.

**WHEREFORE**, based on the foregoing, Plaintiffs, Malcolm Nigel Scott and Demarchoe Carpenter, pray that this Court grant them the relief sought, including, but not limited to, actual damages, compensatory damages and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,


/s/ W. Brett Behenna
W. Brett Behenna
COYLE LAW FIRM
125 Park Avenue, First Floor
Oklahoma City, OK 73102
Telephone: (405) 232-1988
Facsimile: (405) 272-9859
bb@coylelaw.com

John W. Coyle, III
COYLE LAW FIRM
125 Park Avenue, First Floor
Oklahoma City, OK 73102
Telephone: (405) 232-1988
Facsimile: (405) 272-9859
jc@coylelaw.com

Michel Leon Brooks
BROOKS LAW FIRM
7100 N. Classen Blvd. Ste. 300
Oklahoma City, OK 73116
Telephone: (405) 840-1066
Facsimile: (405) 843-8446
michael.brooks@brookslawok.com

Emily S. Eleftherakis
EMILY S. ELEFTHERAKIS, PLLC
7100 N. Classen Blvd. Ste. 303
Oklahoma City, OK 73116
Telephone: (405) 254-5097
Facsimile: (405) 212-4459
emily@eleflaw.com

Joseph M. Norwood
NORWOOD LAW OFFICE
1717 Cheyenne Ave.
Tulsa, OK 74119
Telephone: (918) 582-6464
Facsimile: (918) 582-7830

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on February 8, 2019, I filed the attached document with the Clerk of Court for the Northern District of Oklahoma. A copy of this motion was provided via electronic filing to Defendants' counsel on the same day it was filed.


                                    /s/ W. Brett Behenna
                              W. BRETT BEHENNA