## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MALCOLM NIGEL SCOTT, and** | ) | |
| **DEMARCHOE CARPENTER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-CV-400-TCK-CDL** |
| | ) | |
| **CITY OF TULSA, OKLAHOMA,** | ) | |
| **MIKE HUFF, GARY MEEK, RONALD** | ) | |
| **PALMER, RANDALL W. SOLOMON,** | ) | |
| **JIM CLARK, and SEAN LARKIN,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION and ORDER

Before the Court are the Motions of the Defendants to Dismiss Plaintiffs' Fourth Amended Complaint (Docs. 153, 154, 155, 156, 157, 171 & 188).   Plaintiffs filed a Consolidated Response to several motions, and separate Responses to two of the Motions to Dismiss (Docs. 175, 183 & 194). Defendants filed Replies to each Response (Docs. 184, 187 & 197)**.**   Plaintiffs voluntarily dismiss Defendant Ronald Palmer and the supervisory claim against him (Count VI of the Fourth Amended Complaint). (Doc. 175 at 1).

Plaintiffs Malcolm Nigel Scott ("Scott") and Demarchoe Carpenter ("Carpenter") allege they spent nearly twenty years in prison after they were wrongfully convicted for a drive-by shooting that resulted in the death of Karen Summers and injuries to Kenneth Price ("Price") and Alonzo Johnson ("Johnson"). Plaintiffs contend they had nothing to do with the shooting, and they are innocent of these crimes. Plaintiffs' Fourth Amended Complaint sets forth allegations which support their belief that their wrongful convictions were no accident. (Doc. 150). Rather, Plaintiffs'

Fourth Amended Complaint details facts supporting their belief that the Defendant Tulsa Police officers worked in concert to frame them. Specifically, Plaintiffs assert that Defendants Gary Meek, Randall Solomon, Jim Clark, and Mike Huff fabricated evidence, including false statements and false testimony from Price, Johnson, and Rashun Williams ("Williams") —all teenagers at the time—that identified Plaintiffs as the shooters, as well as false police reports stating Plaintiffs had been driving a car that was similar to the car used in the shooting. To bolster their false case, Plaintiffs allege Defendants suppressed evidence of their fabricated and coerced witness statements and testimony, as well as evidence pointing to the real perpetrator, Michael Wilson ("Wilson"), who later confessed to committing the shooting alone.

Plaintiffs' claims against the City of Tulsa, Oklahoma ("City") include allegations that the City employed a number of unconstitutional law enforcement policies and customs that were a moving force behind the violation of Plaintiffs' constitutional rights, as well as the wrongful convictions of several other citizens." Fourth Amended Complaint ¶ 103.

Plaintiffs added Defendant Sean Larkin ("Larkin"), a Tulsa Police Department Lieutenant ("TPD") to include separate allegations of a later cover-up as set forth *infra* at pp.7-9.

**I. Background**

In 322 paragraphs, Plaintiffs' Fourth Amended Complaint outlines how they believe Defendants' misconduct violated their constitutional and state-law rights and caused their wrongful convictions for crimes they did not commit.

In the early morning hours of September 10, 1994, Wilson, a known gang member, drove by a rival gang's house party located at East 29th Street North in Tulsa. *Id*. at  ¶¶ 21, 31. Wilson shot into a crowd of people at the party using a .380 Lorcin semiautomatic handgun. *Id.* at ¶¶ 21,

2

28, 31, 50. He was being driven by a friend, Billy Alverson ("Alverson"), in a red or maroon car that he had rented a few days earlier. *Id.* at ¶¶ 22, 28. Wilson's friend, Richard Harjo ("Harjo"), was also in the car. *Id.* at ¶ 28.

A woman attending the party, Karen Summers, was killed by the gunshots. Price and Johnson, were also shot but survived. *Id.* at ¶ 31. Tulsa police officers, including Defendants Meek, Solomon, and Clark, responded to the scene of the shooting and conducted a canvas. *Id*. at ¶ 32. They recovered three spent bullet casings from a .380-caliber weapon, interviewed several witnesses at the scene, and interviewed the surviving victims at the hospital. *Id*. at ¶¶ 32, 33, 59.

After Defendants' initial investigation, they had no suspect and no witness who could describe the shooter or any occupants in the car. *Id.* at ¶¶ 33, 40, 59. Plaintiffs allege that "absent any legitimate means to solve the case, they decided to pin the shooting on Plaintiffs Scott and Carpenter." *Id*. at ¶¶ 244-45, 256. Plaintiffs were not present at the scene of the drive-by shooting and knew absolutely nothing about it. *Id.* at ¶¶ 30, 67. No physical evidence ever tied Plaintiffs to the shooting*. Id*.

Defendants then framed Plaintiffs by coercing several teenage witnesses to falsely implicate them. *Id*. at ¶ 33. Defendants started with Price, one of the surviving victims of the shooting. *Id*. Price was interviewed in the hospital by Defendant Solomon. *Id*. Price told Defendant Solomon that he did not see who was in the car or who fired shots from the car because his back was turned. *Id*. Without reason to believe that Scott or Carpenter had any involvement in the shooting, but with animosity towards them, Defendant Solomon pressured Price to identify Plaintiffs as the shooters. *Id.* When Price nevertheless refused to implicate Plaintiffs, Defendant Solomon fabricated a statement that Price saw Plaintiffs in a red Ford Escort at the scene of the

crime. *Id*. Solomon suppressed Price's true statements that he did not see who was in the car or who fired shots from the car. *Id.* at ¶ 35.

Later that evening, Price was interviewed by Defendant Meek, and over the next month, by at least one or more Defendants including Meek and Solomon. *Id*. at ¶ 38. In each interview, Price truthfully stated that he did not see the shooter, or who was in the car with the shooter. *Id.* at ¶¶ 38, 39. Nevertheless, Defendants pressured Price into identifying Plaintiffs as the shooters with several coercive tactics, including threatening to charge Price with murder if he did not falsely implicate Plaintiffs. *Id.* at ¶¶ 38, 39. Price eventually succumbed to Defendants' pressures, and later testified that he saw Plaintiffs shooting from the car and Wilson driving. *Id*. at ¶ 37.

Defendants next coerced the other surviving victim of the shooting, Johnson. Johnson was also interviewed by Defendant Solomon in the hospital. *Id.* at ¶ 59. Like Price, Johnson truthfully told Defendant Solomon that he did not see who was in the car when shots were fired or who fired the shots. *Id*. And as he did with Price, Defendant Solomon nevertheless fabricated a false statement that Johnson saw Scott fire several rounds of shots into the crowd. *Id.* at ¶¶ 59, 60. Solomon suppressed Johnson's true statements that he did not see who was in the car or who fired shots from the car. *Id*.

Finally, Defendants pressured Williams to falsely implicate Plaintiffs. *Id*. at ¶ 45. Williams was at the house party and seated next to Karen Summers when she was fatally shot. *Id*. at ¶ 40. When Williams was interviewed by police at the scene, he truthfully told them that he did not see the shooters or the occupants of the car, but did see they were driving a red or maroon Ford car. *Id.* Later that evening, Williams was interviewed at the police station by one or more Defendants, including Defendant Meek. *Id.* at ¶¶ 42, 44. As they did with Price, Defendants pressured Williams

with threats and other coercion into identifying Plaintiffs as the shooters in the backseat of the car. *Id*. at ¶ 44. In particular, Defendant Meek fed Plaintiff Carpenter's name to Williams. *Id*. at ¶ 42. Williams eventually succumbed to Defendant Meek and the other Defendants' pressures, adopting the false narrative that he saw Plaintiffs committing the shooting. *Id*. at ¶ 44.

Defendants also fabricated other evidence to implicate Plaintiffs in the shooting. Specifically, a day before the shooting, Defendant Clark pulled over Plaintiffs in a caramel brown Grand Prix. *Id.* at ¶ 23. Defendant Clark gave Scott a ticket for driving without a license or insurance. *Id*. The next day, after the drive-by shooting, Defendant Clark fabricated in a police report that when he had pulled Plaintiffs over the day before, they were in a red or maroon Ford Escort, the same color and type of car that witnesses had reported the shooter was driving. *Id.* at ¶ 25. Plaintiffs were in fact driving a caramel brown Grand Prix. *Id.* at ¶ 23. Based on Solomon and Clark's false reports, Plaintiffs were arrested for the shooting. *Id*.

Finally, to complete their frameup of Plaintiffs, Defendants ignored other evidence that pointed to Wilson as the shooter. *Id.* Specifically, the day after the shooting, Defendant Huff received a tip from a confidential informant regarding the location of a car that matched the description of the car used in the shooting. *Id.* at ¶ 46. Defendant Huff went to the location, which was Wilson's home. *Id.* Parked in Wilson's driveway was a maroon Ford Taurus, which matched the description of the car that witnesses had described as being involved in the shooting. *Id.* Defendant Huff asked Wilson to go to the police station for questioning, and Wilson agreed. *Id.* While Defendant Huff was waiting for Wilson, he observed Wilson remove a gun from under his shirt and throw it under his bed. *Id*. Defendant Huff seized the weapon and observed it was a .380 Lorcin semiautomatic handgun, the same type of gun used in the drive-by shooting. *Id*. Despite

5

getting a tip that the shooter's car was located at Wilson's home, and Wilson had a car matching the description, and was armed with a .380 handgun, Defendant Huff never had the weapon tested. *Id.* at ¶ 47.

Defendant Meek then questioned Wilson at the police station, where Wilson stated that he had been driving a maroon Ford Taurus at the time of the shooting and had a .380 Lorcin semiautomatic that his mother had given him for protection. *Id.* at ¶¶ 48, 49. Wilson confirmed that he had not loaned the weapon to anyone. *Id.* Finally, Wilson told Meek that he had been shot on September 7, three days before the shooting, by members of the same rival gang as those throwing the house party on September 10. *Id.* at ¶ 48. Defendants ignored this evidence pointing to Wilson, including Wilson driving a vehicle that matched the same vehicle reported at the shooting; possessing a weapon that matched the weapon used to commit the shooting; and providing a motive to commit the shooting—i.e., as retaliation for an earlier shooting. *Id.* at ¶ 51. In furtherance of pinning the shooting on Plaintiffs, Defendants failed to test Wilson's rented maroon Ford Taurus or his weapon for fingerprints. *Id.* at ¶ 47.

After Plaintiffs were arrested and charged, forensic testing revealed that the weapon seized from Wilson was in the fact the weapon used in the shooting. *Id*. at ¶ 50. In addition, Defendants failed to investigate the other two occupants of Wilson's car, Alverson and Harjo. Alverson and Harjo were never questioned, arrested, or charged with any crimes related to the drive-by shooting. *Id.* at ¶¶ 84, 86.

At Plaintiffs' trial in 1994, no physical evidence was presented linking them to the scene of the shooting, and there were no witness accounts—aside from the falsely procured ones—that placed them at the scene. *Id*. at ¶¶ 68-69. Based on Defendants' fabricated evidence, Plaintiffs

were wrongfully convicted of first-degree murder, shooting with intent to kill, and using a vehicle to discharge a weapon. *Id.* at ¶ 70. They were sentenced to life in prison for the murder, two seventy-five-year terms for the shooting with intent to kill, and twenty years for the use of a vehicle to discharge a weapon. *Id.*

After Plaintiffs were wrongfully convicted, Wilson confessed to committing the shooting numerous times to several witnesses, including confessing for a fourth time two days before he was executed for a different crime. *Id.* at ¶¶ 53- 56. Some of Wilson's final words before he was put to death were: "Malcolm Scott and Demarchoe Carpenter are innocent." *Id.* at ¶¶ 1, 56-57. Williams and Price also recanted their prior testimony, *Id.* at ¶¶ 38-39, 44, and Alverson and Harjo, who were in the car with Wilson at the time of the drive-by shooting, gave statements providing that Wilson committed the shooting alone and that Plaintiffs had nothing to do with it. *Id.* at ¶¶ 84-88.

Armed with these confessions and recantations, Plaintiffs filed petitions for postconviction relief. *Id.* at ¶¶ 3, 4. On May 13, 2016, Plaintiffs' petitions were granted. *Id.* On November 10, 2016, the Oklahoma Court of Criminal Appeals affirmed the grant of Plaintiffs' post-conviction petitions. *Id.* at ¶¶ 2, 102. Almost twenty years after their ordeal began, Plaintiffs' convictions were vacated and they were released from prison. *Id.*

After finally proving their innocence and winning their freedom, in July 2017 Plaintiffs filed the instant lawsuit alleging the named Defendants, excluding Larkin, committed numerous violations of their civil rights in procuring their wrongful convictions.(Doc. 1). Then, during discovery in this case, Larkin retaliated against Carpenter by framing him yet again for another shooting he did not commit. *Id.* at ¶¶ 199, 208, 299, 300, 304-05.

7

Specifically, in late June and early July 2019 as this lawsuit was proceeding through discovery, Plaintiffs deposed nine City of Tulsa officials, including members of the TPD. *Id.* at ¶¶ 186-87. A few weeks after those depositions, on August 6, 2019, a man named Sheldon Reed ("Reed") was shot in North Tulsa. *Id.* at ¶ 189. Immediately after the shooting, Reed was clear that he could not identify the shooter. *Id*. at ¶¶ 191-93. In fact, when he called to report the shooting and was asked by the 911 dispatcher who shot him, Reed answered, "I don't know." *Id.* at 190-91. Four days later, a TPD officer visited Reed in the hospital and again asked him who shot him, and Reed reiterated that he did not know. *Id.* at ¶¶ 192-93. Then, Larkin spoke to Reed. *Id.* at ¶ 194. Although Reed was clear after that shooting that he had no idea who shot him, Larkin coerced him to name Carpenter as his assailant. *Id*. at ¶¶ 191-93, 209.

On August 11, 2019, Larkin and Reed had an unrecorded conversation. *Id.* According to medical records, on the day of this unrecorded conversation and the subsequent identification, Reed still had PCP in his system and was hallucinating. *Id.* at 195. Shortly after Larkin and Reed's unrecorded conversation, Reed claimed for the first time ever, in an incoherent and illogical story, that Carpenter was the person who shot him. *Id.* at ¶¶ 194, 196. Larkin made no attempt to defer this alleged identification for a time when Reed was not high and hallucinating, nor did Larkin question Reed about how to reconcile this purported identification with his earlier claims that he did not know who his assailant was. *Id.* at ¶¶ 196-98. Instead, Larkin told Reed, "Alright hey, we'll find his ass, but you need to stick with us and prosecute him," and "[h]e might have gotten out on this murder, but we're going to put him away on this one. Ok." *Id.* at ¶ 199.

Without ever interviewing any eyewitness to the shooting, within two days, Larkin ensured that Carpenter was charged. *Id*. at ¶¶ 200-01. Larkin pursued Carpenter knowing that the

eyewitnesses Larkin failed to interview would have averred that Carpenter was not the person who shot Reed. *Id*. at 202-03. Moreover, Larkin actively sought to sabotage the physical evidence in the case because he knew it would exonerate Carpenter. *Id*. at ¶¶ 204-08. For instance, Larkin released the car that Reed was shot in and then waited until nine days to test the car for forensic evidence, after it had been exposed to outside elements, thus preventing the reliable identification and collection of physical evidence from the crime. *Id*. at ¶ 205. Additionally, Larkin purposefully failed to collect video evidence that would have shown that Reed's fabricated story was untrue, and Larkin also refused to investigate or follow up with potential suspects in the case who had both knowledge of the shooting and a motive. *Id.* at ¶¶ 206-07.

Finally, Larkin intimidated a witness who came forward and averred that Reed admitted to him that Reed did not know who shot him and said that TPD was forcing him to falsely implicate Carpenter. *Id*. at ¶ 209. The witness signed an affidavit about Reed's admissions and was listed as a witness for Plaintiff Carpenter in the criminal trial against him. *Id.* at ¶¶ 210-11. Ten days before the criminal trial, the witness was arrested by a TPD unit supervised by Larkin, to silence the witness. *Id*. at ¶¶ 212-13. The tactic worked, and the witness refused to testify because he feared retaliation from the TPD. *Id.* at ¶ 216. Despite Larkin's effort to frame Plaintiff, given the false evidence, a jury acquitted Plaintiff Carpenter on the charges of shooting Sheldon Reed. *Id*. at ¶ 217.

In this lawsuit, Plaintiffs bring ten claims, eight of which are relevant to Defendant Meek, Solomon, Clark, and Huff's Motions to Dismiss: a due process claim for withheld *Brady* evidence (Count I); a due process claim for the fabrication of evidence (Count II); a malicious prosecution and unlawful pretrial detention claim under the Fourth Amendment to the United States

Constitution (Count III); a failure to intervene claim (Count IV); a conspiracy claim alleging Defendants conspired to deprive Plaintiffs of their constitutional rights (Count V); and state law negligence and respondeat superior claims (Counts X and XI). Plaintiffs' Fourth Amended Complaint also includes a prayer for punitive damages. Plaintiffs' claims against Larkin include malicious prosecution and First Amendment Retaliatory Arrest related to the 2019 arrest of Carpenter. (Counts VII and VIII).

Count IX is a claim against the City for municipal liability. This claim is based on the City's longstanding, documented knowledge of police misconduct and failure to train, discipline or institute policies to correct the internal problems: "The actions of each of the individual Defendant Officers, and other investigating officers as described herein, were undertaken pursuant to policies, practices and/or customs of the Tulsa Police Department, described more fully in paragraphs 103-184, 241-243 *supra.* The polices, practices and/or customs described in this Complaint were maintained and implemented by the City of Tulsa with deliberate indifference to the Constitutional violations likely to result. These policies have continued until 2021 and were used once again to try and obtain a false and fraudulent arrest and conviction against Demarchoe Carpenter. There is a causal nexus between the policies, practices and customs and Plaintiffs' damages and injuries as described herein." ¶¶ 311-314.

For example the Plaintiffs state that "despite Lt. Larkin's very clear history of engaging in unconstitutional misconduct, he has never been disciplined or required to complete additional training by the TPD. *Id*. at ¶ 233. Further, as the result of an FBI investigation, "Lt. Larkin has been barred from testifying in federal court because the United States Attorney's Office refuses to sponsor his testimony. *Id.* at ¶ 230. "In fact, the federal government believes that Lt. Larkin is so

10

corrupt and dangerous that they sought to seal the records of witnesses who came forward against Lt. Larkin out of fear that Lt. Larkin would retaliate and seek to harm them. *United States v. Adkinson,* Case No. 08-CR-167-JHP." (Docs. 151, 154). *Id.* at ¶231. Additionally, the FBI Agent in the *Adkinson* case also feared for his safety from Lt. Larkin if the proceedings were unsealed. *Adkinson,* Doc. 132 at 21-22.

"Rather than discipline Lt. Larkin, he received a promotion and was designated to represent the City and the TPD in its short run being featured on the television show, "Live PD." Doc. 150 at ¶ 234. Perhaps most shocking is that the United States Attorney requested that this information be sealed to the public. " The Court: And it is your position then that this information should be sealed permanently to protect the informants? Mr. Faerber: It is, Your Honor. Because I cannot think of a circumstance so long as these confidential informants exist and Sergeant Larkin exists, I can't think of a circumstance that would make it safe." *United States v. Adkinson*. *Id.* at ¶ 232, Docs. 82, 132 at 25, 154 at 6. This information was not sealed and has been public information since 2014. *Adkinson*, Doc. 154 at 6.

## II. ANALYSIS

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. 556). In assessing whether a plaintiff states a claim, courts must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the pleading party. *Beedle v. Wilson*,

422 F.3d 1059, 1063 (10th Cir. 2005).

The dismissal of claims prior to discovery "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

Further, all defendants argue they are entitled to qualified immunity. While district courts may adjudicate qualified immunity claims presented in a motion to dismiss, such claims face a challenging standard because the court must analyze the defendant's conduct by fully crediting the allegations in the complaint and drawing all reasonable inferences therefrom. *Ullery v. Bradley*, 949 F.3d 1282, 1287 (10th Cir. 2020); *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). Accordingly, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal [because] when defendants do assert immunity it is essential to consider facts in addition to those in the complaint." *Rock v. Levinski*, 2013 WL 12329164, at *1 (D.N.M. Oct. 22, 2013) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000)). [1] "Motions based on qualified immunity typically are better brought under Rule 56 rather than at the 12(b)(6) pleading stage." *Id.*

Plaintiffs bear the burden of overcoming a qualified immunity defense. *Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021). At the motion to dismiss stage, this burden requires a plaintiff to: (1) plead facts demonstrating that the defendant violated a federal constitutional or statutory right, and (2) show that the right was clearly established at the time of the defendant's conduct. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Doe v.*

---

[1]As discussed *supra* at 14, Defendant officers have submitted matters outside the pleadings for the Court's consideration of this matter.

*Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019)).

To meet the first prong, all a plaintiff must do to state a claim under Section 1983 is allege that a person acting under color of state law has deprived him of a federal right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Supreme Court admonishes that this basic pleading requirement of Section 1983 claims is not heightened simply because a defendant asserts a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 594-97 (1998); see also *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (no heightened pleading requirement to refute in qualified immunity; rather, the complaint must need only "meet the minimal standard of notice pleading as articulated by the Court in *Twombly*."). Accordingly, under the first prong for assessing qualified immunity, the complaint need only contain factual allegations that plausibly give rise to an entitlement to relief. *Ullery*, 949 F.3d at 1287 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

This basic pleading requirement "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfullyharmed-me accusation." *Id.* (citing *Iqbal*, 556 U.S. at 678, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In assessing whether plaintiffs state a claim, courts must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the pleading party. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005).

A plaintiff meets the second element, the clearly established prong, "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (citation omitted). This requires that the contours of the right are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates

that right." *Id*. The analysis is general and does not require an exactly analogous case—it "is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id*. (quoting *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)); see also *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019) (second prong of the qualified immunity analysis is met when it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted ... even though existing precedent does not address similar circumstances.") (citation omitted).

### A. Notice

Defendants move to dismiss Plaintiffs' Fourth Amended Complaint on that ground that it impermissibly "lumps all Defendants together." (Doc. 184).   The Court finds, however, Plaintiffs' complaint identifies a limited and well-defined subset of individuals who are alleged to have violated Plaintiffs' rights, and it further describes what actions they took. (Doc. 150 ¶¶ 33-37, 40-45, 59-60 (Defendants pressured witnesses Price, Johnson, and Williams into giving false statements inculpating Plaintiffs and hid that they had coerced these witnesses); ¶¶ 23-25 (Defendants fabricated additional evidence implicating Plaintiffs in the crime); ¶¶ 46-51 (Defendants conspired with each other to hide, downplay, or ignore evidence that pointed to Wilson as the shooter). That is all that is required at this stage. Contrary to Defendants' argument that Plaintiffs have engaged in impermissible "lumping," it is well established that a complaint does not fail because it refers to the actions of a small number of defendants as a group.

Defendants Meek, Solomon, Clark, and Huff are not entitled to dismissal because the Fourth Amended Complaint makes the same allegations against each of them. Instead, the core consideration is notice. *Twombly*, 550 U.S. at 554-55. Thus, district courts in this Circuit have

repeatedly refused to dismiss complaints for allegedly improper group pleading. *See, e.g.*, *APMC, Inc. v. Fogarty*, 2008 WL 4279780, at *2 (W.D. Okla. Sept. 12, 2008) (plaintiff meets the pleading standard by identifying specific activities taken within a discrete time frame); *Bledsoe v. Bd. of Cty. Commissioners of Cty. of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D. Kan. 2020) (noting "the Tenth Circuit never has adopted a blanket prohibition against collective allegations" and finding that the collective allegations against a defined group of defendant officers were sufficiently specific to survive a motion to dismiss).

Dismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery. *See, e.g., Birdsong v. Unified Government of Kansas City*, 2014 WL 2216904, at *5 (D. Kan. May 29, 2014) ("[T]o the extent that [defendants] are requesting that Birdsong be required to allege how [defendants] otherwise 'agreed, conspired, and acted in concert to falsely and maliciously prosecute Birdsong, that level of pleading is not required by Rule 8(a)(2). Moreover, it is understandable that Birdsong, prior to discovery, may not have sufficient knowledge or information to provide the specific level of detail requested by [defendants].")). This is particularly true in cases like this one, where much of the alleged misconduct happened outside of Plaintiffs' direct observation. For example, in *Bark v. Chacon*, 2011 WL 188469 (D. Colo. May 18, 2011), the court rejected the defendants' "lumping" challenge on the ground that it would be unfair to require the plaintiff in a search and seizure case to allege which specific defendant committed which specific act in question, holding that all the plaintiff was required to do at the pleading stage was name the officers involved, describe the alleged misconduct, and allege that the officers collectively committed that misconduct. *Id.* at *5.

Just as in *Bark*, Plaintiffs in this case have named the officers involved in the investigation, described the misconduct used to secure their wrongful convictions, and alleged that the Defendants collectively committed that misconduct. Without discovery, it is not reasonable to expect, nor does the law require, Plaintiffs to identify every specific action each Defendant took. *See, e.g., Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008) (holding complaint which grouped defendants together was sufficient because complaint clearly named defendants who allegedly committed misconduct, which gave defendants fair notice of the grounds on which the plaintiff claimed entitlement to relief.).

Therefore, Plaintiffs' allegations in the instant case, which identify the individual defendants and then consistently discuss different subgroups of defendants are sufficient—Defendants Meek, Solomon, Clark, Huff, and Larkin are on adequate notice of the claims against them. This is all that is required at this early stage of litigation.

## B. Defendants' Motion to Dismiss Cannot be Decided on Matters Outside the Pleadings

Despite their characterization, Defendants' motions to dismiss are motions for summary judgment and are premature. This Court cannot consider evidence outside the operative complaint at the motion to dismiss stage. A Rule 12(b)(6) motion that is based on material outside the pleading is converted to a Rule 56 motion pursuant to Federal Rule of Civil Procedure 12(d). *Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014).

When resolving a motion to dismiss, "a district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claim, and (3) indisputably authentic." *Id*. Courts may also properly rely on matters that they can judicially notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider "matters of which [it] may take judicial

notice" in ruling on motions to dismiss). None of these conditions apply here.

In support of their motions, Defendants ask this Court to consider additional documents outside the Plaintiffs' Complaint that purportedly establish what happened during the interviews of witnesses Price and Williams; what actions Defendants took during their investigation; and what motivations were behind Wilson's actions, who later confessed to being the shooter. *See, e.g.*, Doc. 155, Defendant Meek's Motion to Dismiss at 7, 8, 9. Further, Larkin submits an audio recording of the interview between him and Reed. *See*, Exhibit No. 1 to Doc. 189.

Defendants next contend this Court can take judicial notice of the facts as described in the state-court criminal proceedings. While the Court could take judicial notice that Plaintiffs were tried and convicted for the shooting, or the fact that Wilson took a plea deal with the Tulsa County District Attorney's Office, it can only do so if those facts are not subject to reasonable dispute. *Gee,* 627 F.3d at 1186. As the state court record includes contested facts, including whether witnesses identified Plaintiffs as the shooters without any police pressure or coercion, this Court cannot take judicial notice of these documents. *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995); *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (taking judicial notice of documents only to show their contents, not to prove the truth of matters asserted therein). Therefore, Defendants' attempt to challenge Plaintiffs' claims based on Defendants' interpretation of the underlying investigation and state-court proceedings in this matter—interpretations which are outside of Plaintiffs' Complaint—converts Defendants' motions to ones for summary judgment under Federal Rule 12(d).

Accordingly, Defendants' Motions to Dismiss are converted to Motions for Summary Judgment. The parties are ordered to submit an agreed scheduling order within 10 days of the date

of this Order which includes all remaining deadlines, as well as an opportunity for discovery and supplementation of the pending Motions for Summary Judgment.

**IT IS SO ORDERED** this 4th day of January, 2022.

TERENCE C. KERN
United States District Judge