## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **MALCOLM NIGEL SCOTT**, *et al.*, | |
| *Plaintiffs*, | |
| v. | **Case No. 4:17-CV-400-GAG-CDL** |
| **CITY OF TULSA, OKLAHOMA**, *et al.*, | |
| *Defendants*. | |

## OPINION AND ORDER

**GUSTAVO A. GELPÍ, Circuit Judge.[1]**

Before this Court are the following three motions: (1) Defendant City of Tulsa, Oklahoma's ("Defendant Tulsa") motion for summary judgment (Dkt. No. 271); (2) Defendant Gary Meek's ("Defendant Meek") motion for summary judgment (Dkt. No. 272); and (3) Defendant Randall W. Solomon's ("Defendant Solomon") motion for summary judgement (Dkt. No. 268). For the reasons set forth herein, the three motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**. In light of this ruling, the motions to exclude (Dkt. Nos. 269, 270) are **DENIED WITHOUT PREJUDICE**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

This case arises from Plaintiffs Malcolm Scott's ("Plaintiff Scott") and De'Marchoe Carpenter's ("Plaintiff Carpenter," collectively, "Plaintiffs") convictions—and decades-long

---

[1] The Honorable Gustavo A. Gelpí, Circuit Judge, United States Court of Appeals for the First Circuit, sitting by designation.

[2] This Court draws the facts from Defendant Tulsa's Statement of Material Facts (Dkt. No. 271 at 6-16, "Tulsa SMF"), Defendant Meek's Statement of Material Facts (Dkt. No. 272 at 6-17, "Meek SMF"), Defendant Solomon's Statement of Material Facts (Dkt. No. 268 at 7-17, "Solomon SMF"), as well as the parties' respective responses and additional statements of material facts.

imprisonment—for a crime they did not commit: a drive-by shooting on September 10, 1994. Plaintiffs contend that misconduct by Defendant Tulsa and its officers led to the wrongful conviction. This Court recounts the facts from the beginning—the early morning of September 10, 1994.

### A. September 10, 1994 Shooting

Between 2:25 a.m. and 2:44 a.m. on September 10, 1994, shots fired from a moving vehicle struck Karen Summers ("Summers"), Ken Price ("Price"), and Alonzo Johnson ("Johnson")—all teens who were attending a party at or near 236 E. 29th Street in Tulsa, Oklahoma. (Tulsa SMF ¶¶1-2; Solomon SMF ¶¶9, 14.) Summers ultimately died from her injuries. (Tulsa SMF ¶1.) Rashun Williams ("Williams"), who was present at the time of the shooting, provided a handwritten witness statement to the police at 2:45 a.m., identifying the shooters as "Malcom and Marco"—*i.e.*, Plaintiffs—and the car as a burgundy, four-door Escort. (Id. ¶3.)

Minutes after the shooting, Defendant Solomon—at the time, an officer at the Tulsa Police Department ("TPD")—was dispatched to Tulsa Regional Medical Center to interview the victims. (Solomon SMF ¶¶5-6.) Defendant Solomon first interviewed Johnson, asking him "what happened [that ]night" and for specific information about the shooting, such as "who, what, when, how and where." (Id. ¶9.) Defendant Solomon testified that Johnson seemed confident in his identification of Plaintiff Scott as the person who did the shooting. (Id. ¶10.) The interview lasted about five minutes. (Id. ¶12.)

Defendant Solomon then went to interview Price. (Id. ¶13.) Defendant Solomon testified that he asked Price to "tell [him] what happened [that ]night." (Id. ¶14.) According to Defendant Solomon, Price answered by describing the car as a red, four-door Ford Escort and identifying two people inside the car: both Plaintiffs. (Id. ¶15.) This interview, too, lasted about five minutes. (Id. ¶16.) Defendant Solomon prepared an incident report based on his interviews with Johnson

and Price that night.  (Id. ¶17.)

At around 5:10 a.m., Defendant Meek, the lead detective investigating the shooting, interviewed Price at the police station.  (Id. ¶18; Meek SMF ¶15.)  Price provided Defendant Meek with a different description of the car, describing it as a "little goldish like car, like a foreign car." (Solomon SMF ¶18; Meek SMF ¶15.)  Price also told Defendant Meek that he did not see who was in the car because his back was turned.  (Solomon SMF ¶19; Meek SMF ¶16.)  When Defendant Meek asked, "Ken, you sure you didn't see who was in that car," Price responded, "I didn't see who was in the car for sure, but I know I seen red."  (Solomon SMF ¶20; Meek SMF ¶17.)  Defendant Solomon was not present for Defendant Meek's interviews with Price.  (Solomon SMF ¶21; Meek SMF ¶18.)

Defendant Meek then interviewed Johnson at around 5:58 a.m.  (Meek SMF ¶19.)  Johnson told Defendant Meek that he could not identify the driver or occupants of the car, but that he heard Williams tell an officer that both Plaintiffs were in the vehicle.  (Id. ¶¶19-21.)

About thirty minutes later, Defendant Meek interviewed Jaynie Jones ("Jones"), who was also present at the shooting.  (Id. ¶26.)  Jones stated that she did not see who was in the car; however, she told Defendant Meek that Williams told her immediately after the shooting that he knew the shooter and "I'm getting Malcolm."  (Id. ¶26; Tulsa SMF ¶8.)  Jones added that Williams told her and others at the hospital that he witnessed Plaintiff Carpenter doing the shooting.  (Tulsa SMF ¶8.)

Defendant Meek interviewed Williams at around 9:57 p.m. (still on September 10, 1994). (Meek SMF ¶22.)  Williams described the car as a burgundy, four-door Ford Escort.  (Id.)  He also said he recognized both Plaintiffs inside the car.  (Id. ¶23.)

The next day, Defendant Meek prepared a Prosecution Report identifying the anticipated testimony of twenty-three potential witnesses.  (Tulsa SMF ¶¶4-5.)  The Statement of Probable

Cause in the report states that "a witness at the scene" identified Plaintiff Scott as the person firing the gun and Plaintiff Carpenter as being in the car. (Solomon SMF ¶34.) According to that Prosecution Report, Williams would testify that he recognized both Plaintiffs inside the vehicle, and that he saw Plaintiff Scott at the driver's side passenger window from where the shots were fired. (Tulsa SMF ¶6.)

On September 12, 1994, Detective Mike Huff confiscated a gun from the home of Micheal Wilson ("Wilson"), which, ballistic analysis confirmed, was used to kill Summers. (Id. ¶¶9-10.) On September 22, 1994, the state charged Plaintiff Carpenter, Plaintiff Scott, and Wilson with the murder of Summers and the shootings of Price and Johnson. (Id. ¶11.)

### B. Pre-Trial and Trial Proceedings

During a hearing on November 23, 1994, the state moved to lessen the charge against Wilson from Murder to Accessory After the Fact to Murder in the First Degree and to dismiss the remaining charges. (Tulsa SMF ¶12.) Wilson subsequently pled guilty to the amended charge. (Id. ¶13.) At the same hearing, Wilson also testified under oath that he gave Plaintiff Carpenter three bullets on the night of the shooting and that he had seen Plaintiff Carpenter "with a black Lorcin 380 automatic handgun." (Id.) Wilson further testified that he met up with both Plaintiffs after the shooting and that they had asked him to hold a handgun for them, which he suspected was the weapon used to kill Summers. (Id. ¶14.) At a December 18, 1994 preliminary hearing held before the state court, Williams testified that he saw both Plaintiffs in the vehicle that fired the shots. (Meek SMF ¶72.)

Trial against Plaintiffs began on November 6, 1995. (Tulsa SMF ¶16.) At trial, Williams testified that he believed "somewhat" that he saw both Plaintiffs inside the car from which the shots were fired. (Tulsa SMF ¶16; Meek SMF ¶73; Dkt. No. 286 at 6-17, "Resp. Meek SMF" ¶73.) Williams also testified that Scott "most likely" had the gun. (Tulsa SMF ¶16; Meek SMF

¶73; Resp. Meek SMF ¶73.)

Price testified that he saw both Plaintiffs in the car while Wilson drove. (Tulsa SMF ¶16; Meek SMF ¶55.) He further testified that it "looked like" Plaintiff Carpenter was "firing shots at the house." (Tulsa SMF ¶16; Meek SMF ¶55.) When asked about the inconsistent statements he provided Defendants Solomon and Meek, Price admitted that he "didn't want to tell him [Defendant Meek]" who shot him because he wanted "revenge." (Meek SMF ¶57.) On cross examination, Price repeated that he lied to Defendant Meek because he wanted revenge. (Id.) Defendant Meek testified at trial that Price told him that he did not see who was in the car. (Meek SMF ¶59).

The jury found Plaintiffs Scott and Carpenter guilty of murder, and the court sentenced them to life plus 170 years in prison. (Tulsa SMF ¶17.)

### C. Post-Conviction Proceedings

About two decades later, in 2014, Plaintiffs Scott and Carpenter filed Applications for Post-Conviction Relief, arguing that their convictions should be vacated based, in part, on affidavits from Williams and Price recanting their testimonies. (Tulsa SMF ¶18.) Among other things, Williams and Price alleged that unnamed TPD officers coerced them to identify both Plaintiffs as the shooters. (Id.)

Price prepared two affidavits. In the first affidavit (dated July 2, 2010), Price affirmed that he "was pressured by officers of the TPD to testify that I got shot" and to identify both Plaintiffs as the shooters. (Meek SMF ¶61.) Price added, "After several interviews with several officers, I was told that De'Marco [sic] Carpenter and Malcolm Scott were the shooters and I just needed to point them out when the time came." (Id.)

In his second affidavit (dated February 3, 2014), Price describes his interactions with Defendant Meek. (Id. ¶62.) The affidavit states that the "Detective became angry because I did

not [know] who the shooters were." (Id.)  That affidavit further asserts that the "police began to put pressure on me to say Malcom [sic] Scott and Demarchoe Carpenter  had shot us." (Id. ¶63.)  A handwritten portion of the second affidavit alleges that "detectives were upset and acted in [sic] angry with me when I told them I didn't see anything in the car or anyone with their body language and pressure." (Id. ¶64.)  The affidavit also states, "The police made me believe that I would be charged with the murder if I did not help them by saying Malcom [sic] and Demarchoe were the shooters." (Id. ¶63.)  For that reason, Price claims, he "went along with what the police wanted me to say; Malcom [sic] Scott and Demarchoe Carpenter were the shooters in the car that night." (Id.)

Williams also signed an affidavit in July 2010, recanting his trial testimony and asserting that "officers for the Tulsa Police Department . . . coerced [him] into making statements that weren't true." (Meek SMF ¶74.)  Williams further affirmed that the officers "told [him that he] would be charged for the murder if [he] didn't testify against" both Plaintiffs. (Id.)  Williams did not identify the officer(s) who coerced him in the affidavit. (Id. ¶75.)

At a Post-Conviction Evidentiary hearing on January 29, 2016, Price testified that the police "pretty much coerced us," but that he could not remember nor identify the officer(s) responsible for coercing him. (Id. ¶¶66-68.)  Price has never accused Defendant Solomon of coercing him to say anything. (Solomon SMF ¶30.)  Indeed, at a deposition on January 4, 2023, Price testified that he had "no issues" with Defendant Solomon. (Solomon SMF ¶¶30-31; Dkt. No. 286 at 17-20, "Resp. Solomon SMF" ¶31.)  Price, however, disputed the authenticity of Defendant Solomon's report in which he states that Price said that he thought he saw both Plaintiffs in the car when he was interviewed in the hospital. (Resp. Solomon SMF ¶31.)

Judge Sharon Holmes of the Tulsa County District Court granted their applications on May 13, 2016. (Tulsa SMF ¶18.)

6

### D.  TPD Training and Policies

During a deposition on October 3, 2023, Major Luther Breashears ("Major Breashears") testified that the Tulsa Police Academy ("the Academy") consisted of 21-22 weeks of training in 1994, during which officers completed 16 weeks of field training with multiple field training officers.  (Tulsa SMF ¶30.)  According to Major Breashears, the training program ran the "full gamut," which was "more robust and longer" than the state's minimum requirements."  (Id. ¶31.) In addition to completing the Academy, police officers in specialized units like the Detective Division received specific issue-focused trainings on topics that were important to that division. (Id. ¶34.)  In 1994, TPD also complied with the state's continuing education training for officers. (Id. ¶33.)

Both Defendant Meek and Defendant Solomon have testified that they attended the Academy and received additional training throughout their time at TPD.  (Tulsa SMF ¶35; Dkt. No. 287 at 5-8, "Resp. Tulsa SMF" ¶35.)  As part of their ongoing training, TPD officers routinely received Training Bulletins, which provided officers with updates on the law, trends in policing, and guidance on how to approach various situations.  (Tulsa SMF ¶39.)  Plaintiffs dispute whether the Training Bulletins contained instruction on how to conduct interrogations or witness interviews.  (Resp. Tulsa SMF ¶39.)

Plaintiffs also dispute whether TPD provided any training whatsoever on disclosure of exculpatory evidence and witness interviews between 1989 and 1994.  (Id. ¶38.)  While Defendant Tulsa admits that there were no such policies, it denies that this meant that TPD policies did not require compliance with *Brady v. Maryland*, 373 U.S. 83 (1963), specifically, or state and federal laws, generally.  (Dkt. No. 300 at 2-17, "Resp. Plaintiffs' ASMF" ¶8, 12.)  Rather, Defendant Tulsa maintains that its policies required officers to comply with all state and federal laws.  (Id. ¶8.)  Part of TPD's policies and procedures are the "Values of the Tulsa Police Department," which state that

"it is the responsibility of the Tulsa Police Department to protect the Constitutional Rights of all persons."  (Tulsa MSF ¶40.)  In addition, TPD rules and regulations require officers to "adhere to the oath of office"; "know and obey department rules, regulations, policies, and procedures"; and "know, enforce, and obey laws and ordinances."  (Id. ¶41.)  The oath officers must take requires them to swear to "defend, enforce, and obey, the Constitution and Laws of the United States, the State of Oklahoma and the Charter and Ordinances of the City of Tulsa."  (Id. ¶42.)

### E.  Procedural History of the Instant Action

On July 10, 2017, Plaintiffs filed in this Court a complaint, which has been subsequently amended.  (Tulsa SMF ¶19; Dkt. No. 2, 4, 5, 87, 150.)  The operative complaint—*i.e.*, the Fourth Amended Complaint (Dkt. No. 150, "FAC")—alleges claims under 42 U.S.C. § 1983 and Oklahoma state law.  (Id.)  Following discovery, Defendants Tulsa, Meek, and Solomon moved for summary judgment.[3]

## II.  DISCUSSION

Defendants Tulsa, Meek, and Solomon each move for summary judgment as to all claims against them.  This Court starts its analysis with Defendant Tulsa's motion for summary judgment.

### A.  Standard of Review

Federal Rule of Civil Procedure 56 dictates that a grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

---

[3] The parties also filed two motions to exclude expert testimony.  Given the outcome of the motions for summary judgment, however, this Court finds it appropriate to dismiss without prejudice the motions to exclude.  The parties will have thirty (30) days to inform this Court which expert evidence they will present, and thirty (30) days thereafter to files amended motions to exclude, taking into account the holdings in this opinion and order.

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1170 (10th Cir. 2021) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).  A dispute over a material fact is *genuine* for purposes of summary judgment "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).  "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023) (quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016)).

The movant, however, "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997).  Rather, the moving party "only bears the initial burden of 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  If the movant carries this initial burden, then the nonmovant "must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995)).  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  It is not the court's role at this stage to weigh the evidence or decide any issues of credibility—that is a job for the factfinder.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### B.  Defendant Tulsa's Motion for Summary Judgment

In moving for summary judgment, Defendant Tulsa argues (1) that Plaintiffs' 42 U.S.C. § 1983 claims must fail because there is no evidence that a constitutional violation resulted from a city policy, custom, or practice, and (2) that Plaintiffs' claims under the Oklahoma Governmental Tort Claims Act are time-barred or, alternatively, insufficient on the merits.  (Dkt. No. 271 at 17, 27.)

At the outset, this Court notes that Plaintiffs' opposition brief states that they "do not rely [sic] widespread practice or custom or negligence claims against Tulsa.  Plaintiffs' request for punitive damages is against Meek and Solomon, not Tulsa." (Dkt. No. 287 at 36 n.15.)  In addition, nowhere in Plaintiffs' opposition papers do they attempt to address Defendant Tulsa's arguments related to the state law claims.  This Court interprets Plaintiffs' statement and inaction as an intentional abandonment of its state law claims against Defendant Tulsa.  *See, e.g.*, *Brown v. Nationwide Ins. Grp.*, No. 21-4122, 2023 WL 4174064, at *1 (June 26, 2023) (collecting cases).

Plaintiffs do properly oppose Defendant Tulsa's motion for summary judgment as to the municipal liability claims under 42 U.S.C. § 1983.

To prevail on a claim of municipal liability under section 1983—often called a "*Monell* claim*," *see, e.g.*, *Griffith v. El Paso Cnty.*, 129 F.4th 790, 823 (10th Cir. 2025)—a plaintiff must establish that "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation," *Campbell v. City of Spencer*, 777 F.3d 1073, 1077 (10th Cir. 2014) (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009)).  The Tenth Circuit has delineated several types of actions that may constitute a

municipal policy, practice, or custom for purposes of a *Monell* claim:

> (1) "a formal regulation or policy state"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions— and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)).

Demonstrating that the policy, practice, or custom was the moving force behind the constitutional violation requires a showing of a "causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This ensures that a municipality is not held liable merely because it "employs a tortfeasor." *Wilson v. Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014) (quoting *Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

With that legal background in mind, this Court turns to the merits of Plaintiffs' *Monell* claims.

### 1. Constitutional Violation

Plaintiffs have put forth enough evidence at this stage to create a genuine dispute of material fact as to whether they experienced constitutional violations. Specifically, there is evidence in the record to suggest that their convictions—and decades-long imprisonment—were a result of both withheld *Brady* evidence and coerced *fabricated* testimonial evidence. *See Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021) ("[T]he deliberate manufacture of false evidence contravenes the Due Process Clause." (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th

Cir. 2012)); *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) (explaining that a criminal defendant's "due process rights would be implicated if the . . . witness was coerced into making *false* statements and those statements were admitted against [the] defendant[] at trial.").

This Court's inquiry does not stop there, however; for there is no cause of action unless the municipality's policy, practice, or custom was the "moving force" behind the constitutional violation. *City of Canton*, 489 U.S. at 389 (citations omitted). Plaintiffs attempt to show this causal link by pointing to Defendant Tulsa's formal policies and its deliberate indifference. This Court addresses each set of claims in turn.

### 2. Policies and Customs

Under the formal policy or regulation theory, Plaintiffs challenge four actions and inactions by Defendant Tulsa—specifically, (1) the policy permitting police officers to conduct pre-interviews before they began videotaping; (2) the decision not to require parents or guardians to be present before interviewing a juvenile; (3) the practice of affording officers broad discretion in deciding how to conduct interviews, including by yelling at, lying to, and threatening the interviewees; and (4) the decision not to specifically outline the requirements under *Brady*.[4] Plaintiffs' attempt to establish a formal policy or custom as the moving force behind their constitutional injury, however, misses the mark.

*First*, Plaintiffs fail to cite any legal authority to demonstrate that it is unconstitutional (1) to conduct pre-interviews with witnesses before pressing the record button or (2) to interview juvenile witness without a parent present.[5] Defendant Tulsa's motion for summary judgment is

---

[4] Plaintiffs' *Brady*-based claim is better analyzed under the deliberate indifference/failure to train framework. So that is where this Court discusses it.

[5] What is more, as explained below, Plaintiffs have not shown that these practices—even if constitutionally suspect—directly caused their specific constitutional injuries. Sure, talking to witnesses before turning on the camera or talking to juveniles without a parent present may be

granted to the extent Plaintiffs wish to pursue claims based on a policy of allowing pre-interview discussions and interviewing minors without a parent.

*Second*, Plaintiffs likewise do not cite any authority to persuade this Court that giving officers discretion to conduct investigations and interrogations is, standing alone, constitutionally suspect.  In any event, even if it were, Defendant Tulsa's formal policy was not the "moving force" behind Plaintiffs' constitutional violation.  Start by considering what their constitutional violations were *not*.  Their constitutional rights were not violated because police officers implemented coercive and threatening interrogation tactics against *them*.  *Cf. Gonzales*, 164 F.3d at 1289 ("Overbearing tactics violate the right *of the person being interrogated* to be free from coercion." (emphasis added) (quoting *Buckley v. Fitzsimmons*, 20 F.3d 789, 794-95 (7th Cir. 1994)).  Nor were their constitutional rights per se violated because coerced testimony was introduced at their trial and resulted in a conviction.  *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[W]e have drawn a line between coerced testimony—'testimony that a witness is forced by improper means to give . . . [it] may be true or false'—and fabricated testimony—which is 'invariably false.'  Only the latter supports a due process claim, and even then, only if the record shows that the officers 'created evidence they *knew to be false*.'" (alterations in original) (citations omitted)); *see also Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[C]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable,

---

problematic.  But encouraging officers to talk to a witness before turning on a camera—which was undoubtedly less accessible in 1994 than it is today—hardly suggests that Defendant Tulsa was endorsing the constitutional violation at issue here, *i.e.*, the fabrication of evidence and withholding of *Brady* evidence.  Similarly, the decision not to have a policy requiring parents to be present for witness interview—which would be "a policy of inaction"—does not make "highly predictable" or "plainly obvious" the risk that *Brady* evidence will be withheld or that evidence will be falsified. *Murphy v. City of Tulsa*, 950 F.3d 641, 648 (10th Cir. 2019) (first quoting *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2016); and then quoting *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019)).

and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial,' because 'evidence collected with these kinds of suspect technique[s], *unlike falsified evidence and perjured testimony*, may turn out to be true.'" (citation omitted)).

Plaintiffs' alleged constitutional injuries here were the withholding of *Brady* evidence and the introduction of *fabricated* evidence at their trial. *See Gonzales*, 164 F.3d at 1289 ("[A] defendant['s] due process rights would be implicated if the subject witness was coerced into making *false* statements and those statements were admitted against [the] defendant[] at trial."). So, while the formal policy permitting coercive and threatening interrogation techniques may directly cause constitutional injuries to those being coerced or threatened, there is no evidence here that Defendant Tulsa's policy permitted officers to withhold *Brady* evidence or to coerce *false* evidence. *See City of Canton*, 489 U.S. at 385 (explaining there must be "a direct causal link between a municipal policy . . . and the alleged constitutional deprivation").[6]

### 3. Deliberate Indifference and Failure to Train

Plaintiffs also pursue *Monell* claims based on Defendant Tulsa's deliberate indifference to policies that resulted in their constitutional violations. Their claims may proceed in part.

As previously explained, a plaintiff may establish municipal liability "based on a municipality's deliberately indifferent training that causes the violation of a federal right." *Valdez v. MacDonald*, 66 F.4th 796, 815 (10th Cir. 2023) (citing *City of Canton*, 489 U.S. at 389). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Waller*, 932 F.3d at 1284 (quoting

---

[6] This is not to say that Plaintiffs have no recourse for their constitutional violations. This holding merely stands for the proposition that Plaintiffs have not shown that it was Defendant Tulsa's formal policy to permit officers to withhold *Brady* evidence or to coerce *fabricated* testimony for admission at trial. *See infra* II.B.3.

*Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* Absent such a pattern, deliberate indifference can be shown "only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Waller*, 932 F.3d at 1284 (internal quotation marks and citations omitted).

Plaintiffs have failed to demonstrate that Defendant Tulsa was on notice of a pattern of similar constitutional violations. They cite two different instances from 1989 to 1991 in which witnesses accused TPD detectives of coercing and/or threatening them, including one specifically involving Defendant Meek.[7] (Dkt. No. 287 at 9-19, "Plaintiffs' ASOF" ¶¶53-55.) As an initial

---

[7] To be sure, Plaintiffs also cite a case from 1994, where a mother, Michelle Murphy, gave an allegedly coerced confession that she murdered her child. *See Murphy v. City of Tulsa*, No. 15-528, 2018 WL 4088071, at *1 (N.D. Okla. Aug. 27, 2018). She was convicted and sentenced to life without parole. *Id.* On September 5, 2013, she filed an Application for Post-Conviction Relief, which was granted on May 30, 2014. *Id.* at *7. On September 12, 2014—after Murphy had served twenty years of her life sentence—the state decided to dismiss with prejudice the charges against her. *Id.* Defendant Tulsa contends that Murphy's conviction was vacated not because of a coerced confession but because the prosecutor incorrectly argued blood evidence at her trial.

Regardless of the justifications for vacating Murphy's conviction, this Court cannot consider this instance as evidence of Defendant Tulsa's deliberate indifference because the events post-date the alleged coercion of Price and Williams. That is, the killing and subsequent alleged coercion happened two days after TPD officers allegedly coerced Price and Williams. *See Waller*, 932 F.3d at 1286-87 ("Incidents that occurred subsequent to the incident at issue . . . cannot have provided [the municipality] with notice of a deficiency in its training program before that incident, and thus they cannot be used as evidence that . . . [the municipality's] 'decisionmakers . . . deliberately chose[] a training program that w[ould] cause violations of constitutional rights.'" (quoting *Connick*, 563 U.S. at 62); *see also Murphy*, 2018 WL 4088071, at *5 ("On September 12, 1994, . . . officers from [TPD] arrived on scene at Michelle Murphy's apartment in response to a 911 call regarding the stabbing death of a baby."); *id.* at *7 ("The state has offered evidence that a

matter, it is a close call whether two similar allegations—from years earlier—"constitute[s] a 'pattern' of conduct giving rise to an inference of deliberate indifference." *Waller*, 932 F.3d at 1287; *see also id.* ("We have expressly held that '[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.'" (quoting *Coffey v. McKinley Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2012)).  In any event, this Court counts only one of the previous incidents as sufficiently similar to have put Defendant Tulsa on notice that its officers were coercing interviewees to making false statements. The other incident, as far as this Court can tell from the newspaper clippings provided by Plaintiffs, suggests that TPD officers may have employed coercive and deplorable tactics, to be sure; but, even if this Court accepted those facts as true, it does not indicate that the officers were coercing the individual to *fabricate* evidence or were routinely running afoul of their obligations under *Brady*.  *Cf. Anderson*, 932 F.3d at 510 (distinguishing coerced testimony from fabricated evidence); *see also Fields*, 740 F.3d at 1112 (similar).  Having only shown one instance of similar misconduct, Plaintiffs have failed to show a pattern sufficient to put Defendant Tulsa on notice. *Waller*, 932 F.3d at 1285, 1287 (quoting *Connick*, 563 U.S. at 62).

So Plaintiffs must rely on a "single-incident failure-to-train" theory of municipal liability. *Valdez*, 66 F.4th at 815; *see also Waller*, 932 F.3d at 1284 (explaining that "absent a pattern of unconstitutional behavior" deliberate indifference can be found "*only* in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction" (emphasis added) (internal quotation marks omitted)).  Under that theory, their claims may proceed.

The Tenth Circuit has articulated three elements of a single-incident failure-to-train claim:

confession was made by [Murphy] . . . on September 12, 1994 . . . .").

"(1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Valdez*, 66 F.4th at 816-17 (cleaned up) (quoting *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021)).  To establish the third element, the Tenth Circuit has adopted the Second Circuit's three-part test: "(i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) the wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (cleaned up) (quoting *Lance*, 985 F.3d at 802).

Although a municipality will not be liable for deficient training if the constitutional violation at issue is not "a plainly obvious consequence of [the] deficient training program," *Barney*, 143 F.3d at 1308; *see also Waller*, 932 F.3d 1288 (no deliberate indifference because "[e]ven an untrained law enforcement officer should have been well aware that any use of force in this situation—where a restrained detainee was simply addressing a judge at a hearing in a polite, calm voice—was inappropriate"), the Tenth Circuit has flatly rejected the argument that "[t]raining is not required for patently obvious criminal conduct," *Valdez*, 66 F.4th at 819-20.  Indeed, the Tenth Circuit has made clear that "[f]ailing to teach police officers about certain constitutional limits can demonstrate a municipality's deliberate indifference to constitutional rights." *Murphy*, 950 F.3d at 652 (internal quotation marks omitted) (quoting *City of Canton*, 489 U.S. at 390 n.10).  That rule extends beyond excessive force cases: "Given the potential for coercion in interrogations, failing to teach police officers how to lawfully interrogate civilians might trigger municipal liability." *Id.*  As relevant here, the Sixth Circuit has specifically recognized that failing to train officers on their obligations under *Brady* can lead to "[w]idespread officer ignorance on the proper handling of exculpatory materials," which "would have the 'highly predictable consequence' of due

17

process violations." *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (citation omitted).

Here, although the record shows that TPD provided its officers with robust training in certain areas, noticeably absent from the record is any evidence that officers were trained on the handling of exculpatory evidence. Not only do officers have a duty to disclose exculpatory evidence, but that duty likewise extends to evidence that witness statements—whether true or false—were obtained by coercive tactics. *See Anderson*, 932 F.3d at 506-07; *see also Douglas v. Workman*, 560 F.3d 1156, 1172-73 (10th Cir. 2009) ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'" (alteration in original) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Given that Defendant Tulsa had a policy of permitting coercive and threatening tactics in interviews and interrogations, it was highly foreseeable—indeed, almost inevitable—that such a policy would result in the creation of *Brady* material in any case in which police officers used such tactics to acquire statements for use at trial against a criminal defendant. And there is a genuine issue of material fact as to whether TPD officers were trained in adequate interview and interrogation practices and the obligations outlined in *Brady*. So Plaintiffs' section 1983 claim may proceed to trial as set forth herein.

### C. Defendant Meek's and Defendant Solomon's Motions for Summary Judgment

Defendants Meek and Solomon both raise the defense of qualified immunity, which "creates a presumption that the defendant is immune from" a claim brought under section 1983. *Alcala* v. *Ortega*, 128 F.4th 1298, 1306 (10th Cir. 2025) (quoting *Est. of Smart* v. *City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2010)). To overcome this presumption at the summary judgment stage, Plaintiffs have the burden to show that: "(1) the officer['s] alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every

reasonable official would have understood, that such conduct constituted a violation of that right." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 757 (10th Cir. 2021) (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 814 (10th Cir. 2020), *rev'd on other grounds*, 595 U.S. 9 (2021) (per curiam)) (internal quotation marks and citations omitted). This Court considers each alleged constitutional violation in turn, starting with Plaintiffs' *Brady*-related claims.

### 1. *Brady v. Maryland* Claims

Plaintiffs bring claims under *Brady*, alleging that Defendants Meek and Solomon failed to disclose exculpatory evidence—namely, that certain witnesses were coerced and evidence was fabricated—which was later used against them at trial. Plaintiffs' claims can proceed in part.

"To prevail on a *Brady* claim, the proponent must show that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024) (quoting *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019)). Though *Brady* typically concerns the conduct of prosecutors who fail to disclose exculpatory evidence, courts routinely have held that *Brady*'s obligations extend to the prosecution team, including police officers who "were part of the team for [the relevant] investigation." *See Tiscareno v. Anderson*, 639 F.3d 1016, 1021 (10th Cir. 2011), *vacated in part on other grounds*, 421 F. App'x 842 (10th Cir. 2011)) (citing *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995)); *see also id.* at 1023 ("Nearly all of our sister circuits have also determined that police may be liable under § 1983 for failure to turn over *Brady* evidence." (collecting cases)). And it is clearly established for purposes of section 1983 "that an investigator must not knowingly or recklessly cause a *Brady* violation." *Id.*; *cf. Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (holding that *Brady* obligations were clearly established in 1986 such that a police department's forensic chemist could not "knowingly use[] false testimony to obtain a conviction or withhold[] exculpatory evidence from the defense" (citations omitted)).

However, there is no due process violation by the government's nondisclosure of evidence if the criminal defendant knew of the evidence anyway. *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

Plaintiffs assert that Defendants Solomon and Meek withheld the fact that, when he was interviewed at the hospital, Price told Defendant Solomon that he could not see who was in the car or who fired the shots. But the record shows that, prior to trial, Plaintiffs were aware of Price's inconsistent statements about whether he saw who was shooting, and they had the opportunity to cross examine him on those statements. (Meek SMF ¶¶57-58.) Defendant Meek also testified at trial that Price told him that he did not see who was in the car. (Meek SMF ¶59.) Therefore, Price's inconsistent testimony as to the identity of the people in the car could not have undermined the outcome of the trial. For these reasons, the *Brady* claims against Defendants Meek and Solomon related to Price's testimony are dismissed.

Plaintiffs also assert that their rights under *Brady* were violated by their failure to conduct forensic testing of physical evidence. The police's failure to conduct forensic testing, however, does not constitute a constitutional violation. *See Arizona* v. *Youngblood*, 488 U.S. 51, 59 (1988) (holding that "police do not have a constitutional duty to perform any particular tests"). Since Plaintiffs only claim that Defendants failed to perform certain forensic tests, not that they withheld the results of such tests, these claims fail as a matter of law.

Plaintiffs' *Brady* claims survive summary judgment to the extent they are based on Defendant Meek's coercing Price and Williams and threatening them to give false statements. The fact that Defendant Meek threatened Price and Williams with, among other things, criminal charges—including murder—would constitute exculpatory evidence, about which Plaintiffs and their counsel did not learn. (Meek SMF ¶¶61-64, 74.) At a minimum, Plaintiffs could have used

such information to impeach the testimony of critical witnesses—for instance, Price, Williams, and Defendant Meek—and undermine the veracity of witness statements upon which the prosecution relied.  *See Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) ("Because of the value of cross-examination, when the credibility of a prosecution witness is important, impeaching evidence is subject to *Brady* disclosure."); *see also Anderson*, 932 F.3d at 507 ("Put most simply, a criminal defendant has a due process right to information that may materially impeach the testimony of a state's witness.").  Therefore, Plaintiffs' section 1983 claim against Defendant Meek may proceed as it relates to the withholding of the aforementioned exculpatory evidence. Defendant Solomon, however, did not interview Williams—nor is there any evidence to suggest he coerced any witnesses—so any *Brady* claims against him related to allegedly coerced testimony are dismissed.  (Meek SMF ¶22).

In sum, the *Brady* claims are dismissed in their entirety as against Defendant Solomon, but Plaintiffs' *Brady* claim against Defendant Meek may proceed to the extent that the claims are based on Defendant Meek's coercing Price and Williams.

### 2.  Substantive Due Process Claims

Plaintiffs aver that, by fabricating evidence and coercing testimony, Defendants Meek and Solomon violated their due process right not to be deprived of liberty.  "To rise to the level of a constitutional violation, a plaintiff must assert a causal connection between the fabrication of evidence and the deprivation of liberty." *Truman*, 1 F.4th at 1236.  A fabrication of evidence claim requires a plaintiff to establish four elements: "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Id*.

As to Defendant Solomon, Plaintiffs' claims may proceed in part.  To the extent the claims are based on Defendant Solomon's purported interactions with Williams, the claim fails; Plaintiffs have provided no evidence that Defendant Solomon interviewed Williams.  However, Plaintiffs do question the accuracy of the report produced by Defendant Solomon following his interview with Price in the hospital, and whether Defendant Solomon knowingly put inaccurate information in the police report is a question of fact that cannot be resolved on summary judgment.[8]  (Resp. Solomon SMF ¶31).

Plaintiffs allege that Defendant Meek coerced Price and Williams to identify Plaintiffs as the shooters.  Considering Price and Williams' post-conviction affidavits and testimony, there appears to be a genuine issue of material fact as to the fabrication of evidence issue.  This Court will leave it to the factfinder at trial to evaluate the credibility of their post-conviction assertions and testimony against Defendant Meek.

### 3.  Malicious Prosecution Claims

Plaintiffs' malicious prosecution claims against both Defendants Meek and Solomon cannot proceed because, even absent the allegedly tainted evidence, there was probable cause.

A section 1983 malicious prosecution claim requires a plaintiff to show five elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages."  *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023) (emphasis omitted).

---

[8] To the extent there were any inaccuracies in Defendant Solomon's report that are reasonable mistakes, he may be entitled to qualified immunity.  This Court cannot decide that question on this record.

Because probable cause "deal[] with probabilities" and depends on the totality of the circumstances, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "[P]robable cause 'is not a high bar.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested." *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (quoting *United States v. Alonso,* 790 F.2d 1489, 1496 (10th Cir.1986)). This is an objective standard, and thus "[t]he subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." *United States v. Valenzuela,* 365 F.3d 892, 896 (10th Cir.2004).

Here, even if we discard the challenged testimonies of Price and Williams, the totality of the record supports a finding of probable cause. Price and Williams were not the only individuals that identified Plaintiffs. The Prosecution Report that Meek prepared identified the anticipated testimony of twenty-three (23) potential witnesses. (Tulsa SMF ¶¶4-5.) Among those witnesses was Johnson, who told Defendant Meek that he could not identify the driver or occupants of the car, but that he heard Williams tell an officer that both Plaintiffs were in the vehicle. (Meek SMF ¶¶19-21.) Then there was Jones, who similarly told Defendant Meek that Williams told her immediately after the shooting that he knew the shooter and "I'm getting Malcolm." (Tulsa SMF ¶8.) Jones also said that Williams told her and others at the hospital that he witnessed Plaintiff Carpenter shooting. (Id.) Moreover, before Williams's apparent coercion, he provided a

handwritten statement identifying Plaintiffs as the shooters.[9]  Because the totality of the evidence supports a finding of probable cause, Plaintiffs' malicious persecution claims as to Defendants Meek and Solomon are dismissed.

### 4.  Failure to Intervene

Plaintiffs claim in the FAC that "one or more of the Defendants" "stood by without intervening to prevent the violation of Plaintiffs' constitutional rights."  (Dkt. No. 150 ¶270.)  As this claim was not clearly established in 1994, Defendants Meek and Solomon have qualified immunity for the failure to intervene claim.  *See Bledsoe v. Carreno*, 53 F.4th 589, 617 (10th Cir. 2022) (holding that police officers were entitled to qualified immunity on failure to intervene claim because such a "claim was not clearly established in 1999").  Since the events of the Summers shooting happened in 1994, Defendants Meek and Solomon are similarly entitled to qualified immunity as to the failure to intervene claims.

### 5.  Civil Conspiracy Claims

Plaintiffs allege that "the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive the Plaintiffs of their constitutional rights."  (Dkt. No. 150 ¶274.)  Plaintiffs do not point to any facts in the record to support the existence of an agreement to a conspiracy against them, so their conspiracy claim must fail.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1285 (10th Cir. 2010) ("Conclusory legal statements cannot preclude summary judgment."); *see also Harris v. Am. Med. Int'l, Inc.*, 982 F.2d 528, at *2 (10th Cir. 1992) (unpublished) (affirming grant of summary

---

[9] Alternatively, even if the foregoing evidence was not sufficient to establish probable cause, the record evidence indicates that Defendants Meek and Solomon would be entitled to qualified immunity because they reasonably "could have believed that probable cause existed to arrest or detain" Plaintiffs.  *See, e.g.*, *Est. of Papadakos v. Norton*, 663 F. App'x 651, 656-57 (10th Cir. 2016).

judgment on conspiracy claim supported only by conclusory allegations).

### 6. Negligence

Tort claims for police misconduct are typically brought under Oklahoma's Governmental Tort Claims Act ("OGTCA").  It is, after all, "exclusive and in place of all other liability of the . . . employee at common law or otherwise."  *Pellegrino v. State ex rel. Cameron Univ.*, 63 P.3d 535, 540 (Okla. 2003).  A government employee, thus, "is relieved from private liability for tortious conduct committed within the scope of employment."  *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1163 (Okla. 2009).  Where, however, a plaintiff brings a tort claim against a government employee who was acting outside the scope of employment, "the [O]GTCA does not apply."  *Speight v. Presley*, 203 P.3d 173, 176 (Okla. 2008).

Here, Plaintiffs have abandoned any negligence claim against Defendant Tulsa under the OGTCA, and so their only option to hold Defendants Meek and Solomon liable for negligence is to pursue a common law negligence claim.  In their opposition brief, however, Plaintiffs mention negligence only one time—to clarify that they are not pursuing a negligent investigation claim against Defendants.  Instead, they say, their claims are "rooted in the violation of their Fourth and Fourteenth Amendment rights as a result of Defendants' fabrication of evidence, failure to disclose *Brady* evidence, deprivation of their liberty without probable cause, failure to intervene, and civil conspiracy."  (Dkt. No. 286 at 31.)  Plaintiffs, thus, have abandoned their negligence claims as against Defendants Meek and Solomon.

### 7. Punitive Damages

Plaintiffs may be entitled to punitive damages in a section 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983). For this Court to grant Defendants' motion for summary judgment on punitive damages, it must

conclude that "no reasonable jury could find the punitive damages standard satisfied." *Shapiro v. Rynek*, 212 F. Supp. 3d 990, 999 (D. Colo. 2016). Given the issues of material fact as to some of Plaintiffs' claims, this Court will allow the factfinder to decide whether Defendants Meek and Solomon possessed the necessary state of mind to warrant an award for punitive damages.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that

Defendant Tulsa's motion for summary judgment (Dkt. No. 271) is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1. Plaintiffs' state law claims against Defendant Tulsa are hereby dismissed;

2. Plaintiffs' *Monell* claims against Defendant Tulsa are dismissed in part. Plaintiffs' *Monell* claim may proceed based only on the "single-incident failure-to-train" theory of municipal liability; and

3. Plaintiffs cannot recover punitive damages against Defendant Tulsa.

**IT IS FURTHER ORDERED** that Defendant Meek's motion for summary judgment (Dkt. No. 272) is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1. Plaintiffs' *Brady* claims against Defendant Meek may proceed to the extent that the claims are based on Defendant Meek's threatening Price and Williams to fabricate their statements;

2. Plaintiffs' substantive due process claims against Defendant Meek may proceed against Defendant Meek to the extent they are based on his fabricating evidence; and

3. Plaintiffs' malicious prosecution, failure to intervene, civil conspiracy, and negligence claims against Defendant Meek are dismissed in their entirety.

**IT IS FURTHER ORDERED** that Defendant Solomon's motion for summary judgment (Dkt. No. 268) is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1.    Plaintiffs' *Brady* claims against Defendant Solomon are dismissed in their entirety;

2.    Plaintiffs' substantive due process claim against Defendant Solomon may proceed only based on the inaccuracies in his reporting; and

3.    Plaintiffs' malicious prosecution, failure to intervene, civil conspiracy, and negligence claims against Defendant Solomon are dismissed in their entirety.

**IT IS FURTHER ORDERED** that the pending motions to exclude expert testimony (Dkt. Nos. 269, 270) are **DENIED WITHOUT PREJUDICE**.  In light of this ruling and dismissed claims, the need for expert testimony has substantially diminished.  The parties shall have thirty (30) days to inform this Court which expert evidence they will present.  Thereafter, the parties shall have thirty (30) days to file a renewed motion to exclude the experts, taking into account the instant ruling.

DATED: March 31, 2025

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPÍ
United States Circuit Judge, Sitting by Designation