**Case Review and Analysis**

*Demarchoe Carpenter and Malcolm Scott v. City of Tulsa, et al.*

**Purpose:**

This review was conducted at the request of Loevy & Loevy regarding the lawsuit, *Demarchoe Carpenter and Malcolm Scott v. City of Tulsa* to assess two things:

(1) whether there were deviations from generally accepted police practices in the investigation into the murder of Karen Summers that was conducted by various Tulsa Police officers; and

(2) whether the Tulsa Police Department's policies, practices, and training related to interviews and interrogations of witnesses, victims, and suspects in homicide cases, and disclosure of exculpatory evidence, were at the time adequate and consistent with acceptable police practices around the country.

I have reached conclusions on both of these issues.

First, as a result of my review of the materials provided to me related to the Summers murder investigation, I conclude to a reasonable degree of professional certainty that the homicide investigation conducted in this case deviated from generally accepted police practices, as explained further below.

Second, based on my review of Tulsa Police Department's (TPD) policies, practices, and training governing how interviews and interrogations were conducted, as well as my review of numerous other documents and depositions and many dozens of homicide files, it is my opinion to a reasonable degree of professional certainty that TPD's policies, practices, and training related to interviews and interrogations, and disclosure of exculpatory evidence, were woefully inadequate, deviated substantially from accepted practices in other departments as explained below. The policies themselves were nonexistent and inadequate, as was the training. These failures likely led to the actions of the detectives in the Summers homicide investigation.

If any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I therefore reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

**Subject Matter Expertise:**

As the reviewer of this case, I have more than 30 years of municipal law enforcement experience. I began my career in 1984 and most recently served as an interim police chief in 2022, a career span of 38 years.

As a California Police Officer, I attended more than 2,300 hours of training certified by the California Commission on Peace Officer Standards and Training (POST). I obtained all POST certifications from Basic POST through the completion of the Executive certification. Relevant to this case review are the following POST training courses:

Basic POST course 580 Hrs; covering basic crime scene response, neighborhood canvassing, report writing, evidence documentation, collection, interviewing, and suspect identification.

- Homicide and Violent Crime Investigation (36Hrs)
- Search and Arrest Warrant Course (28Hrs)
- Supervisory Course (80Hrs)
- Leadership and Accountability Course (16Hrs)
- Critical Incident Response for Supervisor (32Hrs)
- Management Course (104Hrs)

Additionally, I am also a member of the International Association of Chiefs of Police and have attended training conferences in the furtherance of my criminal justice and leadership career.

Relevant to this case, I have served as a violent crime detective, working homicide cases for nearly five years, this includes working homicide cases during the 1990's. I then supervised and managed violent crime/homicide investigations throughout my role in police leadership.

I have served as police chief in three northern California cities: the cities of Fairfield, Vacaville, and Vallejo.

As the interim police chief for the City of Vallejo, I facilitated a comprehensive audit of all areas of law enforcement in that city. I worked closely with the designated OIR Group from Southern California with an overarching goal of providing 100% accessibility within the police department. A key achievement was the line of communication that opened for internal information needed to accurately audit policing in the city.

When I completed my term as the interim police chief for the City of Vallejo, the law firm Sloan Sakai Yeung & Wang LLP hired me as a subject matter expert to develop an

implementation plan for the City of Vallejo, based on the OIR Group's audit and recommendations. After completing the implementation plan, the City of Vallejo once again approached and offered me the position of assistant police chief to make the recommendations operational.

The audit review was broad-based, and the completed audit's majority focus was on officer-involved shootings, use of force incidents, training, and community engagement. Relevant to this review, however, was the additional focus on accountability across multiple areas of the department. The lack of appropriate supervision within the organization led to a lack of accountability within the police department's work product.

During this assignment, the California Department of Justice entered into an overview agreement with the Vallejo Police Department. The Justice Department contracted with Hillard Heintze of Chicago to facilitate the Vallejo oversight and implement the audit recommendations. By the conclusion of the assignment, I had worked effectively with both the Justice Department, Hillard Heintze group, and the City of Vallejo work group and initiated the necessary reforms that had been designated as priorities for the city's police department.

Most recently, between 2021 and 2022, I served as interim police chief for the City of Vacaville. They asked me to review areas of needed reform within the police department and to hire an outside firm to conduct an audit of police activity within the department's jurisdiction. By the conclusion of the assignment in January 2022, I had selected an audit firm and also accomplished a number of high-priority reforms that were identified.

**Approach:**

I have reviewed the documents listed below. I have also completed a review of the criminal investigation's source material. I have applied my knowledge of police procedure and investigative practices, based on my training, education, and experience, to the facts and allegations in this case in order to render my opinions.

The conclusion and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge and expertise, drawn from 30-plus years of service.

**Material Reviewed:**

- Fourth Amended Complaint
- Tulsa Investigative File

- Post Conviction Discovery Information
- Criminal Trial Transcript 1995
- Evidentiary Hearing January 26, 2016
- Application for Post Conviction Relief
- Brief of Appellant July 16, 1996
- Amended Brief in Support of Application for Post Conviction Relief
- Jim Clark Deposition
- Mike Huff Deposition
- Randall Solomon Deposition
- James Alexander Deposition
- Richard Alexander Deposition
- Van Evans Deposition
- Joyce Powell Deposition
- Laurel Roberts Deposition
- Ken Price Deposition
- Shannon Jennings Deposition
- Mark Wollmershauser Deposition
- Demarchoe Carpenter Deposition
- Malcolm Scott Deposition
- Gary Meek Deposition
- TPD 1994 Policies and Procedures
- TPD 1994 Training Bulletins
- Evidentiary Hearing 2016
- Rashun Williams Affidavit 2010
- Francine Sharp Affidavit 2023
- Darrell Benson Affidavit 2023
- Ken Price Affidavits 2010, 2014
- Ronald Palmer Deposition (from *Murphy v. City of Tulsa*)
- Matt McCord Deposition (Rule 30(b)(6) witness)
- TPD Training Bulletins 1980's-1990's (CDR 2427-2545)
- TPD Tips for Taping Interviews
- TPD Policies and Procedures Manual (COT 18220-18570)
- TPD Investigative Handbook 1994 (COT 19578-19619)
- TPD Detective Division Operations Manual 1995 (COT 19620-19656)
- TPD Sergeants Field Training Guide
- TPD Homicide Cases Review 1990-1994
- IACP Interrogations and Confessions 1996 (COT 19328-19334)
- Tulsa World Article Laroye Hunter

**Criminal Investigations Source Material:**

*Practical Homicide Investigation; Vernon J. Gerberth (Fifth Edition) O'Hara's*

*Fundamentals of Criminal Investigation; DeVere D. Woods, Jr. 2019 US*

*Scientific American Magazine; Hal Arkowitz, January 1, 2010*

**Review of Facts Related to the Summers Homicide Investigation:**

On September 10, 1994, Karen Summers, 19 years of age, was attending a party at 226 E. 29th Street North, Tulsa Oklahoma. Many “107 Hoover Crips” gang members and associates were in attendance at this party as well as other persons. A large group of people were outside the residence talking. At approximately 2:45 am Summers was sitting on the hood of a vehicle talking with Rashun Williams and others standing around the vehicle.

A suspect vehicle drove by the “Crips” party and an occupant yelled something similar to, “what’s up blood” and shots were fired from the passing vehicle. Summers was shot once and died at a local hospital. Two others were also shot, Ken Price and Alonzo Johnson who were each shot one time in this drive by shooting.

Tulsa Police Department (TPD) patrol officers including Defendants Clark and Solomon and Defendant Detective Meek interviewed multiple witnesses at the scene of the murder, the local hospital and the police department. Three suspects were arrested for the murder of Karen Summers and shooting of Price and Johnson. Demarchoe Carpenter and Malcolm Scott were arrested based on conflicting witness statements. No physical evidence linked them to this crime. Tulsa County Sheriff’s Gang Intervention unit documented Carpenter and Scott as “Red Mob Gangsters”, a “Bloods” gang and rival to the “Crips.”

Days after the crime, Michael Wilson was arrested based on his possession of the murder weapon, a .380 caliber Lorcin brand semi-automatic handgun, and possession of a vehicle matching the description of the suspect vehicle in this drive-by murder. Wilson is also a “Bloods” gang member, however not of the “Red Mob Gangsters” sect.

The murder and two attempted murder charges against Wilson were dismissed and he pled guilty to an accessory and after the fact charge with reduced bail and reduced sentencing.

Carpenter and Scott were found guilty after a trial of the murder of Karen Summers and the shooting with intent of Price and Johnson. The State’s evidence against Carpenter and Scott was the testimony of Darrell Benson, Rashun Williams, Ken Price, and Francine Sharp, who all gave statements to Defendant Detective Meek implicating Carpenter and Scott in the crime.

On January 7, 2014, Michael Wilson in a videotaped interview admitted to shooting Karen Summers and two others. Wilson named Billy Iverson and Richard Harjo as being with him at the time of the murder on September 10, 1994.

Billy Iverson wrote a statement in 2010 while in prison stating in the case of Carpenter and Scott he was with Wilson in Wilson's vehicle. As they drove towards Cincinnati (cross street for E. 29th Street North) they saw a crowd in the street and Wilson said those are the dudes who tried to shoot him, at which point Wilson fired his gun into the crowd.

Richard Harjo in 2001 also in prison wrote a statement related to the Summers murder. He writes that two people who had nothing to do with the crime were charged and erroneously convicted. He then identifies Michael Wilson as the one who shot into the crowd.

Ken Price, Rashun Williams, Darrell Benson, and Francine Sharp have all recanted their statements implicating Carpenter and Scott in the crime. Price, Williams, and Benson swore under oath that they were pressured by police to implicate Carpenter and Scott. Sharp swore under oath that she never made the statement attributed to her implicating Carpenter and Scott.

**Analysis:**

**Opinion 1: Deviations from Generally Accepted Police Practices in the Karen Summers Homicide Investigation**

In the preface of Practical Homicide Investigations, author Vernon K. Gerberth describes the basic rule for the professional homicide practitioner: "The detective looks for consistencies as well as inconsistencies and must be prepared to change the focus of the investigation as new information is developed."[1] My analysis/review of this investigation included the following topics:

- Tunnel Vision
- Interviews and Interrogations
- Physical Evidence
- Photo-Lineup
- Supervision and Case Management
- Policy and Procedure
- Exculpatory Evidence

---

[1] Practical Homicide Investigation, Vernon J. Geberth

**TUNNEL VISION**

Author Geberth writes about the 10 most common errors or missteps in a death investigation. One of the issues he addresses is tunnel vision. Geberth writes; "Another problem that occurs is focusing on one suspect too soon, while eliminating other possibilities. This could be considered jumping to conclusions. Another problem is tunnel vision. At times investigators may close their minds to other possibilities once they've developed a theory. Then they begin to try and make the evidence fit their theory instead of allowing the evidence to lead them to a suspect."[2]

Tunnel vision likely began in this case at 2:46 am when TPD Dispatch broadcast the names of two black males, one named Demarchoe and the other Malcolm, as recorded in a supplemental report completed by Officer K. Eddings. This supplement does not note who provided this information to TPD Dispatch.

Less than three hours after the death of victim Summers Detective Meek has clearly narrowed his focus to Malcolm Scott. Below I give two examples of the danger of tunnel vision this early in the investigation and I discuss this further in the next section of this report.

First, during his questioning of Ken Price at 5:10 am Price is unable to identify the drive-by suspect. Detective Meek gives him the name Malcolm Scott which Price confirms.

Later in the interview Price is asked if he knew who the suspects were shooting at. Price does not know but basically says they don't care who they shoot, and "that cop out there in Apache." Detective Meek responds, "You think Malcolm and them did that,", again providing the name Malcolm to Price.

Later in the interview Detective Meek is asking Price if Bloods were at the Wave Length Club prior to the homicide. When Price gives a general answer "Yeah, all of them were there." Detective Meek asks, "Malcolm there?" This is the third time Meek gives the name Malcolm to Price.

So clearly within just a few hours of the murder Detective Meek had narrowed his investigation to Malcolm Scott, and he had provided the name Malcolm Scott to Price multiple times in the interview. Author Gerberth as previously noted it can be problematic to narrow your focus to one suspect too soon.

---

[2] Practical homicide Investigations, Geberth pg 43

Second, Michael Wilson was interviewed by Detective Meek on September 11, 1994 at 8:27 pm. During the interview which I will cover in the Michael Wilson portion of this review, it is clear that Detective Meek had interviewed Wilson prior to the recorded interview and did not record this initial interview. It is also clear that Detective Meek had tunnel vision on who he believed were the suspects in Summers murder based on the following line of questioning.

> Meek: "Now, you told me that you talked to a couple of…are they friends of yours or just associates or…"
>
> Wilson responds: "I just associates I know"
>
> Meek: "And that being a Marco who you know as Loco"
>
> Wilson: "Yeah"
>
> Meek: Is that Marco Carpenter?
>
> Wilson: Yes
>
> Meek: And also Malcolm Scott who you know as Dirty Mac
>
> Wilson: Yeah
>
> Meek: Have you looked at TPD photograph #15334 of Malcolm, Malcolm Scott is that correct?
>
> Wilson: Correct

At this point in the Wilson interview, Detective Meek introduces the names of Demarchoe Carpenter and Malcolm Scott related to a prior conversation he had with Wilson. In addition, Detective Meek knew that Wilson had been in possession of a handgun of the same caliber believed at this point of the investigation to be that of the murder weapon as well as driving a car matching the suspect vehicle. Rather than follow up on the highly incriminating evidence linking Wilson to the crime, Meek's tunnel vision led him instead to focus on Carpenter and Scott as suspects, going so far as to introduce those names to Wilson.

## INTERVIEWS AND INTERROGATIONS

The arrest of Malcolm Scott and Demarchoe Carpenter is based on witness and identifications only and no physical evidence linking them to the crime scene or victim

Summers. Defendants' obtaining of witness statements and identifications did not adhere to generally accepted police investigative standards or practices,

I summarize these issues below and following that summary, discuss each individually.

First, several witnesses gave conflicting statements that TPD never corroborated or verified, rather they simply took the statements implicating Scott and Carpenter without seeking to find the truth related to why these statements contradicted their statements of not seeing the shooting suspect or suspects.

Eyewitness accounts by themselves can be questionable. An article in Scientific Magazine by Hal Arkowitz, January 1, 2010, is titled "Why science tells us not to rely on eyewitness accounts." This article lists reasons why eyewitness testimony can be error prone. Two factors he lists that can reduce the accuracy of a witness are:

> Extreme witness stress at the crime scene
> Presence of a weapon at the crime scene.[3]

Both factors occurred in this case, as well as shots being fired from a moving car in hours of darkness in seconds. Only 3 spent 380.caliber shell casings were found at the scene, which indicates the extremely limited time a witness would have had to identify the shooter. Detective Meek should have questioned the reliability of witness's identifications given their extremely limited opportunity to view the shooter.

Second, the defendants ignored obvious differences in witnesses based on age and vulnerability. Major Matt McCord, a witness designated by TPD to testify about TPD's policies, procedures, and training,testified in an October 2023 deposition that the TPD does not have specific policies related to interviews of juvenile witnesses. This allowed detectives in this investigation to interview juveniles in the same manner they would an adult.

TPD recognized a juvenile suspect should not be interviewed without a parent present, but ignored the need for a parent when interviewing a juvenile who had just been shot or the girlfriend of a murder suspect, both vulnerable juveniles.

Alonzo Johnson was shot in the arm at the scene of Karen Summers' murder. Approximately three hours after being shot and without a parent or guardian present ,he was interviewed about this incident.

---

[3] Arkowitz, Scientific Magazine, January 1, 2010

Melissa Shields, Demarchoe Carpenter's girlfriend, was removed from a class at her high school and interviewed about the Summers homicide. No parent or guardian was present, and there is no indication that a parent was ever notified she was removed from class to participate as a witness in a murder investigation. Shields gave a statement as an alibi witness for Carpenter and Scott stating she was with them at the time of the murder. Consistent with TPD policy, TPD detectives did not record her interview.

Both Johnson and Shields were vulnerable juvenile witnesses treated as adults by TPD detectives with the approval of TPD supervisors. Standard police practice is the recognition of differences between adults and juveniles and training within police departments to recognize these differences and vulnerabilities.

Third, Defendants ignored obvious signs they learned in the investigation that pointed to the true perpetrator. At the party in which victim Summers was killed, Defendants were aware that "Crips" were talking prior to the shooting about getting Malcolm. This obvious bias should have been investigated as a possible explanation as to why "Crips" implicated Malcolm. A police investigation in line with generally accepted police practices would have attempted to resolve the obvious conflicts and contradictions in the statements by witnesses and victims of the shooting.

**Rashun Williams**

Shortly after the shooting, Officer Stiles interviewed Williams at the Tulsa Regional Medical Center. Officer Stiles noted, "Williams was the most informative witness at the scene. Williams said he was at a "Crip" party talking to some friends who were sitting on the hood of the victim's (Summers) car. A red or maroon Ford Escort 4dr with dark tinted windows drove by and a person in the vehicle yelled, "hey Blood" and then started shooting into the crowd."

Williams said the suspects were Malcolm and Marco, he did not see them but recognized the car. He added the suspect vehicle was followed by a brown car and a blue Olds Cutlass or Monte Carlo. Officer Stiles failed to ask or note what Williams meant by recognizing the car.

A very important question in this investigation that is not answered is when Williams states he did not see Malcolm and Marco but recognized the car. What did he mean by this statement? As a stand alone statement Williams' first interview after the shooting

makes it clear he did not see the shooters but is only linking Malcolm and Marco to the shooting by a previously known vehicle.

A standard follow-up question by an experienced police officer would be “what do you mean by you recognizing the car?” Where do you know this car from?” Most importantly a follow-up question by an experienced officer would be, “let me confirm you did not see who shot into the crowd, but only recognize the car?:”

On September 10, 1994, Tulsa Sheriff’s Gang Officer Ernestine Truewell interviewed Williams at his residence. Williams told Officer Truewell he was talking to victim Summers when the suspect vehicle drove by. A suspect yelled “what’s up Bloods” and started shooting. Everybody got on the ground and Summers did not get up.

Williams blames Sherece Shaw for telling the suspects (Bloods) about the party. He describes the suspect vehicle as a newer model red or maroon 4dr occupied by four black males. He then names the two suspects as Malcolm and Demarchoe who Officer Truewell names as Malcolm Scott and Demarchoe Carpenter. It should be noted Williams has already said in his initial statement that “he did not see them” referring to the suspects, but recognized the car.

Williams was interviewed a third time by Detective Gary Meek on September 10, 1994 at 9:57 pm. Meek testified that he would have read all police reports before conducting witness interviews, including Officer Truewell’s prior interview with Williams.

During the third interview, Detective Meek, as he did with Wilson, interviewed Williams first and did not record or document the contents of the interview, and then conducted a second interview which was recorded. Williams confirms his nickname is “Rawbeanie.” Williams confirms he was at the party when Summers was killed. He describes a burgundy car, a 4 door maybe tinted windows but the back window rolled down, drove by once and then returned. Shots were fired from the window out of the back driver's side where the window was rolled down.

The first time the car drove by Williams did not recognize anyone in the car. The second time it drove by a person in the car yelled, “hey Blood” and Williams’ states “that's when like I see Malcolm’s face, I seen what’s his name with the green eyes, forget his name.”

At this point Detective Meek introduces a suspect name into the interview. An experienced detective should not introduce any facts to witnesses, but rather have facts come from the witness. An experienced detective would have allowed Williams to

provide a physical description, how he knows him, his last contact with him, location he lives, what kind of car he drives, is he a rival gang member, associates of his.

Rather than feeding the name of the suspect to Williams, Meek should have allowed the witness to fill in the unknowns by good questioning and then a photo line-up to confirm who you as a detective believe the suspect.

During the questioning Williams places Demarchoe in the back seat, possibly in the middle leaning and Malcolm in the front of the car, "kinda in the middle like." At this point of the interview Detective Meek leads the witness creating possible scenarios for what might have happened. An experienced detective should not lead a witness.

Detective Meek asks, referring to Malcolm, "could he have been in the middle front seat sticking the gun out the back window?" "Or could he have been in the back seat?" Williams' response to these questions is very telling, he states, "anything's possible." This answer suggests that Williams from his vantage point was not able to tell where the occupants of the car were sitting. This is consistent with Williams' prior statements that he only saw only heard "hey Blood," saw a gun, heard shots being fired, and immediately got on the ground.

Williams goes on to describe the front window being up possibly halfway and the back window all the way down. It appears from his statement he notices the shooter's braided hair, "all i seen was that hair" and then the shots went off and he and Karen got on the ground. Williams then pulled out his gun and fired at the suspect vehicle driving away.

Williams has now given three statements to officers in approximately 19 hours. After telling Jaynie Jones and Officer Styles that he did not see the shooting, it is not until his conversation with Meek that Williams specifically identifies Malcolm and Demarchoe,

Detective Meek's interview of Williams would leave an experienced detective with serious questions as to the validity of Williams' identification of Malcolm or Demarchoe.

Williams describes talking to TPD officers at the hospital and trying to give them the suspect names. Detective Meek asks, "people that shot." Williams answers, "yeah cause they know em better." Williams' answer indicates that he did not see or know the names of the suspects while still at the hospital and was looking for TPD help to identify the rival gang members.

Instead of questioning Williams to determine the veracity of his supposed identification, Detective Meek feeds Williams information. He asks, "Did you all name anyone else

besides Malcom Scott and Demarchoe Carpenter?" An experienced detective should not lead a witness by providing them an answer to a question.

Detective Meek asks Williams if he knows who else was in the suspect vehicle. Williams responds, "Not quite, just I mean I just heard that it was everybody after that, you know saying what I'm said, it was Malcolm."

Detective Meeks responds, "Well other than that I mean you know it was Malcolm, you saw Malcolm." Again Detective Meek leads Williams by telling Williams what his answer should be. Williams' answers, "yeah yeah and everybody else know Malcolm."

Two things are clear from this exchange, Demarchoe Carpenter is not mentioned at all by Williams and "everybody" is naming Malcolm as the suspect. As the lead detective, Meek would have reviewed Williams' prior statements to Officer Stiles and Officer Truewell and should have noticed the obvious contradiction in his statements. Meek should have questioned whether Williams saw the shooter in this homicide or was simply agreeing with "everybody" that it was Malcolm.

In addition, the day after Detective Meeks interviewed Williams he knew that Michael Wilson was arrested with a firearm matching the caliber believed to be the murder weapon as well as driving a car matching the suspect vehicle description.

A reasonable and experienced detective would have re-interviewed Williams to confirm his identification of Malcolm Scott and Demarchoe Carpenter. He should have doubted the validity of the identification after reviewing all statements and specifically noting Williams' initial statement that Williams did not see the shooter and that there was evidence that another suspect, Wilson, committed the shooting. The lack of consistency in Williams' statements to police about seeing the shooting, the fact that Williams got on the ground immediately when he heard shots, as well as the manner in which this drive-by shooting occurred--very briefly and during the middle of the night when it was dark outside would signal to any reasonable investigator that Williams' identification was not reliable.

The additional information after the arrest of Wilson should have also caused Detective Meeks to re-interview WIlliams. A fundamental truth in homicide investigation is that it is more important to exonerate the innocent and not arrest an innocent person than convict the guilty.

When Williams was interviewed by Ernestine Truewell, he told her there were four black males in the suspect vehicle. Detective Meeks does not document asking Williams to

describe the persons other than Scott and Carpenter. Basic police investigation practices when seeking the truth is to simply ask for a description of the suspects from a witness. This did not happen or if it did, was not recorded, contrary to generally accepted police practices.

In an affidavit dated June 27, 2010, Williams stated, "I was a witness on behalf of the state and I testified against him but the truth of the matter is I don't know if he actually committed the shooting. I was at the party that got shot up all those years ago but I didn't see anything. It was officers for the Tulsa Police Department that coerced me into making statements that weren't true. They told me I would be charged for the murder if I didn't testify against De'Marco Carpenter and Malcolm Scott. I was young ta the time and I didn't want to go to prison so I got on the stand and told the jury what officers told me to say. I didn't understand what I was doing at the time but now that I am grown, I realize that I made a huge mistake because I really believe two innocent men are in prison for a murder that they didn't commit."

If Williams's statement is true,[4] then his conduct by the detectives (threatening a witness into falsely identifying someone as the culprit) clearly would be contrary to generally accepted police practices. This information—the detectives' acts of coercion and threatening of a witness—would also be exculpatory and/or impeachment evidence for Scott and Carpenter that should have been disclosed. As discussed in greater detail in Opinion 2 below, the fact that TPD had no policies or training on the disclosure of exculpatory and impeachment evidence contributed to this conduct and led to the violation of Scott and Carpenter's constitutional rights.

**Ken Price**

Price was initially interviewed by Defendant Officer Solomon at Tulsa Regional Medical Center.

Officer Solomon describes Price's injury as a gunshot wound entering his right buttocks and exiting his left buttocks. In the interview with Detective Meek Price describes having his back turned to the suspect vehicle which matches his injury. At a minimum he would have had his right side only facing the suspects and turning his back as previously noted making it nearly impossible to have seen two persons in the suspect vehicle. Ken Price was interviewed by Detective Meek on September 10, 1994 at 5:10 am. Again, Meek would have read prior police reports about Price before the interview.

[4] This would be up to a jury to determine.

As was TPD's policy and practice, Meek conducted an unrecorded pre-interview before conducting a recorded interview. During the recorded interview, Price confirmed he was present at the party when victim Summers was shot and killed. Meek questioned Price about what he did prior to the shooting and persons he was with. Price makes a comment, "we was trying to avoid, uh, Malcolm and them." Detective Meek followed up by questioning Price about gang activity. Price confirmed he associates with the "107's" (107 Hoover Crips),Rashun was a "107", and that Malcolm was a "blood."

At the party he was outside when he describes a small "goldish" car drive by and a person yells "Blood" and then shots are fired. Detective Meek asks Price if he saw who was in the car and he responds, "No I didn't see who was in the car cause my back was turned."

Detective Meek asks Price again, "Ken, are you sure you did not see who was in the car?" Price responded, "I didn't see who was in the car for sure, but I know I seen red."

Despite Price telling Meek repeatedly that he did not see who the shooter was, Detective Meek continues to question him and feed Malcolm's name to Price. Here are a few examples of statements by Detective Meek:

> "Let's go back to the conflict with Malcolm"
> Incident at Apache Apartments, "you think Malcolm and them did that"
> Chased by Malcolm and two others in a car, "Malcolm driving"
> Tonight at the Wave Length, any Bloods there, Yes, "Malcolm there"

A basic investigative concept any reasonable detective would adhere to is to not focus on a particular person so early in the investigation because it impacts detectives' questioning. A proper interview allows for the witness to bring up his or her perception of what occurred and who was involved. Detective Meek appears to be prompting Price to include Malcolm in the shooting death of Summers by the repetitive use of his name in the interview, contrary to generally accepted police practices.

On January 4, 2023 Ken Price completed a deposition related to the Summers homicide. In the deposition he denied seeing the shooter, said he was shot in the buttocks and kind of turned to look at the suspect vehicle, but did not see who was in it.

Price testified that approximately a week after the murder he was interviewed again. Detective Meek was frustrated that he could not identify the shooter. Detective Meek told him, "just say you seen it even though you didn't see it."

Price said he eventually testified in the murder trial and named Demarchoe Carpenter and Malcolm Scott as the suspects in the murder of victim Summers. He said he did this after being pressured and threatened by Meek that he would be charged with murder if he did not identify them.

During cross examination he was asked about his alleged statement identifying the shooters in the hospital. Price denied that he knew who the shooters were when at the hospital.

In an affidavit he signed on June 24, 2010, Price stated: “I was pressured into getting on the stand by officers of the TPD to testify that I got shot in the buttocks and to point out De’Marco Carpenter and Malcolm Scott as the culprits to committed the shooting. I got shot in the buttocks so it is obvious that my back was toward the action. I initially told officers I didn’t see anything and I didn’t know who did the shooting. After several interviews with several officers, I was told that De’Marco Carpenter and Malcolm Scott were the shooters and I just needed to point them out when the time case. I don’t know if they did it because I didn’t see anything but I did testify and say what officers told me to say just as I was told.”

Furthermore, in a February 3, 2014 affidavit, Price reiterated what he stated in his 2010 affidavit and further stated that when he was interviewed by the detective on September 10, 1994, the detective “became angry” when he told him that he did not know who the shooters were. Subsequently, “[o]ver the next month I was interviewed several more times by Tulsa police officers. The police began to put pressure on me to say Malcom Scott and Demarchoe Carpenter had shot us. … I understood that the Tulsa police wanted me to say Malcom and Demarchoe were the shooters. The police made me believe that I would be charged with the murder if I did not help them by saying Malcom and Demarchoe were the shooters. After that, I went along with what the police wanted me to say; Malcom Scott and Demarchoe Carpenter were the shooters in the car that night.”

If Price’s statements are true, then this conduct by the detectives (threatening a witness into falsely identifying someone as the culprit) clearly would be contrary to generally accepted police practices. This information—the detectives’ acts of coercion and threatening of a witness—would also be exculpatory and/or impeachment evidence for Scott and Carpenter that should have been disclosed. As discussed in greater detail in Opinion 2 below, the fact that TPD had no policies or training on the disclosure of exculpatory and impeachment evidence contributed to this conduct and led to the violation of Scott and Carpenter’s constitutional rights.

**Alonzo Johnson**

Johnson was interviewed by Detective Meeks on September 10, 1994 at 5:58 am. Johnson confirmed he was at the "Crip" party when Summers was killed. He had limited information; however, he was able to describe the suspect vehicle as a newer Red or Maroon Ford Tempo or Taurus. Johnson gave Officer Solomon

Detective Meek asked Johnson if he could name anyone in the car. Johnson stated, "No sir, except the one Rashawn, that officer in there, Demarco Carpenter and Malcolm Scott." Detective Meek asked, "You heard Rashawn told somebody that? Johnson responded, "Tell that Officer."

In a standard police investigation witnesses should be separated so they cannot hear the statements of other witnesses. Author Geberth notes, "It is important to keep witnesses separated from one another. Witnesses who have conferred with each other may change their stories."[5] Meek, Solomon, and all TPD officers would have received this basic police training to keep witnesses separated. Problematic is that witness Jaynie Jones as previously noted refers to Rashun Williams talking with other gang members at the hospital with Jones overhearing the conversation.

Author Geberth raises the concern that stories may change after persons confer, failure to separate witnesses is problematic in this investigation and outside of standard police practice.

**Demarchoe Carpenter**

Detective Meek notes in a supplemental report that Demarchoe Carpenter arrived at TPD with his mother and Aunt and gave a statement. He stated he was home on the night of September 9, 1994, from around 2000 hours and never left the house. Around 0415 hours his mother's house was shot up. Carpenter's mother Pamela confirmed this. Demarchoe also noted Malcolm Scott was at his mother's home until 0305 hours.

Detective Meek asked Carpenter about being seen at the QuikTrip that same night? Carpenter confirmed he left his house between 0100-0130 and was gone for approximately 15 minutes at the QuikTrip. At the QuikTrip he spoke to Michael Wilson who was with Richard Harjo and a black male he did not know. Carpenter said they did not speak about guns or ammunition and he was not given any ammunition from Wilson.

[5] Practical Homicide Investigation, Vernon J. Geberth pg 102

Detective Meek then states at the conclusion of the interview Carpenter was arrested for first degree murder and two counts of shooting with intent to kill. Detective Meek writes, “The interview up to the time that “Demarco” was placed under arrest was not recorded.” Detective Meek then noted he offered to now interview Demarchoe on tape and make it available to the district attorney’s office; however, his mother invoked his right to an attorney.

Demarchoe Carpenter was a suspect in the murder of victim Summers. Standard police practice would be to tape record the initial interview with him. Carpenter had volunteered to give a statement. Failure to record his statement brings into question what was discussed in this interview.

The supplement by Detective Meek does not even mention the murder of victim Summers. Carpenter is not asked if he was the suspect in the drive-by shooting at the “Crips” party. He is not asked about his gang affiliation in a gang homicide. He confirms he saw Michael Wilson at the QuikTrip, but he is not asked about his relationship with Wilson. Carpenter is not asked if he has a car or access to a car. The brief record of the interview with Carpenter and the failure to record this interview is not standard police practice, and it is not consistent with generally accepted police practices.

**Malcolm Scott**

The interview with Malcolm Scott has even less information than the interview with Demarchoe Carpenter. The interview with Scott was not recorded, and only noted he denies involvement with the murder and he was with Carpenter until 0200 hours.

Standard police practice would have been to record the interview with Carpenter and ask detailed questions about his gang affiliation, association with Scott and Michael Wilson, access to a vehicle, was he with Scott and Wilson at the QuikTrip, etc.

It is clear TPD had the ability to record interviews as they recorded many in this case including the interview with Michael Wilson in which he gave a statement that would benefit/exonerate himself. The most important interviews in this investigation, Scott and Carpenter, were not recorded.

**Michael Wilson**

Michael Wilson had recently been shot allegedly by a “Crips” gang member, creating the motive and the means to murder Karen Summers. Wilson was in possession of the murder weapon and a vehicle matching the suspect vehicle description.

If Wilson shot and killed Karen Summers and wounded two others, every statement he made must be evaluated by likelihood he would give statements to benefit/exonerate himself. As I review Wilson’s involvement, I will keep this likelihood as a focus of the review.

On September 10, 1994, at approximately 7:00 pm acting on information from Detective Meek, Sgt. Mike Huff TPD was looking for Michael Wilson and his rented 1994 Maroon Ford Taurus 4dr OK IOE-474.

The nexus between a homicide suspect and a homicide is a priority in a standard police investigation. Why a person is being sought and what information brought them up as a potential suspect must be included in a police report. This did not happen in this case.

Sgt. Huff simply states he was looking for Wilson based on information provided by Detective Meek, yet it is unknown what that information is. Detective Meek does not provide what the information leading to seeking Wilson was in his report, leaving the question unanswered.

A police report is a key element in seeking justice for the homicide victim and their family members. Author Geberth writes, “The official police report is the tool used by the criminal investigator to document the findings of his investigative actions. It is the principal source used by the courts, the defense, the district attorney’s office, and the police department to evaluate the thoroughness of an investigation and the ability of the reporting detective.”[6]

The TPD investigative report on the murder of Karen Summers does not record how Michael Wilson became a person of interest. This is a substantial error. As Gerberth notes, it limits the courts, defense and prosecution from obtaining a full picture of what occurred in the investigation.

Detective Meek’s records clearly state how Malcolm Scott and Demarchoe Carpenter became suspects even with conflicting statements by the eyewitnesses. However, the

[6] Practical Homicide Investigation, Vernon J. Geberth pg 1144

person with the murder weapon and suspect vehicle just appears in the report without a nexus to the crime scene or a specific witness.

On September 11, 1994 at 8:27 Michael Wilson was interviewed by Detective Meek. It is unknown all that occurred in the approximately 1 ½ hours between Sgt. Huff contacting Wilson and his interview with Detective Meek. What is known based on the recorded interview is that Detective Meek had a non-recorded pre-interview that included Wilson waiving his Miranda rights and a discussion about talking to friends the night of the murder at the QuikTrip. The names Marco and Malcolm were introduced, but because the pre-interview was not recorded, it is unclear whether Wilson volunteered the names or Meek introduced them. Wilson was then shown a photograph of Malcolm Scott—if Meek had introduced Scott's name to Wilson, showing Wilson a photograph was a clear violation of generally accepted police practices which teach never to prime witnesses or use unduly suggestive identification procedures.

There were other deviations from police practices in Meek's interview with Wilson. Meek failed to record the waiver of a suspect's rights, which brings into question a suspect's understanding of their rights. Meek also primed Wilson by naming suspects prior to the recorded interview and planting the seed, suggesting at a time of high stress who is involved without allowing the person interviewed to provide their version of what and who was involved.

Detective Meek was also unreasonably focused on Malcolm Scott and Demarchoe Carpenter as the persons responsible for victim Summers' murder. Wilson was able to create a scenario that places blame on Scott and Carpenter and helps to exonerate himself. If Wilson is the person who shot and killed victim Summers, again, he would know that spent .380 caliber casings would have been left at the crime scene. These casings could match the gun he had in his possession when arrested. Knowing Detective Meek was already focused on Malcolm and Demarchoe, stating he placed .380 caliber bullets in Demarchoe's possession would help shift blame from Wilson to Demarchoe and Malcolm.

A standard police interview of a potential suspect would hold back all of the information Detective Meeks brought up in the non-recorded pre-interview allowing Wilson to answer questions for himself.

During this Interview Detective Meek asks Wilson about getting shot the previous week. Wilson says he was shot at his girlfriend's house and Detective Meek asks if he knows who shot him, Wilson tells Detective Meek just faces but he has had problems with

these guys for about a month. Detective Meek stops his inquiry into Wilson being shot and says, “let’s go back to the QuickTrip.”

Standard police practice would have included asking Wilson additional questions about his being the victim of a shooting so close in time to the Summers murder. Victim Summers was murdered in a gang shooting in which “Bloods” gang members shot into a crowd at a “Crips” party. Detective Meek should have asked follow-up questions to Wilson related to the gang shooting topic, for example:

> Are you in a gang?
> Are you a Bloods gang member?
> Were the suspects who shot you “Crips?”
> Were the people you had recent problems with “Crips?”

Detective Meek would have known Wilson had the motive and means to do the drive by shooting at the “Crips” party where Summers was murdered. This is yet another example of the danger of tunnel vision--Detective Meek was not interested in pursuing the possibility that Wilson committed this murder, despite obvious signs pointing to Wilson.

Related to how Wilson heard that Summers had died, Detective Meeks asks him, “At sometime yesterday I think you told me, you had a conversation with a guy named Benny Dean.” This was another non-recorded pre-interview of Wilson.

Detective Meek asks Wilson if Dean might be associated with the murder. Wilson says no; however, Dean’s girlfriend was at the party wearing red and “I guess they was trying to jump her.” Dean’s girlfriend wearing red at a “Crips” party whose color is blue should have raised some questions for Detective Meek. Wilson is describing a disturbance at the party between Dean's girlfriend and some “Crips.” Due to the possibility that this could have resulted in the shooting death of Summers, Detective Meek should have asked follow-up questions. At a minimum he should have asked what Dean’s girlfriend’s name was.

When Detective Meek and the other Defendants reviewed all of the reports from this murder, they would have become aware of a disturbance between Shereece Shaw wearing a red shirt and a “Crips “gang member. They would have had Ernestine Truewell’s report in which key witness, Rashun Williams, tells Truewell he thinks Shereece Shaw told the shooter about the “Crips” party. Williams links the murder of Summers to Shereece Shaw who is likely Dean’s girlfriend.

Standard police practice would have been for Detective Meek to investigate the possibility that Shaw contacted her boyfriend Benny Dean and, as he was aware from Rashun Williams, this could've led to Summers' murder. This was not recorded as an investigative step in the police report or did not occur, another deviation from generally accepted police practices. As previously noted, tunnel vision will at times cause investigators to not follow leads that do not match their conclusion as to what occurred.

As Detective Meek is near the close of the interview, he asks Wilson questions about his gun. He says, "Your telling me that gun won't match up from anything that we got from the crime scene." Wilson responds he was at a party the prior evening and there were a lot of guns at the party and a lot of dark .380 and Loricn is a very common gun on the streets. Wilson states, "It's possible that like everybody looking at everybody's gun, I'm not sure I got my gun back."

Detective Meek states to Wilson, "So people handled your gun last night, is that correct?" Wilson answers "Yes." Detective Meek than states, "But as far as you know, that's your right gun that you got back?" Wilson responds, "I'm hoping that it is since you talking about this ballistic check. I'm hoping that's my gun and it doesn't match up."

If Wilson shot and killed Summers, he is now in a very difficult point of this interview. He has easily been able to point to Malcolm Scott and Demarchoe Carpenter and exclude himself from suspicion. Now however Detective Meeks narrows to the gun and its potential link to the crime scene thus the murder. Wilson's answer to his gun "not matching up" is a difficult to believe scenario as to why he might not have his own gun. By his own statement a Lorcin black .380 is a very common gun on the streets, the idea that anyone would want to look at a common gun is not believable. It is the different gun that would be of interest. However, Wilson did not have much time to think under the pressure of the interview.

If one assumes what Wilson stated about the party and passing of guns is true, then Detective Meeks failed to ask follow-up questions and failed to take follow-up investigative action.

Detective Meeks should have asked at a minimum:

> Where was the party held? We know who for but where?
> What time were you at the party?
> How many people are at the party?
> Was Benny Dean at the party?

> You are a "Bloods" gang member and you do not know the name of a single person at the party?

In addition, the fact that Detective Meek did not ask if Malcolm Scott and Demarchoe Carpenter were at the party is outside of standard police practice. At this point Detective Meek has information that Scott and Carpenter are the suspects in the murder of Summers. So, if Wilson's gun matches the crime scene, Detective Meek would want to link Scott and Carpenter to Wilson at this party. His not asking the question is an indication of tunnel vision believing he already knew what happened and who was responsible.

On November 13,1994, Michael Wilson had a court hearing in which the murder charge and two shooting with intent to kill charges were dismissed and he pled guilty to being an accessory. In that hearing he added to the statement he gave to Detective Meek further benefiting himself and placing the blame for victim Summers' murder on Demarchoe Carpenter.

Wilson said a day or two after the murder of Summers he again saw Demarchoe Carpenter at the QuikTrip on Harvard. Carpenter asked him to hold a black .380 Lorcin handgun and he kept it on him at all times after that. This was the gun that Sgt. Huff found on him, the murder weapon.

Wilson has stated the gun found in his possession was provided to him by his mother and he believed it was this weapon Sgt. Huff recovered, or if the gun matches the murder weapon it could belong to someone else. On November 13, 1994, he adds he also had a gun given to him by Demarchoe Carpenter at "all times" on his person. If he had Carpenter's gun and the gun from his mom, he should have been found with two guns in his possession. Clearly, a reasonable detective would know that Wilson's statements are conflicting and unreliable.

**Billy Iverson and Richard Harjo**

On January 7, 2014, Michael Wilson was interviewed by Tiffany Murphy of the Innocence Project. Wilson confesses to shooting and killing victim Summers in retaliation for being shot by "Crip" gang members. Wilson identifies the other people in the car with him as Billy Iverson and Richard Harjo who both when interviewed confirmed Wilson's confession as factual.

During the 2022 deposition of Detective Meek, he states that he was aware that Billy Iverson and Richard Harjo were with Michael Wilson on the night of victim Summers

murder. Detective Meek added that he tried to contact both of them and left lots of business cards, but they never surfaced. The attempt to locate these two potential suspects or witnesses is not documented in the TPD report which is yet another failure to abide by generally accepted police practices.

The importance of Iverson and Harjo cannot be overstated. They are key to two possible facts that is recorded in the TPD investigation:

- If they were with Wilson at the QuikTrip when he spoke to Demarchoe Carpenter, they may have been witnesses to the alleged giving of .380 caliber bullets to Carpenter.
- Wilson was in possession of the murder weapon and a vehicle matching the suspect vehicle which should have caused Detective Meek to consider since they were with Wilson the night of the murder, they could be potential witnesses or suspects.

The fact that Detective Meek could not locate either Iverson or Harjo would have caused an experienced police detective to consider if they were hiding out due to their involvement in the Summers murder. At the very least a standard police investigation would have recorded the steps used to locate Iverson and Harjo. Again, tunnel vision obscured the obvious importance of Iverson and Harjo as they are recorded in a minimal manner in the TPD investigation.

**Physical Evidence**

Author Geberth calls physical evidence the “unimpeachable witness.”[7] His statement points to the priority of securing and examining physical evidence to seek the truth and facts related to a crime. Specifically, when writing about firearms and vehicles he notes both should be “Photographed and examined for fingerprints.”[8]

Author DeVere D. Woods also states the importance of physical evidence in his statement, “Searching the scene of the crime for physical evidence can be the most important part of the investigation.”[9]

Writing on fingerprints, Woods noted firearms and automobiles are the “types of surfaces”[10] to be searched for fingerprints.

---

[7] Practical Homicide Investigation, Vernon J. Geberth pg 215
[8] Practical Homicide Investigation, Vernon J. Geberth pg 769, 781
[9] Fundamentals of Criminal Investigation, DeVere D. Woods, pg 35
[10] Fundamentals of Criminal Investigation, DeVere D. Woods, pg 63

On September 10,1994 Sgt. Mike Huff recovered a handgun from Michael Wilson. This handgun was later confirmed to be the murder weapon in this case. On the same date Huff contacted Wilson, Wilson was in possession of a 1994 Maroon Ford Taurus which matched reports of the suspect vehicle.

Lead Detective Meek was investigating three potential suspects for the murder of victim Summers. Detective Meeks had witnesses who gave conflicting statements which call into question the validity of the statements. A police investigation in line with generally accepted practices would seek to connect physical evidence related to this crime to a particular suspect.

It is equally important in a police investigation that aligns with generally accepted practices to provide evidence that would be exculpatory that tends to exonerate a person. Not finding named suspects' fingerprints on the murder weapon or in a vehicle matching the suspect vehicle description is exculpatory and an investigation seeking truth should have processed the gun and vehicle for fingerprints.

TPD did have policy and procedure directing the importance of physical evidence. Policy 31-112 F Date December 10, 1985:

> *To increase the quantity and quality of physical evidence collected and to assist field officers in the collection of evidence, a Scientific Investigation Unit Detective will be available on every shift. Major Crime Scene-Homicide.*

Policy 31-112 F points to TPD view of the importance of crime scene evidence, however it is invaluable if the evidence is collected and processed, which did not happen in this case, contrary to TPD policies and generally accepted police practices.

TPD also had a policy specific to firearms. Policy 31-112 February 6, 1990:

> *6. B A firearm should not be packaged unless it is to be processed by the police forensic lab.*
> *C. If the property is to be processed by the police forensic lab, write on the package to be processed, latent prints.*

It is clear that TPD policy required officers to process evidence, specifically processing a firearm for latent prints. It did not happen in this case, contrary to TPD policies and generally accepted police practices.

**Murder Weapon**

The handgun found in Wilson's possession was immediately known to match the caliber of the spent casings found at the murder scene. Post autopsy it was determined that the gun found in Wilson's possession was the murder weapon. Processing this gun for fingerprints to connect a person to the murder weapon would be a generally accepted police practice, however this was not done. It was the responsibility of Detective Meek to direct this weapon to be processed for fingerprints and his failure to do so is a gross deviation from generally accepted police practices. Defendants' failure to follow these basic investigative steps suggests that they were not determined to find the truth.

The firearm in Wilson's possession should have been examined for fingerprints to determine the other perpetrator(s) of the crime. The failure to do so leaves other perpetrator(s) of the crime uninvestigated or apprehended. In addition, conflicting witness statements could have been verified if a suspect's fingerprints were found on the murder weapon.

**Suspect Vehicle**

Based on witness accounts two to more than four persons were in the suspect vehicle when victim Summers was murdered. A generally accepted police response to determine who the other people in the vehicle were would be to process the car for fingerprints, but this was not done. It was the responsibility of Detective Meek as lead detective to direct this vehicle to be processed for fingerprints. Again, his failure to do so deviated from generally accepted police practices.

Witnesses describe the suspect vehicle in this case as follows:

| | |
|---|---|
| Rashun Williams: | Newer Maroon of Red Ford Escort 4dr Tinted Windows |
| Larry Brown: | Newer Maroon Ford Taurus 4dr |
| Alonzo Johnson: | Newer Maroon Ford Taurus or Tempo |
| Ken Price: | Small Goldish Car/Red Ford Escort |
| Brian Conard: | Red Ford Escort |

It would appear the suspect vehicle was a newer model red or maroon Ford Taurus or Escort.

Ernestine Truewell and gang investigator with the Tulsa County Sheriff's Office, was called about this homicide at 3:45 am on the morning of the occurrence. Truewell interviewed persons involved and wrote a report documenting her actions. In this report

she lists two vehicles as “possible suspect vehicles” and both are associated with Michael Wilson:

- 1994 Ford Taurus Dark Maroon in Color Tag # IOE-474 leased by Wilson’s mother.
- 1991 Ford Taurus Wagon Dark Red or Maroon in color unknown tag, owned by Michael Wilson and confirmed to be in a repair shop by TPD.

Again, in this review, I must question the validity of the “eyewitness” statements when considering the suspect vehicle. Michael Wilson is a “Bloods” gang member who had recently been shot by a rival gang the “Crips.” The “Crips” would likely know the type of car Michael Wilson drove a Red or Maroon Ford Escort. TPD Detectives should have asked witnesses if they knew Wilson and knew what type of vehicle he drove.

When the suspect drove by and began shooting, in the brief second prior to hitting the ground, witnesses clearly saw a dark maroon or red car. It is also known that the “Crips” gang members spoke at the scene and at the hospital and the police department, “comparing notes” so to speak. What is interesting is both the car Wilson would be known to drive and the one he was driving are both mentioned, this is a strong link to the murder of victim Summers.

Detective Meek and the other defendants failed to initiate follow-up investigations attempting to confirm the actual suspect vehicle. After the arrest of Michael Wilson, no follow-up interviews with eyewitnesses were completed to determine further about the car and their knowledge of Wilson's vehicle.

In addition, the police investigation does not link Malcolm Scott or Demarchoe Carpenter to a newer dark red or maroon Ford Taurus or Escort. Standard police investigation would have attempted to link the proposed suspects to the car matching witnesses’ descriptions. This could be done by searching relatives' vehicles, and associate’s vehicles. TPD Detectives could also have completed a records check to determine if Scott or Carpenter had ever been stopped as a driver of passenger of a car matching the suspect vehicle description. This did not happen. Defendants’ failure to follow these basic investigative steps suggests they were not determined to find the truth.

When TPD Dispatch gave the names Malcolm and Demarcho at 2:46 am, Defendant Sgt Clark advised that Carpenter and Scott were stopped on September 9, 1994 at approximately 1900 hrs in a red Ford Escort. The TPD investigation does not link this stop and vehicle to the murder of Summers.

Lack of investigation into the suspect vehicle is a problematic point in this investigation. Once the alleged identification of Scott and Carpenter occurred it appears that all other standard investigative practices stopped. This includes identifying the suspect vehicle as well as the previously noted lack of attempting to link physical evidence to this murder through fingerprint analysis.

**Photo Line-up**

On September 20, 1994, Detective Meek showed a photo line-up to Carol Wright, a witness to this shooting. The line-ups contained photographs of Malcolm Scott and Demarchoe Carpenter. Wright was unable to identify anyone in the line-ups. This should have been a red flag to Meek and the other defendants. In addition, it is concerning that Carol Wright was not shown a photo line-up containing Michael Wilson. For reasons unknown and not documented in the TPD investigation, Wilson was apparently eliminated as the shooter in the murder of victim Summers, despite being the only individual that physical evidence linked to the crime.

It would appear the forensic examination of the projectile that killed victim Summers was completed on September 15,1994, five days prior to the contact with Carol Wright. Standard police practice would be to place the suspect with the murder weapon and suspect vehicle into a photo line-up to show witnesses, unless that person has been eliminated as a suspect, this did not happen. Tunnel vision by the defendants was clearly at play.

**Supervision and Case Management**

Author Gerberth writes, "Case management relates directly to the process involved in monitoring the progress of an investigation. This begins with the initial report or officer-initiated police action and continues through all phases of the investigation until the case is closed."[11]

In my review of this case, it has been difficult to completely assess the level of case management this murder investigation received. Two statements give some insight to the role supervisors played in assisting the lead detective in case management.

In Detective Meek's deposition in 2022 he stated that he would update his supervisor if something important was discovered related to the case. He also noted at times the

---

[11] Practical Homicide Investigation, Vernon J. Geberth pg 1136

supervisor may provide him investigative direction. A supervisor cannot meet the standard described by author Geberth if he is only briefed when a detective feels what has been discovered is important enough.

Sgt. Jim Clark in his deposition 2022 said that due to the volume of police reports he never saw a supervisor sit and actually read every page.

It is possible that based on supervisors not reading all reports and only being briefed at the discretion of the detective the following areas of this investigation remain in conflict or not answered:

- Conflicting statements from eyewitnesses and no clarifying interviews
- Malcolm Scott on the “Crips” radar prior to the Summers murder
- Wilson had motive, he had been shot and means the gun and car
- Photo line-up with Scott and Carpenter but not Wilson
- Lack of follow-up on Iverson and Harjo
- Four in suspect vehicle no documented attempt to describe or identify all four
- Is Benny Dean a possible suspect based on Shereece Shaw
- Witness contamination based on not separating witnesses
- No follow-up on Wilson’s description of guns passed around at the party
- How does Ernestine Truewell identify Wilson’s vehicles?
- Why were the interviews with Scott and Carpenter not recorded?

These are a few of the items that remain in conflict or are unknown at the conclusion of the TPD investigation. Detective Meek and TPD supervisors were responsible for these conflicts and/or unanswered questions.

**Opinion 2: TPD’s Policies, Practices, and Failure to Adequately Train Concerning Witness, Victim, and Suspect Interviews and Interrogations and Disclosure of Exculpatory Evidence Likely Resulted in Detectives’ Actions in This Investigation**

Policy, procedure, and training form the basis upon which an investigation is conducted. The TPD allowed broad discretion to detectives and officers which caused a failure to implement basic police practices in the areas of interview and interrogation and disclosure of exculpatory evidence.

Specific failure to meet a standard police practice was found in the lack of recorded interviews of key persons including Demarchoe Carpenter and Malcolm Scott. The use of the pre-interviews to bypass the generally accepted practices of obtaining a recorded interview was also used in key interviews in this investigation.

Tulsa Police Department's retired Chief of Police Ronald Palmer in a deposition February 2017 was asked about an interview TPD conducted related to a 1994 interview of a person named "Murphy". Palmer was asked if the interview should have been recorded and he answered, "if the equipment was available, yes."

Major Matt McCord was TPD's designated witness on TPD's policies, practices, and training. McCord provided binding testimony at his deposition as a witness for the City of Tulsa on the City's policies, practices, and training in effect from 1989 to 1994 and 2014-2019 on the following topics: witness and suspect interrogations and interviews in homicide investigations; responding to subpoenas from criminal defendants; requesting all records in a homicide investigation, including policies, practices, and customs for ensuring that exculpatory information is disclosed to suspects, criminal defendants, their attorneys, and prosecutors; and *Brady* obligations. He testified, among other things, that TPD knew that recording interviews and interrogation was important because it provides more evidence to a jury.[12] However, in the 1989-1994 time period, TPD policies, procedures and guidelines did not require the recording of interviews and interrogations.

**The TPD Investigative Handbook January 1994 had a topic, "Tips for recording."**

TPD procedure 31-202 dated April 8, 1994 describes the value of using a mobile recording device when interviewing both suspects and witnesses within or away from the police unit.

TPD training bulletin 87-04 October 16, 1987 notes, "obviously a recorded confession is desirable in most cases."

It is clear that at the time of the Summers homicide, recording was available and known by the TPD to be important. However, in 1994, there were no specific directions, policies, procedures, guidelines, or training provided to officers requiring the recording of witness interviews.[13] In 1994, the policy of the TPD was that pre-interviews were not required to be recorded.[14] In fact, the Detective Handbook directs for pre-interviews to be done and not recorded.[15] The "Tips for Taping Interviews from the Investigative Handbook states, "Do a pre-interview before you begin taping." TPD's expectation was that officers would follow the guidelines laid out in the Investigative Handbook, and the general expectation in 1994 was that an officer would do an unrecorded pre-interview.[16]

[12] McCord Deposition, pg 112-13
[13] McCord Deposition, pg 66-67, 112
[14] McCord Deposition, pg 68-69
[15] McCord Deposition, pg 69-70
[16] McCord Deposition, pg 74, 76

Officers were expected to follow what the training bulletins directed them to do.[17] Ultimately, the authority for all of TPD's policies, procedures, and training (including the training bulletins, Investigative Handbook, and Operations Manuals) came from the Chief of Police.[18] In addition, McCord could not identify what training TPD provided to officers on unrecorded pre-interviews.[19] TPD officers and detectives in this case acted consistent with TPD's policies, procedures, guidelines and training and did not record and memorialize the statements of witnesses contacted at the hospital just after the incident, and other witness and suspect interviews.[20]

TPD detectives failed to record interviews with Demarchoe Carpenter and Malcolm Scott. Standard police practice would be to record the interviews with Carpenter and Scott as detectives did with Michael Wilson. Instead with Carpenter, Detective Meek used the "pre-interview" as not a "pre" but rather a complete thorough interview and then offered a recorded interview, ignoring best practice.

In addition, TPD failed to give direction to detectives in policy procedure or training on the scope of a pre-interview. TPD Investigative Handbook simply states, "Do a pre-interview before you begin taping." TPD uses interview and interrogation interchangeably as the next point in the handbook reads, "Give Miranda Rights before you interview."

TPD's policies, procedures, guidelines, and failure to train resulted in both Carpenter and Scott being interviewed by TPD detectives without providing the prosecuting or defense attorneys the benefit of a recorded interview, which is police standard practice.

By definition, pre-interview is before a meeting at which information is obtained (interview). By definition, it is not the time in which information specific to the case is obtained that should be completed after Miranda warnings. The pre-interview should be limited to the detective describing why he wants to interview a person, it could include some general facts such as dates and times, all designed to help the person interviewed to be prepared for the questions that will seek answers or information.

It is clear in this investigation that TPD policy, procedure, and failure to train and supervise allowed for detectives to use the pre-interview to help Michael Wilson develop a story to incriminate Carpenter and Scott. The pre-interview was used as the complete interview for Carpenter and Scott which is outside of standard police practice.

[17] McCord Deposition, pg 48, 50
[18] McCord Deposition, pg 29, 37, 50-51, 63, 76
[19] McCord Deposition, pg 76
[20] McCord Deposition, pg 76-78

TPD was aware of the problems of not recording interviews. The 1989 interview of LaRoye Hunter who had been charged with murder was suppressed due to a 40-minute unrecorded gap during the taping of his interview, yet non-recorded interviews continued in 1994 without department intervention or correction.

Melissa Shields, an alibi witness for Carpenter and Scott who said she was with them at the time of the Summers murder, did not have her interview recorded. Not recording a key witness is outside of generally accepted police practices.

**Interviews and Interrogations**

Moreover, in 1994, TPD had no policies or procedures requiring that juveniles be treated any differently from adults.[21] It was also consistent with TPD policy to interview juvenile witnesses without a parent or guardian present.[22] Furthermore, there were no policies or procedures in 1994 that informed officers regarding acceptable interview and interrogation techniques for witnesses.[23] Interrogators had discretion about what techniques to use during witness interviews and how to conduct them.[24] There were no written policies limiting what kind of techniques interrogators could use or what acceptable interview/interrogation techniques were. For instance, interrogators or interviewers could lie to witnesses, and that would not be a violation of TPD policy.[25] There were no policies prohibiting threatening witnesses (juvenile or adult) or displaying a weapon during an interview/interrogation.[26] McCord, the City's witness, could not identify any specific training that TPD officers had in 1994 regarding witness interrogations and interviews.[27] In fact, McCord testified that he did not find any evidence that any training was taking place in the 1994 time period (other than Meek going to an outside training in Kansas City).[28] At the end of the deposition, McCord admitted that there was no training in 1994 on interviews and interrogations.[29]

**Disclosure of Exculpatory Evidence**

[21] McCord Deposition, pg 84
[22] McCord Deposition, pg 88
[23] McCord Deposition, pg 90, 114
[24] McCord Deposition, pg 90
[25] McCord Deposition, pg 90-91
[26] McCord Deposition, pg 92
[27] McCord Deposition, pg 93
[28] McCord Deposition, pg 94-95
[29] McCord Deposition, pg 115

The TPD investigation into the murder of Karen Summers requires the reader to search for facts that point to the guilt of Michael Wilson and away from Demarchoe Carpenter and Malcolm Scott. The *Brady* decision in 1963 made it clear to all in law enforcement the importance of the right of the defense in a criminal case to have access to all exculpatory and impeachment evidence.

The *Brady* (1963 Supreme Court ruling in *Brady v. Maryland*) decision held that the defense has the right to examine all evidence that may be of an exculpatory nature. The prosecution will not only release evidence that the defendant might be guilty of a crime but also release all evidence that might show that the defendant is innocent as well.

Author Vernon Geberth defines exculpatory evidence as, “Evidence that exculpates or proves a suspect or defendant is not guilty.”[30]

The following facts are just some of the exculpatory information not found in a summary statement completed by TPD detectives, these facts are also not included in the Prosecution Report completed by Detective Meeks.

- Rashun Williams' first statement at the hospital just after the shooting related to Carpenter and Scott was, “He did not see them but recognized the car” this statement is not included. The prosecution report also neglects to identify Officer Stiles who took the exculpatory statement from Williams as a witness.
- Detective Meek fails to record the most important facts of this investigation which are both exculpatory in nature and his failure to do so is outside of standard police practice. Detective Meek does not record in his prosecution report that Wilson was in possession of the murder weapon and a vehicle matching the suspect vehicle at the time of his arrest.
- Detective Meek does not record that he failed to show witness Carol Wright a photo line-up containing Michael Wilson.
- Detective Meek does not record interviewing potential alibi witnesses.

Detective Meek fails to provide exculpatory evidence for both the prosecution and defense review in his prosecution report. As discussed below, TPD failed to have necessary policies and training on the disclosure of exculpatory evidence, which led to this result. As Major McCord testified at his deposition, TPD had no written policies or

---

[30] Practical Homicide Investigation, Vernon J. Geberth pg 1185

procedures in place in 1994 with respect to *Brady* or disclosure of exculpatory evidence.[31] Officers were simply expected to follow the law. Only recently ("in the last few weeks") did the TPD add any policy regarding disclosure of exculpatory evidence or *Brady*.[32]

TPD provided training bulletins to officers, but none of them addressed disclosure of exculpatory evidence or *Brady*. Nor could Major McCord identify any training on disclosure of exculpatory evidence.[33] The absence of such policies and training information means that none were provided to TPD officers, supervisors, or command staff. Officers were simply expected to follow the law.

**Identification Procedures**

In 1994, TPD had no specific training, policies, or procedures for how and when to conduct identification procedures in homicide investigations.[34] Officers could use a six-pack, but they did not have to, and they were not required to use any kind of identification procedure in an instance where a witness said they knew the suspect.[35] Pursuant to TPD policy and practice, the use of any particular identification procedure was entirely up to the discretion of the investigator.[36]

**No Separation of Witnesses**

Furthermore, in 1994, TPD had no training, policy, or procedure requiring separation of witnesses, even though TPD understood that this was important to prevent witnesses from influencing each other or contaminating each other's identifications.[37]

**The Consequences of Inadequate Policies, Procedures, and Training**

In 1994, the Tulsa Police Department policies and training were unreasonable and absent. For many important (and basic) police responsibilities, including interviews and interrogation, disclosure of exculpatory evidence, identification procedures, and dealing with juvenile witnesses (and suspects), there should have been written policies followed by appropriate training. Written policies, training, and supervision are essential for reasonable and lawful police conduct.

---

[31] McCord Deposition, pg 63-64, 103
[32] McCord Deposition, pg 65
[33] McCord Deposition, pg 65
[34] McCord Deposition, pg 95-99
[35] McCord Deposition, pg 95, 98
[36] McCord Deposition, pg 98-99, 118
[37] McCord Deposition, pg 101, 117

The absence of reasonable and appropriate policies, training, and supervision mechanisms significantly contributed to a predictable and preventable high-risk environment, which was likely to cause the constitutional rights of citizens (such as Scott and Carpenter) to be violated. Reasonable municipal policymakers would be aware of and alert to the absence of policy, training, and supervision mechanisms. The absence of essential policies and training likely created an environment where officers and detectives would not be held accountable for any misconduct.

General policies requiring officers to obey the law or the Constitution are not enough to guide officer conduct and ensure accountability. This is not adequate, reasonable or appropriate policy. It does not address or direct the performance of police officers to a reasonable degree of specificity and relevance. It does not tell officers what the law is, or what their actions should be to conform to the law. Police officers are not lawyers. For example, understand what evidence officers must preserve, identify, and disclose in order to fulfill their constitutional responsibility to disclose exculpatory/impeachment evidence is crucial. Reasonable policymakers should have policies and training that explain what exculpatory and impeachment evidence are. A reasonable police chief or policymaker would foresee that neglecting to have such policies and procedures (with accompanying training) would very likely result in violations of law. This is particularly so with detectives who investigate crimes and frequently deal with exculpatory and impeachment evidence.

Similarly, written policies and training governing the conduct (and documentation of) suspect or witness interviews is crucial. TPD's failure to have such policies or training likely led to the use of suggestion during interviews. Detective Meek in particular asked many leading and suggestive questions during his interviews with witnesses. The failure of the TPD to have policies and training governing these topics likely caused the violations here.

TPD had nonexistent or inadequate training on key topics, including interviews and interrogations, identification procedures, and disclosure of exculpatory evidence. Reasonable policymakers would provide training in these areas.

**Other Information Required by Federal Rule of Civil Procedure 26**

My rate of compensation is $250 per hour. My CV is attached. I have no publications. I have testified at trial or deposition in the last four years, in the following cases:

Deposition Michael Liggins v. City of Chicago, October 3, 2022

Deposition Robert Bouto v. City of Chicago, January 30, 2023
Deposition John Whitney v. City of Vallejo, et al., March 16, 2023

Sincerely,

Joe Allio